Justin Carlson and Rebecca Lombard
171 Elkview Dr.
Forest City, PA 18421
570-234-9808
justin.carlson.legal@gmail.com
**Plaintiffs**

FILED
SCRANTON

MAY 0 7 2026

PER _____ _cu_
DEPUTY CLERK

## UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JUSTIN CARLSON;** **REBECCA LOMBARD;** VC, a Minor, by JUSTIN CARLSON, Guardian<br><br>**PLAINTIFFS,**<br><br>vs.<br><br>**MICHELLE GRAZIANO,** in her individual capacity; **DIANNA ROSZEL,** in her individual capacity; **BRITTANY SMITH,** in her individual capacity; **JENNIFER MCCAMBRIDGE; SUSQUEHANNA COUNTY, PENNSYLVANIA,** acting through SUSQUEHANNA COUNTY CHILDREN AND YOUTH SERVICES; **CHILDREN'S HOSPITAL OF PHILADELPHIA; LINDSEY KUNKLE; DR. ALEXANDRA MEDORO; DR. SERGEI ROUMIANTSEV; JACQUELINE CHANDLER; HEATHER OUSLEY; WAYNE MEMORIAL HOSPITAL; MORGAN SILFIES; DR. SALMAN ZAHID; DR. SHEILA HOCKMAN; CITY OF PHILADELPHIA; OFFICER JOHN DOE 1,** in his individual capacity; **OFFICER JOHN DOE 2,** in his individual capacity; **VALERIE A. ARKOOSH,** in her official capacity as Secretary of the Pennsylvania Department of Human Services<br><br>**DEFENDANTS.** | Civil Action No. 3:26-CV-1231<br><br>**(JURY TRIAL DEMANDED)**<br><br>COMPLAINT<br><br>FOR VIOLATIONS OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 AND SUPPLEMENTAL STATE LAW CLAIMS |

**TABLE OF CONTENTS**

INTRODUCTION............................................................................................. 1

JURISDICTION AND VENUE...........................................................................2

PARTIES...........................................................................................................3

FACTUAL BACKGROUND...............................................................................5

PRIVATE ACTOR STATE ACTION................................................................29

POLICY, PRACTICE, AND CUSTOM ALLEGATIONS (MONELL)................31

FAILURE TO TRAIN (MONELL)....................................................................33

42 U.S.C. § 1983 CLAIMS............................................................................. 33

STATE LAW CLAIMS.....................................................................................47

DAMAGES..................................................................................................... 56

REQUEST FOR RELIEF.................................................................................57

PRESERVATION OF EVIDENCE................................................................... 60

JURY DEMAND.............................................................................................. 60

VERIFICATION OF JUSTIN CARLSON.........................................................61

VERIFICATION OF REBECCA LOMBARD....................................................61

## INTRODUCTION

This case arises from a state-manufactured emergency used to justify the unconstitutional seizure of a medically stable child from her parents. By the time Plaintiffs were forcibly removed from their daughter's hospital bedside, the child had already received successful emergency care days earlier, had stabilized, and was improving daily. And no further life-saving procedures were performed after custody was seized, but only reductions in medication, as confirmed by medical staff. Yet it was falsely represented to a judge that life-saving treatment was being withheld and that immediate state intervention was necessary to prevent death. Those assertions were made without any oath or affirmation and were demonstrably false. After court proceedings exposed those falsities and failures, the investigation continued, while hospital Defendants used threats of more state action to override parental decision-making despite no statutory harm alleged.

This Complaint seeks relief for core constitutional and procedural violations arising from the unlawful seizure, detention, and coercive legal process initiated against Plaintiffs under color of state authority. Plaintiffs assert claims under the First, Fourth, and Fourteenth Amendments, including violations of familial association, parental autonomy, procedural and substantive due process, and the right to be free from unreasonable searches, seizures, and excessive force. The challenged conduct also supports claims under state law for malicious prosecution,

abuse of process, breach of physician-patient confidentiality, intentional infliction of emotional distress, and medical malpractice, as well as conspiracy under 42 U.S.C. § 1983. These violations were not isolated errors, but coordinated state action and systemic misconduct with serious constitutional consequences. Indeed, the Pennsylvania Superior Court has already determined that the taking *"lacked even a minimum threshold level of reliability,"* was *"in contravention"* of the governing rules, and that the CPSL investigation *"lacked authority"* while even citing to the Third Circuit that removing a child *"without an objectively reasonable suspicion of abuse … shocks the conscience."*

Among the foundational issues presented is the misuse of 23 Pa. C.S. § 6301 et seq.—Pennsylvania's Child Protective Services Law ("CPSL")—as a tool to trigger investigation, custody restrictions, and coercive state action without a lawful factual predicate, despite the profound liberty and parental interests at stake.

**JURISDICTION AND VENUE**

1.     Plaintiffs invoke this Court's jurisdiction under 28 U.S.C. §§ 1331 and 1343 for their federal 42 U.S.C. § 1983 claims, and invoke supplemental jurisdiction under 28 U.S.C. § 1367(a) for related claims arising under Pennsylvania law that are based on the same events and occurrences alleged in this Complaint.

2.     Plaintiffs invoke venue in the Middle District of Pennsylvania under 28 U.S.C. § 1391(b)(1)–(2). Defendant Susquehanna County Children and Youth Services maintains its offices in Susquehanna County. A substantial part of the

events giving rise to the claims occurred in Susquehanna County. Defendants located outside this District took actions and made communications with Susquehanna County concerning VC and Plaintiffs as described in this Complaint.

## PARTIES

## PLAINTIFFS

3. **Justin Carlson** is the biological father of VC and at all relevant times, a resident of Susquehanna County.

4. **Rebecca Lombard** is the biological mother of VC and at all relevant times, a resident of Susquehanna County.

5. **VC is a minor child**, represented in this action by JUSTIN CARLSON, her natural GUARDIAN.

## DEFENDANTS - SUSQUEHANNA COUNTY

6. **Susquehanna County, Pennsylvania**, acting through Susquehanna County Children and Youth Services (CYS), is a municipal entity/political subdivision located at 31 Lake Avenue, Montrose, Pennsylvania 18801. CYS is a county agency/department of Susquehanna County located at 75 Public Avenue, Montrose, Pennsylvania 18801.

7. **Michelle Graziano** was the Director of CYS during the events alleged.

8. **Dianna Roszel** was a supervisor at CYS during the events alleged.

9. **Brittany Smith** was a caseworker at CYS during the events alleged.

10. **Jennifer McCambridge** was counsel for CYS during the events alleged.

## DEFENDANTS - CHILDREN'S HOSPITAL OF PHILADELPHIA

11. **Children's Hospital of Philadelphia (CHOP)** is a private hospital

headquartered at 3401 Civic Center Boulevard, Philadelphia, Pennsylvania 19104. CHOP also operates a hospital campus in King of Prussia, Pennsylvania located at 550 S. Goddard Boulevard, King of Prussia, Pennsylvania 19406.

12. **Lindsey Kunkle** is a social worker who was employed by CHOP during the events alleged.

13. **Dr. Alexandra Medoro** is a physician who was employed by CHOP during the events alleged.

14. **Dr. Sergei Roumiantsev** is a physician who was employed by CHOP during the events alleged.

15. **Jacqueline Chandler** is a physician assistant who was employed by CHOP during the events alleged.

16. **Heather Ousley** is a social worker who was employed by CHOP during the events alleged.

**DEFENDANTS - WAYNE MEMORIAL HOSPITAL**

17. **Wayne Memorial Hospital (WMH)** is a private hospital located at 601 Park Street, Honesdale, Pennsylvania 18431.

18. **Morgan Silfies** is a social worker who was employed by WMH during the events alleged.

19. **Dr. Salman Zahid** is a physician who was employed by WMH during the events alleged.

20. **Dr. Shelia Hockman** is a physician who was employed by WMH during the events alleged.

## DEFENDANTS - CITY OF PHILADELPHIA

21. **Officer John Doe 1** is a Philadelphia Police Department officer whose true name is unknown to Plaintiffs. Plaintiffs allege he is Officer GRIFFIN, Badge No. 6663, assigned to District 18.

22. **Officer John Doe 2**, is a Philadelphia Police Department officer whose true name is unknown to Plaintiffs. Plaintiffs allege he is Officer BELLO, Badge No. 1193, assigned to District 18.

23. **City Of Philadelphia** is a municipal corporation in the Commonwealth of Pennsylvania.

## DEFENDANTS - DEPARTMENT OF HUMAN SERVICES (DHS)

24. **Valerie A. Arkoosh** is the Secretary of DHS. Plaintiffs seek injunctive and declaratory relief in connection with DHS.

## FACTUAL BACKGROUND
*All dates refer to events in 2024 unless otherwise explicitly identified.*

25. **Plaintiffs' daughter, VC, was born at Wayne Memorial Hospital (WMH) in Honesdale, Pennsylvania, in 2024.**

26. Justin Carlson and Rebecca Lombard are VC's biological parents.

27. VC was born with a large, circular area of discoloration on her scalp.

28. WMH obstetrician Defendant Dr. Sheila Hockman (Dr. Hockman) was present during VC's delivery.

29. Plaintiffs asked Dr. Hockman about VC's scalp discoloration after delivery.

30. Dr. Hockman did not tell Plaintiffs that the scalp discoloration required evaluation or treatment.

31. Plaintiffs consented to measurement, weighing, vital signs, glucose checks, and a blood draw.

32. VC's blood was drawn around 12:00 am on August 4.

33. Plaintiffs were told the blood draw was to assess blood type and jaundice.

34. WMH staff told Plaintiffs that VC's blood type was A negative.

35. On August 4, WMH pediatrician Defendant Dr. Salman Zahid (Dr. Zahid) performed a Ballard gestational-age assessment and estimated 34–35 weeks.

36. On August 4, WMH employed social worker, Defendant Morgan Silfies (Silfies) told Plaintiffs that due to policy, she was filing a report because Rebecca had no medical insurance and had not had prenatal doctor visits.

37. On August 4 Silfies caused a report (Wayne Report) to be filed under 23 Pa.C.S. § 6301 et seq. (CPSL).

38. The Wayne Report alleged that Rebecca *"had no prenatal care," "no medical insurance," "took prenatal vitamins during pregnancy,"* and *"was appropriate and bonding with newborn."*

39. On August 4, WMH medical staff told Plaintiffs that because Rebecca declined postpartum testing, discharge would occur at 48 hours (8:30 p.m. on August 5), and Plaintiffs agreed.

40. On August 5 morning, Dr. Zahid told Plaintiffs VC was clear for discharge, then 1–2 hours later, he denied discharge referencing gestational age protocol.

41. Dr. Zahid told Plaintiffs VC had no health concerns.

42. Dr. Zahid told Plaintiffs: VC would be safe at home; that he had no apnea

concerns; that Plaintiffs appeared to be appropriate caregivers; that jaundice was possible, but common and manageable at home, with home phototherapy; and instructed Plaintiffs to seek care for fever or feeding problems.

43. On August 5, Dr. Zahid told Plaintiffs that due to policy, a report would be filed because Plaintiffs declined vaccines for VC.

44. Plaintiffs chose to discharge VC on August 5 based on (a) repeated statements that CPSL reports would be filed regarding routine parental decisions, (b) the absence of any health concern communicated to them at that time, (c) Dr. Zahid's original verbal discharge approval, (d) Dr. Zahid's gestational age estimate, and (e) concern about out-of-pocket costs.

45. Dr. Zahid did not ask Plaintiffs to remain at WMH to monitor for jaundice.

46. On August 5, Dr. Zahid supplemented the Wayne Report which asserted: *"peds doctor at the hospital wanted baby to stay till 35 weeks"* and *"parents have strong beliefs about vaccines."*

47. The Wayne Report states: *"no current child abuse and/or neglect reported."*

48. The Wayne Report does not mention jaundice, head bruising, or any other imminent health concerns.

49. WMH staff told CYS that Plaintiffs' August 5 discharge was not against medical advice and that no imminent health concerns were identified.

**50. On August 5, CYS caseworker Defendant Brittany Smith (Smith) called Plaintiffs, in which Plaintiffs told Smith they did not require CYS services.**

51. On August 7, Smith and CYS caseworker Chad Weaver (Weaver) made an unannounced visit to Plaintiffs' property.

52. Smith and Weaver called Plaintiffs on August 7.

53. Smith and Weaver told Plaintiffs it was their policy to see the home and the child upon receiving any CPSL report.

54. Plaintiffs denied Smith and Weaver access and requested a supervisor.

55. On August 7, Plaintiffs spoke with Defendant Diana Roszel (Roszel).

56. Roszel told Plaintiffs that CYS must investigate all CPSL reports.

57. Roszel told Plaintiffs her staff needed to see VC for medical reasons.

58. Roszel told Plaintiffs that Smith and Weaver were not medical professionals and that she had no knowledge of any medical issue involving VC.

59. Plaintiffs told Roszel that WMH had discharged VC with no health concerns identified and that Plaintiffs would seek redress if CYS continued its involvement without articulating any abuse or neglect allegation.

60. Roszel referenced *"a dead child in a closet someplace"* and that CYS needed to see if the *"baby is alive"*, and CYS would continue its investigation.

61. After Plaintiffs denied access to their home and to VC, and said they would seek redress, Roszel stated she could involve the court.

62. Smith, Weaver, and Roszel did not tell Plaintiffs that the Wayne Report stated *"no current child abuse and/or neglect reported."*

63. Plaintiffs did not threaten violence toward any CYS employee.

64. After CYS's contact, Plaintiffs researched reports of CYS abuse and, experiencing intense anxiety and distress, feared an unannounced seizure of VC and interpreted Roszel's court statement as a near-term threat.

**COMPLAINT - 8**

65. While Rebecca recovered postpartum and cared for her newborn, and fearing CYS, Plaintiffs temporarily left Pennsylvania to stay with family in New Jersey, arriving late night on August 8.

**66. On August 9, VC stopped feeding and her temperature dropped, so Plaintiffs brought her to Shore Memorial Hospital (SMH) for emergency care.**

67. At SMH, staff administered antibiotics, attempted intubation but were unable to intubate VC, and arranged transfer to CHOP.

68. A CHOP transport team arrived at SMH, sedated VC, intubated her, and transported her to CHOP in the early morning hours of August 10.

69. Plaintiffs consented to CHOP's recommended treatments for VC, including double-volume exchange transfusion, dopamine, phenobarbital, antibiotics, vitamin k, lumbar puncture, and brain-activity monitoring.

70. Plaintiffs' observed from August 11–12 that VC did not have a fever.

71. By August 12, CHOP had performed infection tests, and none was positive.

72. CHOP administered ampicillin and cefepime for suspected infection.

73. On August 12 at approximately 10:00 a.m., during morning rounds with Plaintiffs, Defendant Dr. Alexandra Medoro (Dr. Medoro) was present.

74. During the August 12 morning rounds, VC's status was described as *"stable in the last 24 hours."*

**75. On August 12, Plaintiffs questioned CHOP's meningitis regimen expressly raising concerns about the use of ampicillin/cefepime, the number of**

**concurrent medications, and the necessity of a lumbar puncture when antibiotics would be given regardless of infection test results.**

76. Plaintiffs did not refuse any CHOP recommended treatment.

77. Plaintiffs declined two diagnostic tests: HIV testing and genetic testing.

**78. On August 12, Defendant Michelle Graziano (Graziano), while employed as CYS Director, requested a Pa.R.J.C.P. 1210 protective custody order by telephone (Ex Parte Call) from Judge Jason Legg (Judge Legg) of the Susquehanna County Court of Common Pleas (Trial Court).**

79. Graziano represented to Judge Legg that VC had organs shutting down, was near death, and Plaintiffs were denying medical care that would keep VC alive.

80. At 3:30 p.m. on August 12, Judge Legg issued a verbal protective custody order (Verbal Order) granting CYS legal and physical custody of VC.

81. The Verbal Order barred Plaintiffs from making medical decisions for VC.

82. No CYS employee was physically present with VC or at CHOP for any events preceding issuance of the Verbal Order.

83. Graziano was not placed under oath when requesting protective custody.

84. No witnesses were presented to Judge Legg on August 12.

85. Graziano presented no witness affidavits to Judge Legg on August 12.

86. Graziano presented no CPSL reports to Judge Legg on August 12.

87. Plaintiffs were not included on the Ex Parte Call.

88. Plaintiffs were not provided notice of the Ex Parte Call.

89. The Verbal Order was issued without any supporting oath or affirmation.

90. The Verbal Order granted protective custody over a minor.

**91. After the Verbal Order was issued, Roszel told CHOP social worker Defendant Lindsey Kunkle (Kunkle) to file a CPSL report.**

92. On August 12 at approximately 3:47 p.m., Kunkle submitted a CPSL report (CHOP Report) after Roszel instructed her to do so.

93. Dr. Medoro certified the CHOP Report as a "near fatality".

94. Kunkle and Dr. Medoro first joined VC's care team on August 12.

95. Before the CHOP Report was filed, Roszel told Kunkle that CYS had obtained a Verbal Order and Plaintiffs had threatened violence toward CYS staff.

96. Kunkle did not initiate the CHOP Report of her own volition.

97. Kunkle disclosed VC's medical information to CYS before any CPSL report of suspected abuse or neglect existed.

**98. At ~7:15 p.m. on August 12, CHOP social workers and security approached Plaintiffs in the secured NICU hallway (7:15 Interaction) asking Plaintiffs to leave the NICU.**

99. On August 12, CHOP staff never saw any written order pertaining to VC.

100. Plaintiffs declined to leave the NICU absent a court order.

101. A CHOP social worker who identified as Kiwana [1] told Plaintiffs they can go to VC's room and she would bring the order to Plaintiffs.

---

[1] Kiwana is likely spelled incorrectly.

102. Plaintiffs remained calm, did not threaten anyone, and walked to VCs unit.

103. Between ~7:15 and ~8:00 p.m., no police or security were present at VC's unit while Plaintiffs and Mike Lombard were with VC.

**104. At ~8:00 p.m., approximately 15 individuals approached VC's unit, including CHOP medical staff, CHOP social workers, CHOP security, and Philadelphia police (8:00 Interaction).**

105. During the 8:00 Interaction, Graziano participated by speakerphone.

106. Graziano told Plaintiffs: *"it is my understanding, you are going to have to leave the hospital."*

107. A CHOP social worker told Plaintiffs: *"The order is saying upon further notice, you are not able to be permitted at the hospital, no contact to the hospital until they further the investigation."*

108. Graziano stated CYS had legal and physical custody of VC and medical decision-making authority.

109. CHOP security lieutenant Jeff told Plaintiffs, *"We're asking you to leave."*, *"You are defying trespass right now."*, and *"You're restricted from CHOP."*

110. Police asked whether Plaintiffs were refusing to leave and Plaintiffs said they would not leave without a court order, but would not resist or fight.

111. Defendant Officer JOHN DOE 1 (Officer Doe 1) is a Philadelphia Police Department officer who responded to CHOP's Philadelphia NICU on August 12, 2024 at approximately 8:00 p.m.

112. On information and belief, Officer Doe 1 is Officer GRIFFIN, Badge No. 6663, assigned to District 18.

113. Defendant Officer JOHN DOE 2 (Officer Doe 2) is a Philadelphia Police Department officer who responded to CHOP's Philadelphia NICU on August 12, 2024 at approximately 8:00 p.m.

114. On information and belief, Officer Doe 2 is Officer BELLO, Badge No. 1193, assigned to District 18.

115. Officer Doe 1 handcuffed Plaintiff Carlson for alleged trespass.

116. Officer Doe 2 handcuffed Plaintiff Lombard for alleged trespass.

117. No warrant was produced to Plaintiffs or to the officers before arrest.

118. Philadelphia police did not state they observed any immediate danger to VC.

119. At the time of arrest, Officer Doe 1 and Officer Doe 2 were on-duty Philadelphia Police Department officers employed by the City of Philadelphia.

120. At ~8:15 p.m., police handcuffed Plaintiffs inside CHOP's badge-restricted NICU, where, as VC's parents, they were authorized visitors with 24 hour access.

121. During the 8:00 Interaction, Graziano did not tell CHOP staff, CHOP security, or police not to separate Plaintiffs from VC.

122. Carlson remained compliant and didn't resist while being handcuffed.

123. Officer Doe 1 searched Carlson and seized his belongings.

124. Officer Doe 1 told Carlson, "*You are already detained so anything on your person I'm going to take in, and we're going to put it on an inventory.*"

125. Officer Doe 1 told Carlson, "*You were told, you were not allowed to be here.*", "*You said you were refusing to leave.*", and "*That's defying trespass.*"

**COMPLAINT - 13**

126. Officer Doe 1 told Carlson, *"I don't know what's going on."*

127. Officer Doe 1 told Carlson, *"I don't know what you are going through, I don't know what the hospital did but they asked you to leave and you're not leaving."*

128. Officer Doe 1 removed Carlson from CHOP without a warrant.

129. Officer Doe 1 placed Carlson in a police vehicle and said *"You're under arrest actually bud."* and when asked why, he said *"For trespass."*

130. Officer Doe 2 asked Rebecca to leave voluntarily.

131. When Rebecca declined to leave voluntarily, Officer Doe 2 asked if she thought it was smart to get arrested and locked up.

132. Officer Doe 2 stated he did not know why he was arresting Rebecca.

133. Rebecca was nine days postpartum and physically in pain when arrested.

134. Officer Doe 2 pushed Rebecca for walking slowly.

135. Officer Doe 2 removed Rebecca from CHOP without a warrant.

136. After being handcuffed and physically restrained for approximately 30 minutes, Plaintiffs were released and escorted off of CHOP property.

137. Police told Plaintiffs if they return, the "simple trespass" will become "criminal trespass" and Plaintiffs will be arrested.

**138. City of Philadelphia later treated Plaintiffs' August 12 "Simple Trespass" citations as "Disorderly Conduct."**

139. On August 12, Plaintiffs were each handed a document titled "CITY OF

PHILADELPHIA CODE VIOLATION NOTICE" (Citations) referencing 18 Pa. C.S. § 3503(b.1), "Simple Trespass."

140. The Citations stated: *Abv was asked to leave CHOP by security. Abv refused.*

141. On or about October 1, the City of Philadelphia mailed each Plaintiff a "NOTICE OF CODE VIOLATION" (Citation Notices).

142. The Citation Notices described the violation code as "Disorderly Conduct."

143. The Citation Notices contained a scanned image of the original August 12 Citations, which charged "Simple Trespass."

144. The charges were changed from "Simple Trespass" to "Disorderly Conduct."

**145. On August 13, Graziano verified under 18 Pa. C.S. § 4904 a Pa.R.J.C.P. 1240 Shelter Care Application (Shelter Application) for VC.**

146. Before the Shelter Application, no CYS employee, including Graziano, had personally observed VC or her care at CHOP.

147. The Shelter Application asserted: *"Child is currently receiving life-saving measures as the child's organs are reportedly shutting down. [Referral Source] is concerned that child will not live if these measures are not allowed to be provided and testing is not done to know how to best treat the child's medical conditions."*

148. The CHOP Report did not allege that Plaintiffs attempted to prevent life saving measures or any documented organ failure.

149. On August 13, CYS attorney, Defendant Jennifer McCambridge (McCambridge) signed and filed the Shelter Application.

150. McCambridge knew that neither Graziano nor any other CYS agent had

personally observed VC or her care prior to filing.

151. McCambridge filed the Shelter Application without attaching any medical records, witness affidavits, CPSL reports supporting Graziano's assertions.

152. On August 13, the Trial Court filed "CONFIRMATION OF VERBAL ORDER FOR EMERGENCY PROTECTIVE CUSTODY" (Confirmation Order) and "ORDER FOR EMERGENCY PROTECTIVE CUSTODY" (Protection Order) (collectively as Custody Orders).

153. The Custody Orders granted legal and physical custody to CYS and ordered that "*The agency has the ability to sign for any medical consent needed for the care of the child*".

**154. On August 14 at 3:30 pm, the Trial Court held a Pa.R.J.C.P 1242 shelter care hearing (Shelter Hearing).**

155. CYS's proposed "SHELTER CARE ORDER" was seeking physical and legal custody to remain with CYS, placement to remain in CHOP, and protective supervision under the agency.

156. CYS's proposed "SHELTER CARE ORDER" was seeking: "*Mother and Father to obtain a Mental Health evaluation ... participate in nurturing parents education ... cooperate with announced and unannounced home visits ... sign consents to release information for all providers ... participate in Family Group Decision Making... cooperate with CHOP staff and follow recommendations for child's care and treatment*"

157. Dr. Medoro testified that infection was a "*diagnosis of exclusion*" and that she did not "*have a definitive diagnosis at this time.*"

158. Dr. Medoro testified that "*at no point did this family, for me, impair the medical care of this child.*"

159. Dr. Medoro testified that the discharge summary from WMH that she reviewed did not state any illnesses, symptoms, or signs to be concerned of.

160. Kunkle testified that she wasn't aware of Plaintiffs refusing any testing or treatment at CHOP other than genetic testing.

161. Kunkle testified that she had no allegations of serious physical neglect.

162. Kunkle testified that she did not make the CHOP Report of her own volition.

163. Kunkle testified that *"today is the first time I'm hearing anything about organs shutting down."*

164. Graziano testified that *"Mr. Carlson did not threaten my staff."*

165. During the Shelter Hearing, CYS withdrew the Shelter Application and Judge Legg vacated the Custody Orders.

166. CHOP Attorney Boswell, attended the Shelter Hearing virtually.

167. At the Shelter Hearing, Attorney Boswell stated that *"So now that it sounds like your legal custody is restored, then we can reevaluate that visitor restriction. Although, I will say that the team was very disturbed by the events that happened on Monday night. And so we'll need to have some discussions about ground rules."*

168. Attorney Boswell was virtually present when Judge Legg stated *"Quite frankly, the Court never ordered, never ordered, that the parents couldn't be around their child or in the presence of their child."*

**169. Plaintiffs returned to CHOP at approximately 11:00 p.m. on August 14.**

170. On August 14, CHOP held a "ground rules" meeting with nursing/social leadership before re-issuing NICU ID cards, causing ~30 minutes of waiting plus a

~30 minute meeting.

171. Plaintiffs reunited with VC at ~12:00 a.m. on August 15.

172. Plaintiffs were not permitted to exercise medical decision-making authority for approximately 50 hours (Aug. 12, 3:30 p.m.–Aug. 14, 5:30 p.m.).

173. Including Plaintiffs travel time from the courthouse (6-6:30 pm) to their property (7:30-8pm), then to CHOP (11:00pm), Plaintiffs were physically separated for approximately 52 hours (Aug. 12, 8:15 p.m.–Aug. 15, 12:00 a.m.).

**174. After CYS obtained custody, CYS authorized a genetic test of VC.**

175. CHOP told Plaintiffs VC was "stable" before suggesting a genetic test.

176. CHOP asked for consent after suggesting a genetic test.

177. CHOP's geneticist told Plaintiffs the test would likely be inconclusive.

178. Nobody told Plaintiffs refusing a genetic test increased any risk to VC.

179. Plaintiffs denied genetic testing of VC before CYS obtained custody.

180. CYS never asked Plaintiffs for consent to genetic test VC.

181. CYS did not seek a court order authorizing a genetic test of VC.

182. No hearing preceded CYS's authorization of genetic testing of VC.

183. CYS authorized genetic testing without any treating physician first telling a court the test was necessary.

184. Plaintiffs were told genetic test results take 2-4 weeks.

185. The genetic test results found nothing related to VC's emergency.

186. Plaintiffs are VC's biological parents, and VC's genetic results necessarily contain information about Plaintiffs' genetics.

187. By letter dated October 23, CHOP denied Plaintiffs' demand to immediately delete VC's genetic data, stating it would retain the data for years.

188. CHOP's refusal letter said it is holding on to VC's *"raw genetic test data"*, a *"vast size of information"* in the *"GDL"* and the result in CHOP *"medical records."*

189. CHOP staff told Plaintiffs the genetic test would be billed under the hospitalization and is not itemized.

**190. By August 12, Plaintiffs were told that no additional life-saving procedures were planned and that VC's care consisted of monitoring, maintenance care, and weaning off interventions.**

191. On August 15, CHOP's team told Plaintiffs that VC's improvement continued, they reduced medications, and meningitis was never confirmed.

192. On August 15, CHOP's team told Plaintiffs that *"either way, she's going to get treated for meningitis."*

193. On August 15, CHOP's team told Plaintiffs that VC's *"liver levels are good."*

194. On August 15, Rebecca told the CHOP team, her milk supply dropped from what it previously was due to events taking place from August 12-15.

**195. After the Shelter Hearing, CYS continued contacting Plaintiffs and VC's providers.**

196. After being reunited with VC, Plaintiffs feared further CPSL reports,

trespass orders or arrest, and no longer knew what they could safely say or question regarding their daughter's care.

197. On September 9, Kathryn Woosnam of Montgomery County Child and Youth arrived unannounced at VC's hospital room trying to photograph VC.

198. On September 10, Graziano emailed Plaintiffs to schedule a home visit after CHOP informed her VC would be discharged soon.

199. After VC's discharge, Plaintiffs feared going to a known address and stayed at AirBnBs and temporary apartments until their October 15 Injunction hearing.

200. On September 13, Plaintiffs filed an emergency injunction seeking to end the CPSL investigation.

201. In an Appeal of Plaintiffs Injunction, the Pennsylvania Superior Court held that *"CYS did not establish a causal nexus between Appellants' conduct and V.C.'s condition"* and that *"[a]ccordingly, CYS lacked authority to initiate the CHOP referral investigation."*

**202. On August 19, after CHOP staff said it was *"in a super bed crunch"* and that VC was *"one of our healthier babies,"* Plaintiffs approved transfer to CHOP–King of Prussia.**

203. The August 19 transfer summary from CHOP-Philadelphia noted *"Bilateral posterior fossa subdural hematomas; perhaps related to delivery process."*

204. On August 19, VC's CHOP-Philadelphia neonatologist told Plaintiffs he believed VC's crisis was not due to a metabolic issue or central nervous system infection but instead due to cephalohematoma paired with prematurity.

**205. In the week leading up to August 26, a nurse informed Rebecca during a diaper change that VC had grey stool.**

206. Out of fear, Rebecca did not initially tell CHOP staff that she believed grey stool could indicate liver dysfunction.

207. In the week leading up to August 26, Rebecca also noticed grey stool but didn't raise the issue, because she feared questioning CHOP's treatment plan again.

208. On or about August 26, Rebecca finally raised the liver concerns, and CHOP discontinued phenobarbital ahead of schedule.

209. Approximately 10 days after CHOP documented good liver levels, Rebecca observed grey stool.

210. Plaintiffs feared medication-related liver effects when they questioned CHOP's drug regimen on August 12 in the absence of an infection diagnosis.

211. VC's grey stools cleared up after phenobarbital was discontinued.

**212. On or about August 26, CHOP performed a newborn hearing screening (OAE and AABR) without Plaintiffs' consent.**

213. A hearing test would not result in knowledge of the cause of high bilirubin.

214. At the time of the hearing screening, VC was ~37-38 weeks gestational age and still under the effects of phenobarbital.

215. Plaintiffs wanted to delay the screening due to VC's age, current phenobarbital effects, and already witnessing VC respond to sound.

216. Plaintiffs feared verbally stating they wanted to postpone the screening.

217. Plaintiffs were billed for the hearing screening.

**218. On August 28, Defendant Dr. Sergei Roumiantsev (Dr. Roumiantsev), and Defendant Jacqueline Chandler (Chandler), told Plaintiffs VC required a fortifier because her weight gain was below a 25g 7/day average.**

219. Total Parenteral Nutrition (TPN) liquids were discontinued ~August 22, which Dr. Roumiantsev told Plaintiffs temporary weight loss can follow.

220. CHOP's medical records show weight drops of -60g on August 22 and -50g on August 24 and no recorded weight for August 23.

221. Excluding Aug 22-24, VC's 7/day weight gain averages were (Aug 24: 28.33g; Aug 25: 32g; Aug 26: N/A; Aug 27: 44g; Aug 28: 39g; and Aug 29: 35g). (*note: no new weight recorded for Aug 26 to obtain a new average.*)

222. On August 28, Plaintiffs asked to wait longer to confirm continued weight-gain progress without fortifier supplementation.

223. Dr. Roumiantsev said refusing a fortifier would be against medical advice.

224. On August 14, Kunkle testified that, at CHOP, "against medical advice" decisions warrant reports.

225. Plaintiffs signed a fortifier waiver on August 28 that mentioned potential infection/HIV risks and stated no guarantee it would work as represented.

226. Plaintiffs signed the fortifier waiver out of fear of more CPSL reports.

227. CHOP began fortifying on August 29 and later increased its caloric concentration multiple times.

228. When adjusting for TPN removal, VC's subsequent weight-gain rate did not exceed the Aug 24–29 post-TPN averages CHOP relied on to require a fortifier.

229. Plaintiffs were billed for milk fortifier.

**230. On September 6, Dr. Roumiantsev and CHOP social worker Defendant Heather Ousley (Ousley) told Plaintiffs that identifying a follow-up pediatrician was a condition of discharge.**

231. Dr. Roumiantsev told Plaintiffs he could not discharge VC without meeting hospital and state follow-up requirements regarding a follow-up pediatrician.

232. Plaintiffs feared that CYS or CHOP would contact follow-up care providers and prompt more CPSL reports.

233. Dr. Roumiantsev told Plaintiffs it was "against medical advice" if they did not provide the name of a follow up pediatrician.

234. Ousley told Plaintiffs that CPSL reporting was a team decision.

235. Plaintiffs chose a local pediatrician from a list provided by CHOP.

236. Plaintiffs did not want to use the local pediatrician for VC's follow-up care.

237. CHOP staff provided the name of the local pediatrician to CYS.

238. Plaintiffs denied CHOP's medical staff and Ousley's repeated suggestions for the PA Early Intervention program.

239. On September 6, Chandler faxed VC's medical information to PA Early Intervention without consent.

240. CHOP required Plaintiffs to purchase a fortifier and bring it to the hospital

as a condition of discharge.

**241. On September 11, the night before VC's discharge, the attending nurse fed VC before her scheduled pre-feed weighing.**

242. On September 12, CHOP staff recorded that VC had gained 100g overnight.

243. VC's prior 7/day average weight gain was allegedly below 30g per day.

244. The 100g overnight gain put VC above CHOP's stated 7-day, 30g discharge benchmark, and CHOP discharged VC later that day, on September 12.

245. CHOP prolonged hospitalization waiting for a 30g 7/day average.

246. From about August 20 until discharge, Plaintiffs performed most feedings and diaper changes, and some baths and physical therapy massages themselves.

247. Plaintiffs were billed for fortifiers, unitemized services, and extended stay.

**248. A hearing was held on October 15 for Plaintiffs motions.**

249. Plaintiffs first requested the CPSL reports orally on August 7.

250. Plaintiffs requested the CPSL reports in writing with an Aug 13: Injunction; Aug 23: Motion; Sep 5: Fax; Sep 6: Text; Sep 9: Motion; Sep 13: Injunction.

251. At the August 14 Shelter Hearing, Graziano didn't inform the Trial Court that Parents have a right to the CPSL reports.

252. CYS first provided the CPSL reports to Plaintiffs on October 15.

253. CYS first provided the CPSL reports to Judge Legg on October 15.

254. CYS did not provide Plaintiffs the Wayne or CHOP Reports until after deeming them unfounded.

255. At the October 15 Hearing, CYS presented Plaintiffs with a third CPSL report concerning VC (CHOP-Extended Report).

256. On October 15, Graziano testified that the Wayne and CHOP-Extended Reports were not reports of child abuse.

257. On October 15, Graziano testified there were no current child abuse reports.

258. The Wayne, CHOP, and CHOP-Extended Reports were produced to Plaintiffs with redactions.

259. Both before the CHOP Report was filed and after it was unfounded, CYS accessed VC's medical information and communications with VC's providers.

260. The Pennsylvania Superior court held that the August 12 CHOP Report did *"not fall within the statutory definition of child abuse"*.

261. On October 15, Graziano testified that about 80% of reports do not meet the threshold of "child abuse".

262. On October 15, Graziano testified that the CPSL has other categories of "neglect" that are outside the definition of "child abuse".

263. On October 15, Graziano was unable to cite to a single provision of the CPSL that authorized investigation for reports that are not of "child abuse."

264. On October 15, without citing a single provision, Graziano testified that non child abuse reports fall under different investigative processes.

265. On October 15, Graziano testified that she has been in the field of child welfare since 2005.

266. On October 15, Graziano testified that as Director, she was required to

obtain ongoing education regarding changes in the CPSL.

267. On October 15, Graziano testified that she did not treat this case any differently than she would treat any other referral.

268. On October 15, Graziano testified that she did not do anything different in this case than she would have done in any other case throughout her experience.

269. On October 15, Graziano testified that nobody at her agency acted in any way differently than they would in any other case based on these circumstances.

**270. The CHOP-Extended Report stated that Plaintiffs had refused to provide VC's medical information to CYS upon request.**

271. The CHOP-Extended Report stated: "*Child is currently safe and received the immediate follow up medical care recommended.*"

272. On October 15, Graziano testified that CYS had no information regarding follow up care and it was entirely possible Plaintiffs did provide follow up care.

273. The CHOP-Extended Report included statements of communications between Plaintiffs and VC's Advocare Pediatrician (Dr. Radhika Lakhani).

274. Dr. Lakhani testified that she didn't file a CPSL report against the Plaintiffs.

275. Dr. Lakhani testified that she only spoke with Graziano from CYS.

276. On October 15, McCambridge stated: "*And Your Honor, for clarity, the newest report that's dated October of 2024 is not from CHOP.*"

277. McCambridge knows who filed the CHOP-Extended Report.

278. Graziano requested VC's medical information from Dr. Lakhani.

279. Dr. Lakhani provided a letter to CYS speaking of VC's medical information.

280. The CHOP-Extended Report states: *"A letter was provided to the Agency during the course of a CPS investigation regarding Medical Neglect."*

281. The CHOP-Extended Report states: *"Follow up needs for the child are documented in the CHOP summary and through a letter from the pediatrician at Advocare."*

282. Graziano and/or CYS agents used the letter from Advocare as a reason to open the CHOP-Extended Report.

283. Dr. Lahkani was unaware that Graziano was using the Advocare letter to initiate a new CPSL report.

284. Graziano filed or caused the CHOP-Extended Report to be filed.

**285. On November 6, Smith verified a Pa.R.J.C.P 1330 dependency petition (Petition) alleging VC *"is without proper care or control"*.**

286. On November 6, McCambridge filed the Petition to the court.

287. On October 15, Graziano testified that if CYS was unable to determine if the child's needs are being met, they would probably file for in-home dependency.

288. Smith was the caseworker assigned to the CHOP-Extended Report.

289. Smith lacked personal knowledge of some assertions in her Petition.

290. Smith's Petition asserted Plaintiffs did provide medical care for VC.

291. Graziano, Roszel, Smith, and McCambridge attended the August 14 Shelter Care Hearing.

292. Before filing her Petition, Smith knew that WMH staff told CYS staff that Plaintiffs did not leave against medical advice.

293. Before filing her Petition, Smith knew that WMH staff told CYS staff that VC did not have any imminent health issues identified when discharged.

294. Before filing her Petition, Smith knew that Dr. Medoro testified that "*at no point did this family, for me, impair the medical care of this child.*"

295. Before filing her Petition, Smith knew the CHOP-Extended Report stated "*Child was released from CHOP*" and VC "*went to two follow up appointments*".

296. Before filing her Petition, Smith knew CYS had already deemed the Wayne and CHOP Reports unfounded.

297. Smith's petition stated: "*As of this filing, the Agency has not been provided with any information regarding current follow up care or treatment.*"

298. Smith's petition stated: "*the family refuses to provide information regarding follow up care, and has refused access to the child.*"

299. Smith's petition was after Plaintiffs filed Injunctions seeking relief from CYS investigations and filed a bar complaint against McCambridge.

300. On December 10, Smith testified that she, Roszel, and McCambridge all worked together to file the Petition.

301. The CHOP Report lists Brittany Smith under "INVESTIGATING WORKER NAME".

302. Both Smith and Roszel testified while under oath that Smith was not involved in the Wayne and CHOP Report investigations.

303. After the October 15 hearing, Graziano resigned from her position at CYS.

304. On December 10, Smith's Petition was dismissed in favor of Plaintiffs for no clear and convincing evidence.

305. **As a result of the foregoing**, Plaintiffs were separated from their newborn, arrested in front of family and hospital staff, deprived of the care, custody, companionship, and control of their child, and publicly accused of abuse, causing severe emotional distress, humiliation, reputational harm, psychological trauma, and lasting disruption of familial association. Plaintiffs also incurred monetary losses, including travel, hotels, and work-related costs, litigation expenses, and substantial loss of time diverted from family care and employment responsibilities.

## PRIVATE ACTOR STATE ACTION
### *(Joint Action, State Compulsion, and Entwinement)*

306. The Wayne Report initiated by Silfies and supplemented by Dr. Zahid stated no current child abuse and/or neglect reported, while disclosing VC's medical information to CYS which triggered a state investigation.

307. WMH maintained policies or practices encouraging CPSL reports even where no statutory category of child abuse or neglect was alleged.

308. Those WMH policies or practices resulted in differing opinions being submitted through the CPSL process and treated by CYS as actionable.

309. After the Wayne Report, CYS contacted Plaintiffs, Roszel spoke of court action, Graziano obtained the protective custody order, Roszel directed Kunkle to file the CHOP Report, and Plaintiffs were separated from VC.

310. On August 12, before submitting any report, Kunkle disclosed VC's medical

information to CYS, despite the only report on file being the Wayne Report stating no abuse or neglect reported.

311. On August 12, and not of her own volition, Kunkle filed a CPSL report after direction from Roszel, and Dr. Medoro certified it as a "near fatality".

312. CHOP staff coordinating in real time with Graziano on speakerphone represented that a "court order" barred parental access, summoned Philadelphia Police, and had Plaintiffs' removed from CHOP, while no separation order existed.

313. CHOP performed genetic testing on VC under CYS's authorization.

314. At ~11:00pm on August 14, after custody was restored, CHOP prolonged Plaintiffs' access to VC until after a "ground rules" meeting.

315. Dr. Roumiantsev, Chandler, and Ousley told Plaintiffs that, under CHOP policy, not following CHOP's recommendations would be "against medical advice," causing Plaintiffs to make decisions out of fear that they otherwise would not have made.

316. Chandler transmitted VC's medical information to Pa Early Intervention without parental consent prompting more state involvement.

317. Dr. Roumiantsev and Ousley told Plaintiffs that naming a follow-up pediatrician was required for discharge and refusing was "against medical advice."

318. Based on these facts, Plaintiffs allege that WMH, Silfies, Dr. Zahid, CHOP, Kunkle, Dr. Medoro, Dr. Roumiantsev, Chandler, and Ousley acted under color of state law for purposes of 42 U.S.C. § 1983.

**POLICY, PRACTICE, AND CUSTOM ALLEGATIONS (MONELL)**

319. Defendant CYS developed and maintained policies, practices, customs, and/or de facto policies known to and approved by final policymakers, including Director Graziano and supervisors, including but not limited to the following:

   a. seeking protective custody orders without sworn witness support, affidavits, or attached supporting records;

   b. seeking emergency or continued custody without filing a dependency petition;

   c. initiating CPSL investigations without allegations of child abuse;

   d. using emergency custody and shelter care procedures to transfer custody before any dependency adjudication;

   e. withholding CPSL reports from parents until after reports were closed;

   f. authorizing genetic testing without notice or hearing;

   g. accessing medical information absent an open child abuse report;

   h. redacting reports that were not alleging child abuse;

   i. expanding the CPSL beyond its statutory terms;

   j. treating non-abuse medical or parenting disagreements as CPSL matters;

   k. using dependency petitions to take over parental medical decision-making;

   l. having agents verify shelter care applications and dependency petitions without personal knowledge or supporting affidavits from witnesses;

   m. filing dependency petitions without specific facts alleging lack of proper care or control;

   n. requiring mental-health evaluations, parenting classes, home visits, releases, and similar conditions before reunification;

   o. continuing or escalating agency action after parents objected, sought redress, or questioned agency authority;

   p. continuing child abuse investigations after evidence showed no child abuse;

q. declining to address and condemn false child abuse reports;

r. agency personnel inducing CPSL reports absent abuse allegations;

s. acting with intentional and/or reckless disregard of the Constitutional rights of individuals, including all Plaintiffs herein and those similarly situated.

320. Defendant City of Philadelphia developed and maintained policies, practices, and/or customs including but not limited to:

a. removing parents from their children at hospital request without requiring officers to review a written order or assess imminent danger;

b. conducting searches and seizures without a warrant or exigency;

c. using excessive force;

d. altering code violation charges after issuance;

321. Defendant CHOP maintained and implemented internal practices used jointly with government officials that include but are not limited to:

a. requiring or encouraging CPSL reports in non-abuse circumstances;

b. using CPSL reporting to override parental medical decision-making;

c. restricting access and enforcing parent-child separations absent an order;

d. forcing and billing for unnecessary services and extended hospitalization under threats of CPSL reporting;

e. transmitting medical information to third parties without parental consent.

322. Defendant WMH maintained and implemented internal practices used jointly with government officials that include but are not limited to:

a. directing or encouraging CPSL reports in non-abuse circumstances;

b. using CPSL reporting to override parental medical decision-making;

c. transmitting medical information to third parties without parental consent.

323. Plaintiffs allege that the policies, practices, and customs identified above

were a moving force behind the violations and damages alleged in this Complaint.

## FAILURE TO TRAIN (MONELL)

324. CYS failed to train its directors, supervisors, caseworkers, and counsel on matters including, but not limited to, requiring sworn factual support before seeking emergency custody, limiting CPSL investigations to reports alleging child abuse, providing parents timely access to CPSL reports, redacting only reports of child abuse, obtaining support from witnesses with personal knowledge, and following dependency-petition procedures before seeking custody.

325. The City of Philadelphia failed to train and supervise officers on matters including, but not limited to, constitutional limits governing family separations, reliance on hospital trespass requests to remove lawful parents from their child, the need to confirm and review judicial authority, the requirement of exigency before warrantless searches, seizures, or arrests, and the limitations on force.

## 42 U.S.C. § 1983 CLAIMS

## COUNT I – SUBSTANTIVE DUE PROCESS – FAMILIAL ASSOCIATION
*(Fourteenth Amendment – 42 U.S.C. § 1983)*

***Defendants:*** *Graziano, Roszel, CYS, Kunkle, Medoro, CHOP, Officer Doe 1, Officer Doe 2, City of Philadelphia, Silfies, Dr. Zahid, WMH*

326. Plaintiffs incorporate by reference all preceding paragraphs.

## WMH CPSL Reporting Trigger

327. Silfies and Dr. Zahid knew they were disclosing medical information through a state child abuse reporting channel.

328. Silfies knew the information she was reporting only concerned Plaintiffs' insurance status, prenatal-care choices, and appropriate bonding.

329. At the time the Wayne Report was filed, Silfies knew no imminent health concern had been identified.

330. When Dr. Zahid supplemented the Wayne Report, he knew he had previously told Plaintiffs that VC was clear for discharge.

331. When Dr. Zahid supplemented the Wayne Report, he knew he did not request Plaintiffs to remain at WMH due to jaundice, apnea, head bruising, or any other identified medical danger.

332. Silfies and Dr. Zahid told Plaintiffs that policy required them to release information through state channels.

333. After Silfies and Dr. Zahid told Plaintiffs their reports were not for abuse, they used CPSL reporting procedures.

334. Silfies and Dr. Zahid knew that using the CPSL process would trigger government child protective contact with Plaintiffs.

335. The Wayne Report triggered CYS's first contact with Plaintiffs on August 5.

336. The Wayne Report states: *"no current child abuse and/or neglect reported."*

337. On August 7, CYS staff visited Plaintiffs property in response to the Wayne Report.

338. On August 7, after Plaintiffs refused CYS services and told Roszel they would redress their government, Roszel told Plaintiffs she would involve the court.

**CYS and CHOP Escalation to Protective Custody**

339. Dr. Medoro was present on August 12, at ~10:00am, when CHOP's team reported that VC was stable in the last 24 hours.

340. On August 12, Kunkle and Dr. Medoro knew that VC had no new life saving procedures scheduled.

341. The Wayne Report was the only existing CPSL report when WMH staff informed Kunkle about it on August 12, after which Kunkle contacted CYS.

342. On August 12, at ~3:30 pm, Graziano told Judge Legg that VC had organs shutting down, parents were refusing care that could keep VC alive.

343. On August 12, at ~3:30 pm, following Graziano's oral application, Judge Legg issued a verbal protective custody order.

344. Graziano obtained the verbal order without supplying the court with any witness under oath or any written affirmations from witnesses.

345. Before requesting protective custody, Graziano had not confirmed with any treating provider that VC had organ failure or that Plaintiffs were preventing life-saving care that would have kept VC alive.

346. The Pennsylvania Superior court held that "*CYS set forth no basis for its oral application*".

347. The Pennsylvania Superior court held that "*the shelter care application lacked even a minimum threshold level of reliability*".

348. On August 12, VC did not have organs shutting down.

349. Plaintiffs had not impaired VC's care.

350. Roszel told Kunkle that Plaintiffs had threatened CYS agents with violence.

351. Plaintiffs had never threatened CYS agents with violence.

352. Roszel told Kunkle to file a new CPSL Report.

353. On August 12, at ~3:47 pm, Kunkle filed the CHOP Report.

354. Kunkle did not file the CHOP Report of her own volition.

355. Dr. Medoro certified the CHOP Report as a near fatality.

356. Before the CHOP Report was filed, Kunkle and Dr. Medoro knew that Plaintiffs had not impaired VC's care.

357. The CHOP Report did not allege Plaintiffs caused VC's medical emergency.

358. The CHOP Report was filed days after VC arrived for emergency care.

359. The Pennsylvania Superior Court held that CYS "*did not establish a causal nexus between [Plaintiffs'] conduct and V.C.'s condition.*"

360. The Pennsylvania Superior Court held that "*CYS lacked authority to initiate the CHOP referral investigation.*"

**CHOP and Philadelphia Police Separation of Plaintiffs From VC**

361. Before Plaintiffs were separated from VC, Kunkle spoke with Roszel and Graziano.

362. Before Plaintiffs were separated from VC, neither Graziano nor Roszel told Kunkle that Plaintiffs could remain with VC.

363. CHOP staff called Philadelphia Police to remove Plaintiffs from CHOP.

364. Police did not approach Plaintiffs at VC's unit until 8:00pm.

365. CHOP staff told Plaintiffs an order restricted Plaintiffs access to VC.

366. No order restricting Plaintiffs access to VC ever existed.

367. Plaintiffs were authorized NICU visitors with 24-hour access to VC.

368. Plaintiffs refused to leave the NICU without seeing an order.

369. On August 12 at ~8:13pm, Officer Doe 1 handcuffed and physically removed Carlson from CHOP for alleged trespass.

370. On August 12 at ~8:13pm, Officer Doe 2 handcuffed and physically removed Lombard from CHOP for alleged trespass.

371. Officers Doe 1 and Doe 2 knew they were separating Plaintiffs from VC.

372. Philadelphia police removed Plaintiffs from VC's bedside after CHOP staff said an order restricted Plaintiffs' access.

373. The City of Philadelphia later altered the trespass charge to disorderly conduct.

374. Plaintiffs never threatened violence during events alleged in this complaint.

**Continued CHOP Separation After Custody Was Restored**

375. On August 14, CHOP delayed Plaintiffs access to VC by holding a "ground rules" meeting before re-issuing NICU ID cards to Plaintiffs.

376. During CHOP's August 14 "ground rules" meetings, staff told Plaintiffs their August 12 separation from VC was due to hospital policy.

377. Plaintiffs were handcuffed, separated from VC, and deprived of medical decision making authority.

378. Plaintiffs were physically separated from VC for approximately 52 hours.

**COUNT II – PROCEDURAL DUE PROCESS VIOLATIONS**
*(Fourteenth Amendment – 42 U.S.C. § 1983)*

**Defendants:** *Graziano, Roszel, Smith, McCambridge, CYS, CHOP, Officer Doe 1, Officer Doe 2, City of Philadelphia*

379. Plaintiffs incorporate by reference all preceding paragraphs.

**Seizure of Custody Without Notice or Hearing**

380. On August 12 at ~3:30pm, Graziano applied for protective custody over VC.

381. Plaintiffs were not asked to participate in the August 12 custody request.

382. Protective custody was granted without the court speaking to Plaintiffs.

383. On August 12, physical and legal custody over VC was granted to CYS.

384. On August 12, decision making authority over VC was granted to CYS.

385. On August 12, Plaintiffs were physically removed from VC's bedside.

**Seizure of Custody Through Deficient Process**

386. The Protection Order stated "*A Dependency Petition is to be set forth alleging the above named child to be a dependent child.*"

387. No Pa.R.J.C.P. 1330 dependency petition was filed from August 12-14.

388. Custody was transferred to CYS without VC being adjudicated dependent.

389. On August 13, McCambridge filed Graziano's Pa.R.J.C.P. 1240 Shelter Care Application without attaching any CPSL reports or any affirmations from someone who witnessed the events described in the shelter care application.

390. At the August 14 shelter care hearing, CYS's own witnesses gave testimony inconsistent with the shelter care application.

391. In an appeal from Plaintiffs Civil Injunction, the Superior Court held that "*the shelter care application lacked even a minimum threshold level of reliability and the agency therefore acted in contravention of Rule 1240 in seeking emergency protective custody without confirmation of the contents of the CHOP referral.*"

## No Meaningful Review of the August 12–14 Custody Seizure

392. Plaintiffs appealed the juvenile court process used to obtain custody of VC.

393. The Pennsylvania Superior Court advised that "*it does not appear that the August 13 Emergency Protective Custody Order is appealable.*"

## Concealment of CPSL Reports During the Investigation and Hearing

394. CYS did not provide Plaintiffs the Wayne and CHOP Reports until October 15, after both had been deemed unfounded.

395. Plaintiffs did not have the full contents of the Wayne and CHOP Reports for the August 14 hearing, during the CPSL investigation, or during the civil injunction proceedings up until October 15.

396. CYS redacted text from the Wayne, CHOP, and CHOP-Extended Reports.

## Deficient Dependency Petition Absent Facts and Meaningful Review

397. On November 6, Smith verified and McCambridge filed a Pa.R.J.C.P. 1330 dependency petition alleging VC was without proper care or control.

398. The Petition stated that VC was released from CHOP and attended follow-up care while also stating that CYS had not been provided information regarding current follow-up care or treatment.

399. The Petition alleged VC was without proper care or control and did not identify any specific unmet need.

400. Plaintiffs were summoned to appear at a dependency hearing on December 10 and warned that failure to appear could lead to arrest.

401. After the Petition was dismissed in Plaintiffs' favor, Plaintiffs noticed an appeal challenging the juvenile court's jurisdiction to require them to appear.

402. Plaintiffs' appeal argued that a petition absent an alleged fact deprives the court of jurisdiction over dependency proceedings, but was deemed moot.

403. Plaintiffs then appealed the mootness ruling, arguing that petitions later dismissed are capable of repetition yet evade review, and review was denied.

404. The Petition did not identify any unmet need, yet required Plaintiffs to appear under threat of arrest, and after dismissal provided no path to review.

## COUNT III – WRONGFUL SEIZURE OF VC
*(Fourth Amendment – 42 U.S.C. § 1983)*

***Defendants:*** *Graziano, Roszel, CYS, CHOP, Officer Doe 1, Officer Doe 2, Philadelphia*

405. Plaintiffs incorporate by reference all preceding paragraphs.

406. CYS obtained a custody order over VC without oath or affirmation.

407. VC was placed under CYS's physical and legal custody for ~50 hours.

408. The August 13 written protective custody order stated: *"take the child into custody if the child is in imminent danger from his/her surroundings"*.

409. VC was removed from her parents' physical custody when her parents were removed from CHOP for alleged trespass.

410. On August 12, nobody told Plaintiffs they were being removed from VC for posing an imminent danger to her.

411. At the August 14 shelter care hearing Judge Legg stated: *"Quite - - and quite frankly, the Court never ordered, never ordered, that the parents couldn't be around their child or in the presence of their child."*

412. VC was physically separated from her parents for ~52 hours.

## COUNT IV – WRONGFUL SEARCH/SEIZURE WITH EXCESSIVE FORCE AND FALSE IMPRISONMENT OF JUSTIN CARLSON
*(Fourth Amendment – 42 U.S.C. § 1983)*

***Defendants:*** *Graziano, Roszel, CYS, CHOP, Officer Doe 1, Officer Doe 2, Philadelphia*

413. Plaintiffs incorporate by reference all preceding paragraphs.

414. Officer Doe 1 handcuffed, searched, and detained Carlson without a warrant.

415. Carlson did not threaten anyone, did not resist, and remained compliant when Officer Doe 1 handcuffed him.

416. Officer Doe 1 searched Carlson and seized his belongings.

417. Carlson's freedom of movement was restrained for ~30 minutes.

## COUNT V – WRONGFUL SEIZURE WITH EXCESSIVE FORCE AND FALSE IMPRISONMENT OF REBECCA LOMBARD
*(Fourth Amendment – 42 U.S.C. § 1983)*

***Defendants:*** *Graziano, Roszel, CYS, CHOP, Officer Doe 1, Officer Doe 2, Philadelphia*

418. Plaintiffs incorporate by reference all preceding paragraphs.

419. Officer Doe 2 handcuffed and detained Lombard without a warrant.

420. Lombard did not threaten anyone, did not resist, and remained compliant when Officer Doe 2 handcuffed her.

421. Officer Doe 2 pushed Lombard while she was handcuffed, walking slowly, and nine days postpartum.

422. Lombard's freedom of movement was restrained for ~30 minutes.

## COUNT VI – PARENTAL AUTONOMY
*(Fourteenth Amendment – 42 U.S.C. § 1983)*

***Defendants:*** *Graziano, Roszel, Smith, McCambridge, CYS, Kunkle, Dr. Medoro, Dr. Roumiantsev, Chandler, Ousley, CHOP, Silfies, Dr. Zahid, WMH*

423. Plaintiffs incorporate by reference all preceding paragraphs.

**CPSL-Based Interference With Medical Decision-Making**

424. Silfies and Dr. Zahid, under WMH policy, filed a CPSL report based on prenatal decisions and lack of insurance, triggering a state investigation.

425. Graziano obtained the August 12 verbal order that granted CYS medical decision making authority over VC.

426. Roszel instructed VC's medical providers to file a CPSL report.

427. Kunkle filed a CPSL report and Dr. Medoro certified it as a "near fatality" after Roszel instructed Kunkle to file one.

**Genetic Testing Over Objection and Continued Retention**

428. CYS authorized CHOP to acquire VC's genetic data.

429. CHOP refused Plaintiffs' demand to delete VC's genetic data.

**Coerced Supplementation and Chilled Treatment Objections**

430. After August 12, Plaintiffs feared questioning VC's treatment.

431. On August 28, Dr. Roumiantsev and Chandler required a milk fortifier.

432. On August 28, Plaintiffs signed a CHOP form titled "CONSENT FOR USE OF DONOR HUMAN MILK" and wrote "under duress" next to their signatures.

433. Plaintiffs only signed the August 28 donor milk risk/liability waiver under fear of additional CPSL reports.

### Non-Consensual Testing and Disclosure

434. CHOP performed an OAE/AABR hearing screen without parental consent.

435. Chandler sent VC's medical information to Pennsylvania Early Intervention without parental consent.

### Discharge-Related Control Over Follow-Up Care

436. Dr. Roumiantsev and Ousley told Plaintiffs that naming their follow-up pediatrician was required for discharge or it would be "against medical advice."

437. CHOP's discharge and prolonged hospitalization were conditioned on VC allegedly averaging less than 30 g/day in weight gain.

### Renewed Attempt To Remove Medical Decision-Making

438. On November 6, Smith verified and McCambridge filed a dependency petition that sought to remove Plaintiffs' medical decision-making rights.

### Resulting Loss of Parental Decision-Making

439. Defendants prevented Plaintiffs from freely making decisions regarding non-urgent testing, disclosures, supplementation, and discharge planning for VC.

## COUNT VII – RETALIATION/CHILLING EFFECT
*(First and Fourteenth Amendment – 42 U.S.C. § 1983)*

***Defendants:*** *Silfies, Dr. Zahid, WMH, Graziano, Roszel, Smith, McCambridge, CYS, Kunkle, Medoro, Dr. Roumiantsev, Ousley, Chandler, CHOP*

440. Plaintiffs incorporate by reference all preceding paragraphs.

### Retaliation for Speech, Objections, and Redress (First Amendment)

441. On August 7, after Plaintiffs told Roszel they would seek redress for what Plaintiffs believed was an unlawful investigation, Roszel told Plaintiffs she would involve the court, and within a few days, Graziano obtained a verbal custody order,

Roszel fabricated lies about Plaintiffs threatening violence, and she told Kunkle to file a CPSL report.

442. On August 12, after Plaintiffs questioned CHOP's meningitis antibiotics following non-conclusive tests and the purpose of a lumbar puncture if antibiotics would be given regardless of test results, Kunkle filed a CPSL report and CHOP called police and had Plaintiffs separated from VC.

443. After Plaintiffs filed a civil injunction challenging the August 12 events, and after testimony contradicted Graziano's averments, CYS continued its CPSL investigation.

444. Plaintiffs filed multiple injunctions, motions, and filed a bar complaint against McCambridge seeking relief and redressing their government.

445. After Plaintiffs court filings and bar complaint, Graziano caused the CHOP-Extended Report to be filed.

446. After Plaintiffs court filings and bar complaint, Roszel, Smith, and McCambridge worked together to file the November 6 dependency petition.

**Retaliation for Parental Medical Decision (Fourteenth Amendment)**

447. WMH, through Silfies and Dr. Zahid, initiated and supplemented CPSL reports for parental medical decisions.

448. On August 4, after Plaintiffs told WMH medical staff that they opted against a prenatal care physician, Silfies, a WMH social worker, filed a CPSL report.

449. On August 5, after Plaintiffs refused newborn vaccines, Dr. Zahid threatened and later filed a supplemental CPSL report noting Plaintiffs vaccine beliefs.

450. On August 5, after Plaintiffs discharged VC in which Plaintiffs were told by

Dr. Zahid, had no imminent health concerns identified, Dr. Zahid filed a supplemental CPSL report for discharging.

451. After Plaintiffs questioned CHOP's treatment plan, Kunkle filed a CPSL report and Dr. Medoro certified it as a "near fatality."

452. On August 28, after Plaintiffs' asked to delay the use of milk fortifiers, Dr. Roumiantsev and Chandler said it would be "against medical advice".

453. After Plaintiffs attempted to keep VC's follow up care private, Dr. Roumiantsev and Ousley told Plaintiffs it was "against medical advice".

454. After Plaintiffs refused to use CHOP for follow-up care, Chandler sent VC's medical information to PA Early Intervention.

**Result of Retaliation**

455. Plaintiffs refrained from voicing concerns out of fear.

456. Plaintiffs refrained from making decisions out of fear.

457. Plaintiffs made decisions they didn't want to make out of fear.

458. After these events, Plaintiffs experienced emotional distress, incurred litigation expenses, and underwent unsolicited medical procedures and charges.

**COUNT VIII – UNLAWFUL SEIZURE OF MEDICAL INFORMATION**
*(Fourth Amendment – 42 U.S.C. § 1983)*

***Defendants:*** *Graziano, Roszel, CYS, CHOP*

459. Plaintiffs incorporate by reference all preceding paragraphs.

460. A CYS employee authorized CHOP to acquire VC's genetic data.

461. Graziano and Roszel were in direct contact with Kunkle.

462. No oath or affirmation preceded the acquisition of VC's genetic data.

463. After custody was restored, CHOP refused to delete VC's genetic data.

464. As a direct result, VC and by biological extension, Carlson and Lombard, were deprived of control over their genetic information.

## COUNT IX – CONSPIRACY TO VIOLATE CIVIL RIGHTS
*(42 U.S.C. § 1983)*

***Defendants:*** *All Defendants except Dr. Hockman*

465. Plaintiffs incorporate by reference all preceding paragraphs.

### Initial Custody Conspiracy (August 12–14, 2024)

466. Graziano and Roszel, together with Kunkle and Dr. Medoro, obtained custody of VC by first securing a verbal custody order at approximately 3:30 p.m. using false allegations, and then filing a "near fatality" CPSL report at approximately 3:47 p.m., after Graziano had informed the court such a report would be filed in support of protective custody. After the custody order was obtained, Roszel directed Kunkle to file the report, and Kunkle and Dr. Medoro did so despite having no allegation or knowledge of culpable parental conduct.

### Wrongful Seizure Cover-Up Conspiracy

467. Officer Doe 1 and Officer Doe 2 removed Plaintiffs from CHOP, a place they had 24-hour access to, without a warrant. After citing Plaintiffs for "simple trespass," the City of Philadelphia later altered records to "disorderly conduct".

### Against Medical Advice Threats and Ongoing Retaliation

468. Silfies and Dr. Zahid filed CPSL reports despite identifying no abuse allegation; WMH then continued releasing medical information to CYS, and WMH staff informed Kunkle of the Wayne Report, prompting Kunkle to contact CYS all

while the only report on file stated no child abuse and/or neglect was reported. Dr. Roumiantsev, Ousley, and Chandler repeatedly obtained medical decisions and disclosures Plaintiffs did not want by invoking "against medical advice" reporting or releasing information without consent.

**Retaliatory CPSL Report and Dependency Petition**

469. Graziano, Roszel, Smith, and McCambridge worked together in filing the CHOP-Extended Report and the November 6 Dependency Petition. Graziano first contacted VC's follow-up pediatrician, Dr. Lakhani, and obtained medical information and a letter from her. The CHOP-Extended Report then stated that CYS received a letter from Dr. Lakhani, who later testified that she only spoke with Graziano after returning Graziano's call and testified that she never filed any CPSL report. Smith, Roszel, and McCambridge then used the letter Graziano obtained from Dr. Lakhani and the new CHOP-Extended Report as the basis for the November 6 Dependency Petition.

**Conspiracy Result**

470. These coordinated acts were the direct and proximate cause of the harms detailed in this complaint.

**STATE LAW CLAIMS**

**COUNT X – ABUSE OF PROCESS**

*Defendants: Graziano, Roszel, McCambridge, CYS*

471. Plaintiffs incorporate by reference all preceding paragraphs.

472. VC has never been adjudicated dependent.

473. From August 12-14, Defendants did not file a Pa.R.J.C.P. 1330 dependency petition naming VC as the subject.

474. From August 12-14, Pa.R.J.C.P. 1210 and 1240 were invoked to obtain and retain custody over VC.

475. Pa.R.J.C.P. 1120 separately defines "child" and "minor".

476. Pa.R.J.C.P. 1210 and 1240 use the defined term "child" and not "minor".

477. Pa.R.J.C.P. 1210 and 1240 govern emergency protective custody and shelter care for a "child."

478. From August 12-14, VC was not a "child" under Pa.R.J.C.P. 1120.

479. Pa.R.J.C.P. 1210 and 1240 were used to obtain custody over a "minor" without filing a Pa.R.J.C.P. 1330 dependency petition.

480. On August 12, Pa.R.J.C.P. 1210 was used to obtain custody over VC without any oath or affirmation supplied to the court.

481. On August 13, CYS obtained a Pa.R.J.C.P. 1242(e) Order before the August 14 Pa.R.J.C.P. 1242 Hearing was held.

482. Defendants' use of procedures governing a "child" to acquire custody over VC was the direct and proximate cause of harms described in this complaint.

## COUNT XI – WRONGFUL USE OF CIVIL PROCEEDINGS

*Defendants: Graziano, Roszel, McCambridge, CYS*

483. Plaintiffs incorporate by reference all preceding paragraphs.

484. On August 7, Roszel told Plaintiffs she would involve the court.

485. Roszel told Kunkle that Plaintiffs threatened her staff with violence.

486. On August 12, Graziano initiated proceedings against Plaintiffs.

487. The proceedings commenced without supporting oath or affirmation.

488. The proceedings were commenced after allegations of VC having organ failure and Plaintiffs preventing life saving treatments.

489. Defendants did not conduct discovery during the proceedings.

490. The August 14 shelter care hearing was not an adjudicatory hearing.

491. The Pennsylvania Superior Court held that Defendants' *"shelter care application lacked even a minimum threshold level of reliability[.]"*

492. On August 12, Defendants knew or had readily available access to the following: VC was already deemed stable; Plaintiffs approved all life-saving procedures and no more were scheduled; and Plaintiffs had not discharged from WMH against medical advice or with any imminent issues identified.

493. Defendants initiated proceedings after Plaintiffs denied CYS's offers for a home visit, assessment, and services, and after Plaintiffs told Roszel they would redress their government for CYS's continued investigation.

494. On August 14, shelter care proceedings were terminated in Plaintiffs' favor.

495. Defendants' initiation of the proceedings was the direct and proximate cause of harms described in this complaint.

## COUNT XII – WRONGFUL USE OF CIVIL PROCEEDINGS

*Defendants: Graziano, Roszel, McCambridge, Smith, CYS*

496. Plaintiffs incorporate by reference all preceding paragraphs.

497. On November 6, Smith and McCambridge initiated proceedings against Plaintiffs by filing a Pa.R.J.C.P 1330 dependency petition (Petition).

498. On November 6, Defendants knew, or had readily available access to the following: Plaintiffs never prevented any life saving care while at CHOP; Plaintiffs never left any hospital against medical advice; and Plaintiffs were already providing the follow-up care Defendants alleged they were unaware of.

499. Defendants did not conduct discovery during the proceedings.

500. Defendants never responded to Plaintiffs' discovery requests.

501. McCambridge told Judge Legg a response to discovery wasn't required.

502. Smith called Plaintiffs on August 5 and visited their property on August 7.

503. On December 10, Smith and Roszel testified that Smith wasn't involved with the Wayne and CHOP Reports.

504. Dr. Lahkani testified that Graziano first made contact with her.

505. Graziano asked Dr. Lahkani for medical information about VC.

506. Dr. Lahkani provided VC's medical information to Defendants (Letter).

507. Dr. Lahkani testified that she did not file a CPSL report.

508. Defendants used the Letter to initiate the CHOP-Extended Report.

509. Defendants used the Letter and the CHOP-Extended Report to initiate the November 6 proceedings.

510. The Petition referenced information found in the CHOP-Extended Report.

511. The Petition stated: *"Parents followed through with the first two appointments post discharge from CHOP..."*

512. The Petition stated: *"As of this filing, the Agency has not been provided with*

*any information regarding current follow up care or treatment."*

513. The Petition stated: *"On October 30th, Agency contacted Advocare, the pediatric facility where the parents took the minor child for the initial 2 follow ups..."*

514. On October 30, the only open CPSL report regarding VC was the CHOP-Extended Report.

515. Graziano testified on October 15 that the CHOP-Extended Report was not a report of child abuse.

516. On October 30, CYS obtained VC's medical information without any open child abuse report.

517. The December 10 proceedings were terminated in Plaintiffs' favor.

518. Defendants initiated November 6 proceedings after Plaintiffs wouldn't provide CYS VC's medical information and after Plaintiffs redressed their government through Injunctions and a bar complaint.

519. Initiation of the proceedings was the direct and proximate cause of Plaintiffs being compelled to appear in court under warnings of arrest and suffering emotional distress, humiliation, monetary losses, and disruption of familial life.

## COUNT XIII – ABUSE OF PROCESS

***Defendants:*** *City of Philadelphia, Officer Doe 1, Officer Doe 2, CHOP*

520. Plaintiffs incorporate by reference all preceding paragraphs.

521. CHOP staff invoked trespass, separating Plaintiffs from VC.

522. Police removed and cited Plaintiffs for simple trespass.

523. As VC's parents, Plaintiffs had 24 hour access to CHOP.

524. No order restricting Plaintiffs' access to VC or the NICU ever existed.

525. Rather than obtaining a court order, the state summary offense process was used to separate Plaintiffs from VC.

526. The City of Philadelphia later altered the summary offense records from "simple trespass" to "disorderly conduct".

527. Defendant's use of the summary offense process to separate Plaintiffs from VC was the direct and proximate cause of harms described in this complaint.

## COUNT XIV – BREACH OF PHYSICIAN-PATIENT CONFIDENTIALITY

*Defendants: Silfies, Dr. Zahid, WMH*

528. Plaintiffs incorporate by reference all preceding paragraphs.

529. From August 3–5, Lombard and VC were patients at WMH.

530. WMH and its staff obtained Lombard's and VC's medical and related personal information during treatment.

531. Defendants disclosed Lombard and VC's medical and related personal information to state agencies without consent.

532. These disclosures directly triggered a CPSL investigation.

533. Defendants' disclosure of Lombard's and VC's information was the direct and proximate cause of harms described in this complaint.

## COUNT XV – BREACH OF PHYSICIAN-PATIENT CONFIDENTIALITY

*Defendants: Kunkle, CHOP*

534. Plaintiffs incorporate by reference all preceding paragraphs.

535. From August 10 – September 12, VC was a patient at CHOP.

536. CHOP and its staff obtained VC's medical and related personal information during treatment.

537. Defendants disclosed VC's medical and related personal information to state agencies without consent.

538. Defendants' disclosure of VC's information was the direct and proximate cause of harms described in this complaint.

## COUNT XVI – BREACH OF PHYSICIAN-PATIENT CONFIDENTIALITY

***Defendants:*** *Chandler, CHOP*

539. Plaintiffs incorporate by reference all preceding paragraphs.

540. On September 6, Chandler signed for and faxed VC's medical information to Pa Early Intervention without consent.

541. Early intervention has contacted Plaintiffs via email, text, and mail.

542. Plaintiffs, fearing more CPSL reports, engaged in email communications with Early Intervention despite not wanting to.

543. As of March 24, 2026, Pennsylvania Early Intervention continues to send Plaintiffs unsolicited and unwanted mail, texts, and emails.

544. Defendants' disclosure of VC's information was the direct and proximate cause of behavioral changes, ongoing state interactions, and emotional distress.

## COUNT XVII – MEDICAL MALPRACTICE

545. Plaintiffs incorporate by reference ¶¶1-77, 202-204.

546. During the events described, Dr. Hockman and Dr. Zahid were acting within the course and scope of their employment with WMH.

547. During VC's delivery, Dr. Hockman discussed cesarean section and vacuum assistance in response to delivery difficulties.

548. VC was born with a large circular scalp discoloration.

549. After delivery, Plaintiffs asked Dr. Hockman about the scalp finding.

550. Dr. Hockman told Plaintiffs the scalp finding was "just a bruise".

551. Neither Dr. Hockman nor Dr. Zahid discussed any potential risks of the "bruise" with Plaintiffs.

552. Neither Dr. Hockman nor Dr. Zahid told Plaintiffs that bruising or cephalohematoma lead to more red cells breaking down, increasing bilirubin.

553. Neither Dr. Hockman nor Dr. Zahid suggested evaluation of the "bruise".

554. Neither Dr. Hockman nor Dr. Zahid told Plaintiffs that prematurity and the "bruise" increased VC's jaundice risk.

555. Dr. Zahid did not include the "bruise" in VC's discharge summary.

556. Dr. Zahid did not include the "bruise" or jaundice risk in his August 5 supplementation to the Wayne Report.

557. Plaintiffs discharged VC on August 5 after being told no imminent health concerns existed and without anybody warning bruising increased jaundice risk.

558. After discharge from WMH, VC suffered a bilirubin emergency.

559. CHOP physicians diagnosed VC with bilirubin-induced neurologic dysfunction and brain injury caused by dangerously elevated bilirubin.

560. VC's bilirubin crisis, emergency hospitalization, and neurologic injuries followed Plaintiffs August 5 discharge without VC's bruise being evaluated and without Plaintiffs being informed heading bruising and/or cephalohematoma lead to more red cells breaking down, increasing bilirubin.

561. Carlson and Lombard suffered fear, anxiety, and anguish during VC's rapid deterioration, emergency transfer, and risk of permanent brain injury.

562. Plaintiffs incurred medical expenses, travel and lodging costs, and lost income related to VC's emergency and follow-up care.

563. Plaintiffs are expected to incur life-long medical expenses, lost income, lost time, and other costs related to VC's injury.

## COUNT XVIII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*Defendants: All Defendants*

564. Plaintiffs incorporate by reference all preceding paragraphs.

565. Defendant's conduct was intentional, extreme, outrageous, without privilege or justification and transcended all bounds of decency.

566. Defendants intended by their conduct to inflict emotional distress or knew or should have known that emotional distress was the certain consequence of such illegal, reckless, unwarranted, extreme and outrageous actions.

567. The unexhaustive list of harms resulting from Defendants' conduct includes:

panic attacks, loss of sleep, repeating nightmares, psychological trauma, and persistent emotional distress; reputational damage; loss of constitutional rights; physical injury to Lombard through disruption of lactation; the chilling of Plaintiffs' ability to advocate for VC; immense fear of all mandated reporters; lingering fear triggered by routine events such as unannounced knocks at the door.

568. The nature and extent of Plaintiffs' emotional injuries exceed what any reasonable person could be expected to endure.

569. Defendants acted with malice, retaliatory motive, and reckless disregard for Plaintiffs' rights, causing harms warranting compensatory and punitive damages.

## DAMAGES

570. As a direct and proximate result of Defendants' actions, Plaintiffs suffered:

   a. **Medical harm to VC**, who has been diagnosed by CHOP physicians with bilirubin induced brain damage resulting in potential permanent disability, pain, suffering, and a lifetime of medical needs and limitations;

   b. **Future economic losses**, including the cost of VC's life-care plan, medical treatment, therapy, adaptive technology, housing accommodations, and loss of earning capacity, in an amount reasonably projected to reach millions of dollars over her lifetime;

   c. **Familial harms**, including the unlawful separation of Plaintiffs from their newborn, disruption of parental custody, companionship, and bonding, and the lasting disruption of family life;

   d. **Emotional and reputational harms**, including public accusations of abuse, arrests in front of family and medical staff, humiliation, psychological trauma, and reputational damage; and

e. **Direct economic losses**, including travel costs, housing, lost wages, diversion of time from work and family care, coerced medical services, state sanctioned medical procedures, and substantial litigation expenses.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against the appropriate Defendants, jointly and severally where permitted by law, and award the following relief:

A. **Compensatory damages** in an amount to be determined at trial, including medical expenses, life-care costs, travel and lodging expenses, lost time, economic losses, out-of-pocket expenses, and emotional, reputational, privacy, liberty, and familial-association harms;

B. **Punitive damages** against the individual-capacity Defendants, where permitted by law, in an amount sufficient to punish and deter reckless, malicious, or callously indifferent violations of Plaintiffs' federally protected rights;

C. **Nominal damages** for each proven violation of Plaintiffs' constitutional and statutory rights alleged herein.

D. **Declaratory Relief**:
   1. Defendants' seizure of VC without exigent circumstances or sworn probable cause violated Plaintiffs' rights under the First, Fourth, and Fourteenth Amendments;

   2. Defendants' invocation of protective custody orders under Pa.R.J.C.P. 1210, or similar procedures, against minors who are not the subject of a filed

dependency petition or already adjudicated dependent, exceeds lawful authority and violates the Fourth and Fourteenth Amendments;

3. Defendants' practice of investigating reports that do not allege "child abuse" as defined in 23 Pa.C.S. § 6303 exceeds the CPSL, violates the constitutional rights of Pennsylvania parents and children, and is inconsistent with Child Abuse Prevention and Treatment Act (CAPTA)'s federally mandated screening requirements under 42 U.S.C. § 5106a and 45 C.F.R. § 1357.20.

4. Defendants' withholding and improper redaction of CPSL Reports violates 23 Pa.C.S. § 6340(b)–(c), and conflicts with CAPTA's requirement that reports and records be made available to the subjects under 42 U.S.C. § 5106a(b)(2)(B)(viii)(I), as incorporated through 45 C.F.R. § 1357.20, and denied Plaintiffs fair notice of the nature and cause of the allegations, thereby violating procedural due process rights.

5. CYS and CHOP's collection and retention of VC's genetic data without lawful consent, hearing, or probable cause, violated Plaintiffs' constitutional rights to privacy and medical decision-making autonomy.

E. **Injunctive relief:**

1. Requiring CHOP to immediately delete all genetic data unlawfully obtained;

2. Requiring Pennsylvania child and youth services agencies to provide parents and guardians complete CPSL reports upon the initiation of any court proceeding, thereby ensuring constitutionally adequate notice of the nature and cause of the proceeding.

3. Requiring Pennsylvania child and youth services agencies to follow Pa.R.J.C.P. 1210 and related rules by using protective custody only upon or contemporaneously with the filing of a dependency petition, or after an adjudication of dependency, thereby preserving the notice, hearings, and appellate review required by due process.

4. Requiring Pennsylvania child and youth services agencies to comply with 23 Pa.C.S. § 6303 and CAPTA's federally mandated screening requirements, 42 U.S.C. § 5106a(b)(2)(B)(iv)–(v), as incorporated through 45 C.F.R. § 1357.20, by screening out—rather than investigating—reports that do not allege statutorily defined child abuse.

5. Requiring CYS to immediately produce to Plaintiffs all CPSL reports involving VC in fully unredacted form, as none constitutes a report of "child abuse" for which redaction is authorized.

6. Such further prospective relief as the Court deems necessary and proper to prevent recurrence of the constitutional violations proven in this action.

F. **Litigation costs** and attorney fees pursuant to 42 U.S.C. § 1988 and other applicable law; and

G. Such other relief as this Court deems just and proper.

## PRESERVATION OF EVIDENCE

Plaintiffs hereby demand that all Defendants immediately preserve all documents, electronically stored information, communications, internal notes, medical records, recordings, policies, procedures, training materials, and other evidence related to the allegations in this Complaint, including but not limited to:

- All CPSL reports and related documents

3. Requiring Pennsylvania child and youth services agencies to follow Pa.R.J.C.P. 1210 and related rules by using protective custody only upon or contemporaneously with the filing of a dependency petition, or after an adjudication of dependency, thereby preserving the notice, hearings, and appellate review required by due process.

4. Requiring Pennsylvania child and youth services agencies to comply with 23 Pa.C.S. § 6303 and CAPTA's federally mandated screening requirements, 42 U.S.C. § 5106a(b)(2)(B)(iv)–(v), as incorporated through 45 C.F.R. § 1357.20, by screening out—rather than investigating—reports that do not allege statutorily defined child abuse.

5. Requiring CYS to immediately produce to Plaintiffs all CPSL reports involving VC in fully unredacted form, as none constitutes a report of "child abuse" for which redaction is authorized.

6. Such further prospective relief as the Court deems necessary and proper to prevent recurrence of the constitutional violations proven in this action.

F. **Litigation costs** and attorney fees pursuant to 42 U.S.C. § 1988 and other applicable law; and

G. Such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

## PRESERVATION OF EVIDENCE

Plaintiffs hereby demand that all Defendants immediately preserve all documents, electronically stored information, communications, internal notes, medical records,

recordings, policies, procedures, training materials, and other evidence related to the allegations in this Complaint, including but not limited to:

- All CPSL reports and related documents
- All medical records, charts, and communications
- All CYS case files, notes, and emails
- All audio/video recordings of court proceedings and hospital interactions
- All police body camera and dash camera footage
- All policies regarding reporting, protective custody, and hospital removals
- All training materials
- All communications between any Defendants regarding Plaintiffs or VC

**Respectfully submitted on this day of May 7, 2026**

**Justin Carlson; Rebecca Lombard; and**
**VC, a Minor, by Justin Carlson**
171 Elkview Dr.
Forest City, PA 18421
570-234-9808
justin.carlson.legal@gmail.com

## VERIFICATION

I declare under penalty of perjury that the factual allegations in the foregoing Complaint are true and correct based on my personal knowledge, except as to matters stated on information and belief, and as to those matters I believe them to be true.

**Respectfully submitted on this day of May 7, 2026**

Justin Carlson and Rebecca Lombard, Plaintiffs