| | |
|---|---|
| **JUSTIN CARLSON et al.,**<br>**PLAINTIFFS,**<br><br>**vs.**<br><br>**MICHELLE GRAZIANO et al.**<br>**DEFENDANTS.** | **NO. 3:26-CV-01231**<br>**CAMONI, M.J.**<br><br>**PLAINTIFF CARLSON'S**<br>**DECLARATION IN**<br>**SUPPORT OF MOTION FOR**<br>**PRELIMINARY**<br>**INJUNCTION AGAINST**<br>**DEFENDANT CHOP** |

I, Justin Carlson, declare:

1.      I am a plaintiff in this action. I have personal knowledge of the facts stated below.

**Transcripts**

2.      On January 9, 2025, at approximately 9:53 a.m., I received an email from Amy Curley, at acurley@susqco.com, transmitting hearing transcripts in the underlying dependency matter, *In re V.C.*, docket numbers 2024-11-DP and 2024-612-CP. A true and correct copy of that email is attached as **Exhibit-1-Documents.pdf at 58**.

3.      **Exhibit-1-Documents.pdf at 17-52** contains true and correct excerpts from the transcripts for docket numbers 2024-11-DP and 2024-612-CP. I have not altered the text of those excerpts except to highlight pin cites.

4.      I retain the complete transcripts as received and will promptly provide or file

the full versions if requested by the Court or if any party contends that additional portions should be considered for completeness.

**Audio/Video Recordings**

5.     I was present with Rebecca when she recorded the two videos submitted as **Exhibit-4-August-12-Morning-Rounds-1-Converted.mp3** and **Exhibit-5-August-12-Morning-Rounds-2-Converted.mp3** during the August 12, 2024 morning rounds. Rebecca transferred those files to my laptop. I renamed the files. The videos were recorded from a pocket, purse, or camera facing down as no visual was captured. Because no visuals were captured and for filesize and service purposes only, I converted the files from mp4 format to mp3 format using VLC Media Player. This decision was made to save expenses by purchasing smaller sized flash drives. Upon request of the Court or Parties, the original larger sized mp4 files can be provided. The low volume captured audio and inaudible portions is due to the phones placement when recorded, and not due to the conversion.

6.     I personally recorded **Exhibit-6-August-12-Separation.m4a** on August 12, 2024, at approximately 8:00 p.m. while at CHOP using my phone. I later transferred the file to my computer without editing or alteration other than renaming the file after transfer. Per STANDING ORDER NO. 2022-14 - IN RE: GUIDELINES FOR FILING AND SUBMISSION OF AUDIO AND VIDEO CONTENT, I converted this audio from its original m4a format to mp3 format using VLC Media Player. **Exhibit-6-August-12-Separation-Converted.mp3** is the converted file.

7.     I personally recorded **Exhibit-7-August-15-Morning-Rounds.m4a** on August 15, 2024, at approximately 10:00 a.m. while at CHOP using my phone. I

later transferred the file to my computer without editing or alteration other than renaming the file after transfer. Per STANDING ORDER NO. 2022-14 - IN RE: GUIDELINES FOR FILING AND SUBMISSION OF AUDIO AND VIDEO CONTENT, I converted this audio from its original m4a format to mp3 format using VLC Media Player.

**Exhibit-7-August-15-Morning-Rounds-Converted.mp3** is the converted file.

**Documents**

8.     The documents contained in **Exhibit-1-Documents.pdf** are true and correct copies of documents I received, except for highlighting added for this exhibit package, redaction of the minor's identifying information, and the removal of unnecessary pages for purposes of the instant motion.

9.     I retain the complete and original versions of those documents as received and will promptly provide or file the full versions if requested by the Court or if any party contends that additional portions should be considered for completeness.

**Statements**

10.     From August 11, 2024, until the separation on August 12, 2024, I personally observed VC's bedside monitor repeatedly display temperatures in approximately the 36.4 to 37.0 degrees Celsius range.

11.     I was present during the August 12, 2024 morning rounds when CHOP's care team described VC as stable during the prior 24 hours.

12.     As of August 12, 2024, Rebecca and I had consented to the life-saving procedures proposed for VC. We declined genetic testing and HIV testing, but we had not refused life-saving treatment.

13. On August 12, 2024, I personally spoke by phone with a CHOP geneticist. During that conversation, I was told that the test results would likely be inconclusive. Based on that discussion, and based on VC's observed progress and current stability, Rebecca and I decided to decline the genetic test because we believed an inconclusive result would likely be used to justify further medications, procedures, and diagnoses without clear benefit to VC.

14. On August 12, 2024, after CHOP asserted that custody had been transferred, neither Rebecca nor I were shown any written court order directing us to leave CHOP or prohibiting us from seeing VC before police removed us.

15. I was present for the audio statements cited in **Exhibit-0-Exhibit-Excerpts.pdf**, personally heard those statements, and believe the cited excerpts accurately reflect what was said in the recordings.

16. At approximately 7:15 to 7:30 p.m. on August 12, 2024, while Rebecca and I were in the NICU hallways at CHOP, a CHOP social worker who identified herself as Kiwana approached us with multiple CHOP security personnel, including one who identified himself as Lieutenant Jeff. They directed us to go downstairs, outside the NICU, to discuss what they represented was an order downstairs. They briefly attempted to stop us from going to see VC, but Rebecca and I refused to go downstairs unless and until we were shown a physical court order. Kiwana then allowed us to proceed to VC's unit and stated that she would bring the order to us.

17. Rebecca and I then proceeded to VC's unit, where Rebecca's father, Mike Lombard, was present with VC. At approximately 8:00 p.m. on August 12, 2024, approximately fifteen people approached us at VC's unit, including CHOP

Security, CHOP social-work staff, CHOP medical staff, and Philadelphia police officers. This was the first time I observed any police presence that evening.

18. After Rebecca and I were removed from CHOP, CHOP performed the genetic test that Rebecca and I had previously declined while CYS asserted medical decision-making authority over VC.

19. On August 26, 2024, a CHOP care-team employee verbally disclosed the genetic test results to Rebecca and me. We were told that the test had no findings.

20. Rebecca and I later requested that CHOP delete the genetic data generated from that testing.

21. Because CHOP continues to retain the genetic data in multiple locations and has refused to delete it, I remain concerned about the continued possession, use, disclosure, copying, transfer, or dissemination of that information. In my view, once genetic information is used or disclosed, the loss of privacy cannot be undone.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 19, 2026.

**Respectfully submitted on this day of June 19, 2026**

*Justin Carlson*
Justin Carlson, Plaintiff