| JUSTIN CARLSON et al., PLAINTIFFS, | NO. 3:26-CV-01231 |
|---|---|
| vs. | CAMONI, M.J. |
| MICHELLE GRAZIANO et al. DEFENDANTS. | **PLAINTIFF LOMBARD'S DECLARATION IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AGAINST DEFENDANT CHOP** |

I, Rebecca Lombard, declare:

1.    I am a plaintiff in this action. I have personal knowledge of the facts stated below.

**Audio/Video Recordings**

2.    I personally recorded the two videos submitted as **Exhibit-4-August-12-Morning-Rounds-1-Converted.mp3** and **Exhibit-5-August-12-Morning-Rounds-2-Converted.mp3** during the August 12, 2024 morning rounds. I transferred those files to Justin's laptop. I believe the recordings accurately reflect the statements and events I heard during CHOP's August 12 Morning Rounds.

3.    I was present during the events reflected in **Exhibit-6-August-12-Separation-Converted.mp3** on August 12, 2024 up until Philadelphia Police separated Justin and I approximately 11-12 minutes into the recording, and I believe that recording accurately reflects the statements and events

I heard during our removal from CHOP.

4.     I was present during the August 15, 2024 morning rounds reflected in **Exhibit-7-August-15-Morning-Rounds-Converted.mp3**, and I believe that recording accurately reflects the statements made during those rounds.

**Statements**

5.     From August 11, 2024, until the separation on August 12, 2024, I personally observed VC's bedside monitor repeatedly display temperatures in approximately the 36.4 to 37.0 degrees Celsius range.

6.     I was present during the August 12, 2024 morning rounds when CHOP's care team described VC as stable during the prior 24 hours.

7.     As of August 12, 2024, Justin and I had consented to the life-saving procedures proposed for VC. We declined genetic testing and HIV testing, but we had not refused life-saving treatment.

8.     On August 12, 2024, after discussions with CHOP staff, including a CHOP geneticist, Justin and I understood that the genetic test results would likely be inconclusive. Based on those discussions, and based on VC's observed progress and current stability, we decided to decline the genetic test because we believed an inconclusive result would likely be used to justify further medications, procedures, and diagnoses without clear benefit to VC.

9.     On August 12, 2024, after CHOP asserted that custody had been transferred, neither Justin nor I were shown any written court order directing us to leave CHOP or prohibiting us from seeing VC before police removed us.

10. I personally heard CHOP staff state words to the effect that an order meant Justin and I were not permitted at the hospital and were not to have contact with VC until further notice or until the investigation progressed.

11. I was present for the audio statements cited in **Exhibit-0-Exhibit-Excerpts.pdf**, personally heard those statements, and believe the cited excerpts accurately reflect what was said in the recordings.

12. At approximately 7:15 to 7:30 p.m. on August 12, 2024, while Justin and I were in the NICU hallways at CHOP, a CHOP social worker who identified herself as Kiwana approached us with multiple CHOP security personnel, including one who identified himself as Lieutenant Jeff. They directed us to go downstairs, outside the NICU, to discuss what they represented was an order downstairs. They briefly attempted to stop us from going to see VC, but Justin and I refused to go downstairs unless and until we were shown a physical court order. Kiwana then allowed us to proceed to VC's unit and stated that she would bring the order to us.

13. Justin and I then proceeded to VC's unit, where my father, Mike Lombard, was present with VC. At approximately 8:00 p.m. on August 12, 2024, approximately fifteen people approached us at VC's unit, including CHOP Security, CHOP social-work staff, CHOP medical staff, and Philadelphia police officers. This was the first time I observed any police presence that evening.

14. After Justin and I were removed from CHOP, CHOP performed the genetic test that we had previously declined while CYS asserted medical decision-making authority over VC.

15. On August 26, 2024, a CHOP care-team employee verbally disclosed the

genetic test results to Justin and me. We were told that the test had no findings.

16.    Justin and I later requested that CHOP delete the genetic data generated from that testing.

17.    Because CHOP continues to retain the genetic data in multiple locations and has refused to delete it, I remain concerned about the continued possession, use, disclosure, copying, transfer, or dissemination of that information. In my view, once genetic information is used or disclosed, the loss of privacy cannot be undone.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 19, 2026.

**Respectfully submitted on this day of June 19, 2026**

*Rebecca Lombard*

Rebecca Lombard, Plaintiff