UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**JUSTIN CARLSON et al.,**
**PLAINTIFFS,**

**vs.**

**MICHELLE GRAZIANO et al.**
**DEFENDANTS.**

**NO. 3:26-CV-01231**
**CAMONI, M.J.**

**EX-0-EXHIBIT-EXCERPTS**

## EXHIBIT EXCERPTS TABLE OF CONTENTS

A. August 13 - Shelter Care Application (Ex#1 at 1)..................................................1

B. August 13 - Custody Orders (Ex#1 at 2-9)............................................................. 1

C. August 14 - Shelter Care Hearing Transcripts (Ex#1 at 17-43)...........................2

D. Trial-court docket (Ex#1 at 10-16)........................................................................ 6

E. October 15 - Injunction Hearing (Ex#1 at 44-52)................................................. 6

F. August 12 Morning Rounds Audio (Ex#4-5)......................................................... 7

G. August 15 Morning Rounds Audio (Ex#7).......................................................... 9

H. August 12 Separation Audio Cites (Ex#6)......................................................... 10

I. August 12 - City Code Violations (Ex#1 at 53)................................................... 12

J. October 23 - CHOP Genetic Deletion Refusal Letter (Ex#1 at 54-56)................12

K. Pennsylvania Superior Court Opinion (Carlson v. Graziano)............................13

L. August 4-5 Report was not a report of child abuse (Ex#1 at 57)........................ 14

## A.   August 13 - Shelter Care Application (*Ex#1 at 1*)

A.1.   Protective custody at 3:30 pm on 8/12/2024.

> ☒ Child is in Protective Custody (removed from the home) and under supervision of the county agency
> Date: 08/12/2024                    Time: 3:30pm
> Location of the child is: Childrens Hospital of Philadelphia

*See Ex#1 at 1.*

## B.   August 13 - Custody Orders (*Ex#1 at 2-9*)

B.1.   Legal custody, physical custody, and medical decision rights transferred.

> 7. CUSTODY AND CONDITIONS
> ☒ (a) LEGAL CUSTODY – Legal Custody of the Child shall ☐remain with ☐return to ☒transfer to:
> ☐ (i) Mother and Father _____
> ☐ (ii) Mother _____
> ☐ (iii) Father _____
> ☒ (iv) County Agency Susquehanna County Services for Children and Youth ("Agency")
> ☐ (v) Other _____ Relationship: _____
> ☒ (b) PHYSICAL CUSTODY – Physical Custody of the Child shall ☐remain with ☐return to ☒transfer to:
> ☐ (i) Mother and Father
> ☐ (ii) Mother
> ☐ (iii) Father
> ☒ (v) County Agency Susquehanna County Services for Children and YouthAgency")
> ☐ (iv) Other _____Relationship: _____

*See Ex#1 at 3.*

> ☒ (b) HEALTH EVALUATIONS – Specify any health evaluations, tests, counseling, or treatments that are necessary: Any and all medical procedures needed for the well-being and care of the child.

*See Ex#1 at 4.*

B.2.   Assessment of imminent danger was required for seizure.

> ☒ GRANTED - The application for court order of protective custody by the County Children and Youth Services Agency is hereby granted.         and/or any duly authorized law enforcement officer is authorized to investigate further the surroundings of the above-named child and to take the child into custody if the child is in imminent danger from his/her surroundings or has run away from his/her surroundings or has run away from his or her custodian. If the child is taken into custody, a shelter care hearing must be held on the next day that the court is available to hear shelter hearings.

*See Ex#1 at 3 & 6.*

**C.    August 14 - Shelter Care Hearing Transcripts** (*Ex#1 at 17-43*)

C.1.   **Judge Legg —** *Okay. And let me explain to the two of you in terms of the oral Order. As Ms. Graziano noted, when she and I spoke it was my understanding that the child was - - basically had organs shutting down, was near death, and it was - - basically that you were all denying medical care that would have been - - kept [VC] alive. That's what I was led to believe. That's where the emergency arose. That's why it was an oral Oder.* *— Tr. 86:18 —* ***See Ex#1 at 42-43.***

C.2.   **Lindsey Kunkel —** *And so - - because my concern was, okay, you have an open case and it's nine days later, and this - - [VC] is in a dire situation, did you ever lay eyes on this child. And she was saying that no one was able to have the opportunity to do so. — Tr. 53:6 —* ***See Ex#1 at 31.***

      **Lindsey Kunkel—***But then in learning all of this information that I just disclosed, and talking with the director, Michelle Graziano, from Children and Youth, Susquehanna Children and Youth, she was saying that DHS, which is Department of Human Services for Philadelphia County, was going to do a courtesy visit based on how far away Philadelphia is from your location to not only lay eyes on the baby, but also to disclose this verbal Emergency Order to parents. And again, now this is over the 5 and 6:00 hour. — Tr. 54:24 —* ***See Ex#1 at 32.***

C.3.   **Q** — *Was there a statement made or an indication made that the parents were going to seek to stop the continued interventions?*
**Dr. Medoro** — *Not to me. — Tr. 21:1 —* ***See Ex#1 at 22.***

      **Q —** *[D]id we ever tell you to take [VC] off any medications?*
**Dr. Medoro —** *No, sir, you did not. — Tr. 25:22 —* ***See Ex#1 at 23.***

      **Q —** *[O]ther than our refusal for an HIV test and genetic testing, did we*

PLAINTIFFS' EXHIBIT EXCERPTS
FOR PRELIMINARY INJUNCTION AGAINST DEFENDANT CHILDREN'S
HOSPITAL OF PHILADELPHIA (CHOP)

*prevent you from proceeding with any of your standard protocols in your treatment process?*

**Dr. Medoro** — *No, you did not.*

**Q** — *Did we, when you came to us, accept what you offered and give approval to every request other than those two denials to search for HIV and a genetic test?*

**Dr. Medoro** — *Correct. That was our experience together. — Tr. 29:21 —* ***See Ex#1 at 25.***

**THE COURT** — *So, Doctor, this is the Judge. One of the reasons for protective custody was the suggestion that the parents were interfering to some degree, or blocking, medical care that was necessary for [VC]. Can you provide any information as to that allegation?*

**Dr. Medoro** — *… [A]t no point did this family, for me, impair the medical care of this child. — Tr. 35:16 —* ***See Ex#1 at 27-28.***

**Q** — *Did she get the medical intervention to stop her from dying?*

**Dr. Medoro** — *Correct. Yes, she did. — Tr. 37:11 —* ***See Ex#1 at 29.***

**Q** — *At any time prior today have the mother and father wanted to have the child discharged from the hospital?*

**Dr. Medoro** — *That has not been my experience at CHOP. — Tr. 40:3 —* ***See Ex#1 at 30.***

**Q** — *Did the parents indicate that if she was discharged from your hospital they would seek further medical treatment in another medical facility?*

**Dr. Medoro** — *We did not discuss discharge, so because of that we did not discuss that possibility. — Tr. 40:11 —* ***See Ex#1 at 30.***

**Q** — *Were you made aware of any statements about refusing any testing or*

PLAINTIFFS' EXHIBIT EXCERPTS
FOR PRELIMINARY INJUNCTION AGAINST DEFENDANT CHILDREN'S
HOSPITAL OF PHILADELPHIA (CHOP)

3

*treatment at your hospital?*

**Kunkel** — … *So there were some questions between my team and conversations with parents about parents' concerns with certain medications, also the genetic testing that Dr. Medoro mentioned. But other than that, I was not aware of any other refusal.* — Tr. 58:6 — ***See Ex#1 at 36.***

C.4.  **Q** — *Does [VC] currently have any organs that are shutting down?*
       **Dr. Medoro** — *So I would say she is on life supporting measures, but I don't know that I could describe any of her organs as shutting down.* — Tr. 35:5 — ***See Ex#1 at 27.***

       **Kunkel** — *In this courtroom today is the first time I'm hearing anything about organs shutting down.* — Tr. 71:2 — ***See Ex#1 at 41.***

C.5.  **Lindsey Kunkel** — *So Ms. Roszel actually, she told me that we needed to file another report based on the condition of the child.* — Tr. 53:11 — ***See Ex#1 at 31.***

       **Dr. Medoro** — *Myself and my social worker did file a report at the request of - - and I may have to defer a little bit on the wording to my colleague who will use the correct words for this. But we did file a report. At the request of the initial referring county, we did file a report in kind with updated information.* — Tr. 36:24 — ***See Ex#1 at 28.***

       **THE COURT** — *So let me have just a minute. I want to make sure I understand something. So Ms. Kunkel, you did not make this report out of your own volition? This was at the prompting of Susquehanna County Children and Youth, is that what you're saying?*
       **Lindsey Kunkel** — *That's correct.* — Tr. 65:6 — ***See Ex#1 at 38.***

C.6.  **THE COURT —** *Quite - - and quite frankly, the Court never ordered, never ordered, that the parents couldn't be around their child or in the presence of their child.*

*ATTORNEY MCCAMBRIDGE — I understand that, Your Honor. And that was not the Agency. — Tr. 56:12 — **See Ex#1 at 34.***

C.7.  **Dr. Medoro** *— We have genetic testing pending at this time that will help us determine if that is the underlying cause. — Tr. 19:6 — **See Ex#1 at 20.***

C.8.  **Q** *— [D]id you have any information that when the baby left the hospital that there was any illnesses, any symptoms, any signs that the parents should have been concerned of?*
**Dr. Medoro** *— I did receive a discharge summary from the hospital, and that information was not there for me. — Tr. 36:7 — **See Ex#1 at 28.***

*Q — Do you have any information of anything we did specifically that caused this case of severe jaundice?*
**Dr. Medoro** *— That, I cannot comment on. I can't. I don't know enough to have an opinion about that. I only met your baby here at CHOP. — Tr. 30:5 — **See Ex#1 at 26.***

*Q — The question is, are you aware of any repeated, prolonged, or egregious failure to supervise the child?*
**Lindsey Kunkel** *— There's no way of me being able to confirm that. — Tr. 64:17 — **See Ex#1 at 37.***

**Lindsey Kunkel** *— So Dr. Medoro and I made that report approximately around 3:45 in the afternoon via phone on the 12th, on Monday. And in the meantime - - that was right before we had made the call for the report. At 3:30, she, Ms. Roszel, the supervisor at Susquehanna CYS, she had called*

PLAINTIFFS' EXHIBIT EXCERPTS
FOR PRELIMINARY INJUNCTION AGAINST DEFENDANT CHILDREN'S
HOSPITAL OF PHILADELPHIA (CHOP)

*me back and said that, because of the near fatality and the nature of the case, that Judge Jason Legg had made a verbal Order for protective custody and that they would be getting us the Court — Tr. 53:17 —* **See Ex#1 at 31.**

**Q** — *You testified that you filed the report from CHOP around 3 to 4:00 p.m., is that correct?*
**Lindsey Kunkel** — *Yep. 3:45*

**Q** — *And what time were you notified of Judge Legg's Order?*
**Lindsey Kunkel** — *Around 3:30.*

**Q** — *Around 3:30?*
**Lindsey Kunkel** — *Um-hum.  — Tr. 67:18 —* **See Ex#1 at 39.**

C.9.  **Dr. Medoro** — *The other potential cause of this, which I consider it more of a diagnosis of exclusion once I've ruled out these other things, would be infection or just acute illness that presented in this way. — Tr. 19:8 —* **See Ex#1 at 20.**

**D.  The trial-court docket reflects no affidavits, sworn testimony, probable-cause hearing, or any filing made under oath or affirmation to support the August 12 seizure of VC.**
(*Ex#1 at 10-16*)

**E.  October 15 - Injunction Hearing** (*Ex#1 at 44-52*)

E.1.  **Judge Legg —** *So, we did talk. So, it would have just, that would just been the two of us on the line. — Tr. 8:19 —* **See Ex#1 at 46.**

**Justin**—*And as you just said, it was Graziano on the phone. So, all I can*

PLAINTIFFS' EXHIBIT EXCERPTS
FOR PRELIMINARY INJUNCTION AGAINST DEFENDANT CHILDREN'S
HOSPITAL OF PHILADELPHIA (CHOP)

*go off of with no sworn affidavit filed into the record, there isn't one. I haven't been handed one or served one. All I can go off is you must have sworn her in on the phone call to get that probable cause. So, that means Graziano is the one, Michelle Graziano, who is sitting right there, is the one who gave you false testimony in order to steal my child.*

**Judge Legg**—*I can tell you I did not swear her in. ... Nor have I ever sworn a caseworker in when they're seeking shelter care. I do talk to them, but I've never sworn them in. Maybe that's my error — Tr. 26:8 —* **See Ex#1 at 48.**

E.2.  **Q —** The key part is when -- okay. When your team began their investigation, were they following up on child abuse as defined?
**Michelle Graziano —** For which report? The child abuse report, yes.

**Q —** Well, let's go through each. The first one, what –
**Michelle Graziano —** First report is a general referral. So, that would have a bit of a different process.

**Michelle Graziano —** The second one is a child abuse. — *Tr. 121:20 —* **See Ex#1 at 51.**

F.  **August 12 Morning Rounds Audio** (*Ex#4-5*)
Audio from the August 12 morning rounds with VC's care team and Plaintiffs confirms VC's morning stability status.
*See also - Plaintiffs' Declarations*

F.1.  that an echocardiogram performed over the weekend showed "*normal function.*" — **See Ex#4 at 00:30**

F.2.  VC's "*hemoglobin went from 12.9 to 12.7*", within normal range. — **See Ex#4 at 01:10**

F.3.   that VC had "*normal glucose.*" — *See Ex#4 at 01:20*

F.4.   that VC's gram stain "*does not have any organisms.*" — *See Ex#4 at 01:20*

F.5.   that "*HSB from serum was negative.*" — *See Ex#4 at 01:35*

F.6.   that "*her temperatures are stable overnight.*" — *See Ex#4 at 01:50*

**F.7.   that: "*So overall, I think we've been stable in the last 24 hours.*"  — *See Ex#4 at 03:00***

F.8.   VC was "*able to avoid doing another double volume at this point.*" — *See Ex#4 at 03:15*

F.9.   Nurse forgot to report something, but claimed it was "*stable*". — *See Ex#4 at 03:30*

F.10.  that VC's kidneys were "*appropriately functioning.*" — *See Ex#4 at 03:40*

F.11.  that from a respiratory standpoint, the team stated: "*I think she's been really stable.*" — *See Ex#4 at 04:30*

F.12.  that "*FiO2 was at 21%*", the lowest setting, and confirmed she was on "*minimal vent.*" — *See Ex#4 at 04:30*

F.13.  Though the team was hesitant towards extubation, it was discussed due to her respiratory progress. — *See Ex#4 at 04:50*

F.14.  The team reduced VC's lab testing frequency, stating: "*I think we just do afternoon labs.*" — *See Ex#4 at 06:00*

F.15.  The team discusses meningitis and conflicting results with red and white blood cells, never confirming meningitis. — *See Ex#4 at 06:20*

F.16.  Regarding lumbar puncture results, the team stated: "*we don't see anything right now.*" — *See Ex#5 at 00:00*

**G.  August 15 Morning Rounds Audio** (*Ex#7*)

Audio from the August 15 morning rounds with VC's care team and Plaintiffs confirms after Plaintiffs lost custody of VC on August 12, 2024, no further life-saving procedures were scheduled or performed; only weaning from interventions and continued signs of clinical improvement.

*See Ex#4 - August 15 Morning Round Audio;*

*See - Plaintiffs' Declarations*

G.1.  that they were able to stop administering dopamine. — ***See Ex#7 at 00:50***

G.2.  they were able to remove the "PAL", which was an arterial line later that afternoon. — ***See Ex#7 at 01:15***

G.3.  they were testing ventilator settings disabled to see if the ventilator tube can be removed. — ***See Ex#7 at 01:30***

G.4.  that all of VC's "gases have looked beautiful". — ***See Ex#7 at 02:00***

G.5.  that meningitis was never confirmed. — ***See Ex#7 at 02:45***

G.6.  sent another test out (PCR). — ***See Ex#7 at 04:45***

G.7.  "*Either way, she's going to get treated for meningitis.*" — ***See Ex#7 at 05:25***

G.8.  VC able to start breast milk feeding. — ***See Ex#7 at 06:00***

G.9.  Rebecca's milk volume decreased since the separation. — ***See Ex#7 at 06:30, 08:40***

G.10.  no seizures since August 11 and VC was off the EKG. — ***See Ex#7 at 010:30***

G.11.  that since the August 12 separation, "*the only additional studies that were sent were urine culture and the urine analysis*" which remained "*unremarkable.*" — ***See Ex#7 at 12:20***

PLAINTIFFS' EXHIBIT EXCERPTS
FOR PRELIMINARY INJUNCTION AGAINST DEFENDANT CHILDREN'S
HOSPITAL OF PHILADELPHIA (CHOP)

G.12.   that since the August 12 separation "*clinically, we've mostly just weaned*". — ***See Ex#7 at 13:15***

G.13.   that since the August 12 separation, "*the one thing that the county gave approval for, after talking to the liver doctors, was a genetic test that would look for reasons why her jaundice was so high.*" — ***See Ex#7 at 13:15***

G.14.   that VC's "*liver levels are good*". — ***See Ex#7 at 13:35***

G.15.   genetic test results takes two weeks.  — ***See Ex#7 at 14:10***

G.16.   the genetic test "*runs all the chromosomes*".  — ***See Ex#7 at 14:55***

G.17.   Plaintiffs reaffirm their cause for concern was being told the genetic test was likely to be "*inconclusive*" — ***See Ex#7 at 15:45, 16:45***

G.18.   "*all good signs in terms of her clinical stability.*" — **See Ex#7 at 29:50**

## H.   August 12 Separation Audio Cites (*Ex#6*)

Audio from the August 12 separation confirms Plaintiffs were removed from the hospital at CHOP's request for "trespassing" without any allegations of imminent danger or judicial authorization.

*See Ex#5 - August 12 Arrest Audio;*

*See - Plaintiffs` Declarations*

H.1.   **Plaintiffs were removed for trespass at CHOP's request—not posing any danger:**

A CHOP social worker named Kiwana[1] stated "*The order is saying upon further notice, you are not able to be permitted at the hospital, no contact to the hospital, until they further the investigation.*" — ***See Ex#6 at 07:05***

CHOP security Lieutenant Jeff told Plaintiffs, "*We're asking you to leave*

---

[1] Kiwana is likely spelled incorrectly and identified herself to Plaintiffs from a previous conversation.

...", "*You are defying trespass ...*", "*You're restricted from CHOP*" and "*I can escort you out...*" — ***See Ex#6 at 07:50, 10:00***

Plaintiffs refused CHOP's request to leave without a court order, but stated they would not fight, resist, or attempt to hurt anyone. — ***See Ex#6 at 10:20***

Officer Doe One (Brian Griffin) arrests Carlson for refusing to leave without a court order — ***See Ex#6 at 10:30***

Officer Doe One (Brian Griffin) searches and seizes Carlson's belongings. — ***See Ex#6 at 11:45***

Officer Doe One (Brian Griffin) told Carlson, "*You were told, you were not allowed to be here,*" and "*You said you were refusing to leave. That's defying trespass.*" — ***See Ex#6 at 12:40, 13:10, 13:35***

Officer Doe One (Brian Griffin) admits he seized Carlson's belongings. — ***See Ex#6 at 13:00***

Officer Doe One (Brian Griffin) told Justin, "*I don't know what you are going through, I don't know what the hospital did but they asked you to leave and you're not leaving.*" — ***See Ex#6 at 13:35***

Officer Doe One (Brian Griffin) stated, "*You're under arrest actually bud ...*" and responds "*for trespass*" when Justin asks "*for what?*" — ***See Ex#6 at 18:10***

Plaintiffs were uncuffed, handed citations for simple trespass, Carlson's seized property was returned, and told returning would make the simple trespass into criminal trespass resulting in jail. — ***See Ex#6 at 46:20***

PLAINTIFFS' EXHIBIT EXCERPTS
FOR PRELIMINARY INJUNCTION AGAINST DEFENDANT CHILDREN'S
HOSPITAL OF PHILADELPHIA (CHOP)

**I.    August 12 - City Code Violations** (*Ex#1 at 53*)

I.1.   Date/Time of 8/12/2024 at 8:13 pm.  — ***See Ex#1 at 53.***

I.2.   Violation of 3503(b.1) - Simple Trespass.  — ***See Ex#1 at 53.***

I.3.   States: "*Abv. was asked to leave CHOP by security. Abv. refused.*"  — ***See Ex#1 at 53.***

**J.    October 23 - CHOP Genetic Deletion Refusal Letter** (*Ex#1 at 54-56*)

J.1.   *We are writing in response to verbal requests you made to staff at Children's Hospital of Philadelphia (CHOP) during your daughter VC's recent inpatient admission. Specifically, you requested that the results of the genetic test performed by the CHOP Genomic Diagnostic Laboratory (GDL) to treat VC not be used for research and that CHOP remove the the genetic information from VC's medical record.*

J.2.   *When a patient receives a genetic test, a blood sample is drawn, **DNA is obtained** from that blood sample, and the test is run using that DNA. The test produces **raw genetics test data** that requires analysis and interpretation to produce the test result. The test result itself is placed into the patient's CHOP medical record. The raw genetic test data used to produce the interpreted test result **is stored** in a secure CHOP system in the GDL separate from the CHOP medical record **due to the vast size of information involved**. (emphasis add)*

J.3.   *However, please note that based on CHOP's document retention and destruction policies, we are required to retain the test result for ten (10) years from the earlier of age 18 or the patient's death, and are therefore not able to remove the test result from [VC's] medical record at this time.*

J.4.   *With regard to CHOP's ability to delete raw genetic test data from the system, CHOP is required to maintain the data in our secure lab system to*

*comply with laboratory accreditation standards for a period of two years. The GDL will delete the raw genetic data from [VC's] test from the secure CHOP system in the GDL after two years (on August 26th, 2026). It may take longer to eliminate the date in back-up systems or servers.*

**K.  Pennsylvania Superior Court Opinion** (*Carlson v. Graziano, Pa: Superior Court 2026*)

K.1.  "*CYS set forth no basis for its oral application other than its own assertions from the Wayne referral and CHOP referral. Indeed, the statements it made to the court in seeking emergency protective custody turned out to be misconstrued from the information reported by CHOP. In the written application, CYS verified to the court the information it relied upon from those referrals in making the oral application, and included more details from the referrals. However, it apparently did so without subjecting the contents of the CHOP referral to any level of scrutiny. In other words, it appears that CYS blindly attested to the accuracy of the information it received without making any effort to confirm its veracity or proper understanding before seeking emergency protective custody. For example, at the hearing, V.C.'s attending neonatologist testified that "at no point did[Appellants] impair the medical care of [V.C.]" while at CHOP. See N.T.Hearing, 8/14/24, at 36, 43-44; see also id. at 71 (CHOP's social worker testifying that CYS may have misconstrued the information CHOP provided to reach the conclusion that V.C.'s organs were shutting down). Once it became obvious that the reality was significantly different than reported, CYS was compelled to move to withdraw the request for emergency protective custody. Accordingly, we hold that the shelter care application lacked even a minimum threshold level of reliability and the agency therefore acted in contravention of Rule 1240 in seeking emergency protective custody without confirmation of the contents of the CHOP*

referral.”—*Majority Mem. at 17-18*

K.2.  “*As set forth herein, its discretion is not unfettered, but rather bound by the protections of our federal and state constitutions. That is, “[t]he agency must articulate to the court the basis for its belief[,]”Petition to Compel, 875 A.2d at 380 (Beck, J., concurring), with "reasonable factual specificity[,]” In re R.M., 790 A..2d at 305 (cleaned up), and a truthful verification, as dictated by Rule 1240. Accord Mulholland, 706 F.3d at 241(reiterating that the guarantees of substantive due process require that a child only be removed from a parent's care when there is “an objectively reasonable suspicion of abuse, based on the information available at the time”*”—*Majority Mem. at 18*

K.3.  “*Upon review, we agree with Appellants that these factors do not fall within the statutory definition of child abuse as CYS did not establish a causal nexus between Appellants’ conduct and V.C.’s condition. In fact, Appellants brought V.C. to the hospital to receive life-saving care, and despite their trepidation about the manner of how that care had to be given, they did not attempt to discharge her against the advice of the medical team nor ask them to cease any life-saving measures. Having discussions about their concerns does not amount to interference, but rather the attempt many parents would make to understand the appropriateness of the care their child is receiving. Accordingly, CYS lacked authority to initiate the CHOP referral investigation.*”—*Majority Mem. at 23–24.*

PLAINTIFFS’ EXHIBIT EXCERPTS
FOR PRELIMINARY INJUNCTION AGAINST DEFENDANT CHILDREN’S
HOSPITAL OF PHILADELPHIA (CHOP)

**L.    August 4-5 Report was not a report of child abuse** (Ex#1 at 57)

What type of access does the <mark>alleged perpetrator</mark> have to the child?

Risk Rating:    Low Risk
Danger Rating:    No danger exists
Safety Rating:    Child is safe

<mark>no current child abuse and/or neglect reported - mother does not have health care but an application was given to mom at the hospital</mark>

**M.    Plaintiffs` Declarations** (Ex#2-3)

M.1.    Rebecca and I then proceeded to VC's unit, where Rebecca's father, Mike Lombard, was present with VC. At approximately 8:00 p.m. on August 12, 2024, approximately fifteen people approached us at VC's unit, including CHOP Security, CHOP social-work staff, CHOP medical staff, and Philadelphia police officers. This was the first time I observed any police presence that evening. — **See Ex#2 at ₱18.**

M.2.    Justin and I then proceeded to VC's unit, where my father, Mike Lombard, was present with VC. At approximately 8:00 p.m. on August 12, 2024, approximately fifteen people approached us at VC's unit, including CHOP Security, CHOP social-work staff, CHOP medical staff, and Philadelphia police officers. This was the first time I observed any police presence that evening. — **See Ex#3 at ₱13.**