Case 3:26-cv-01231-SAC   Document 24-6   Filed 06/19/26   Page 1 of 58

Susquehanna County Clerk of Courts Received 8/13/2024 12:07 PM
Susquehanna County Clerk of Courts Filed 8/13/2024 12:57 PM
CP-58-DP-0000011-2024

Commonwealth of Pennsylvania
Court of Common Pleas – Juvenile Division
County of [Name]
Judicial District



Docket No: CP-___-DP-_____-20___
FID: _____-FN-_____-20___
County Local No: _____

| FILING TYPE |
|---|
| ☒ SHELTER CARE APPLICATION |

## PETITIONER / AGENCY

| Name: Susquehanna COunty Children and Youth Services | Address: 75 Public Ave Montrose, PA 18801 | Phone: 570-278-5920 |
|---|---|---|

## IN THE INTEREST OF:

| Name: ▉▉▉ VC | Age: ▉▉ 2024 | DOB: 10 days | Sex: F |
|---|---|---|---|

| Address: 3401 Civic Center BLVD Philadelphia, PA 19104 | Phone Number(s): | Phone Type: |
|---|---|---|

Race: ☐ Asian/Pacific Islander  ☐ Bi-Racial  ☐ Unknown/Unreported
☐ Black  ☐ American Indian/Alaskan Native
☒ White  Tribal Affiliation: _____

Ethnicity: ☐ Hispanic
☒ Not Hispanic
☐ Unknown

## CASE INFORMATION

**Type of Dependency**: The child named above comes within the jurisdiction of the court as defined by The Juvenile Act at 42 Pa.C.S.§6302.

Abuse and/or Neglect
☒ (1) is without proper care or control
☐ (2) has been placed for care or adoption in violation of law
☐ (3) has been abandoned
☐ (4) is without a parent, guardian, or legal custodian
☐ (10) is born to a parent whose parental rights with regard to another child have been involuntarily terminated
**Abuse:**
☐ The petition alleges that the above named child is a victim of child abuse as defined at 23 Pa.C.S. §6303.

Status Offense
☐ (5) while subject to compulsory school attendance is habitually and without justification truant from school
☐ (6) has committed a specific act or acts of habitual disobedience
☐ (7) is under the age of ten years and has committed a delinquent act
☐ (8) has been formerly adjudicated dependent, and is under the jurisdiction of the court
☐ (9) has been referred pursuant to section 6323 (relating to informal adjustment), and who commits an act which is defined as ungovernable in paragraph (6)

### Protective Custody:

☐ Child is NOT in Protective Custody
Location of the child is: _____
☐ Child remains in home but is in <u>imminent risk</u> of placement in foster care absent preventive services.

☒ Child is in Protective Custody (removed from the home) and under supervision of the county agency
Date: 08/12/2024          Time: 3:30pm
Location of the child is: Childrens Hospital of Philadelphia

## CHILD'S PARENTS AND/OR OTHER LEGAL GUARDIAN OR CUSTODIAN

| Mother's Name: Rebecca Lombard | Father's Name: Justin Carlson | Legal Guardian's or Custodian's Name: |
|---|---|---|
| DOB: 05/31/1991 | DOB: | Relationship:          DOB: |
| Address: 171 Elk View Dr. Clifford Township, PA 18421 | Address: 171 Elk View Dr Clifford Township, PA 18421 | Address: |

| Phone Number(s): | Phone Type: | Phone Number(s): | Phone Type: | Phone Number(s): | Phone Type: |
|---|---|---|---|---|---|
| | | | | | |

☐ Whereabouts Unknown          ☐ Whereabouts Unknown          ☐ Whereabouts Unknown

☐ Closest Relative – If whereabouts unknown for Parents and Guardian
Name:
Address:
Phone Number:
Relation to Child:

☐ Additional Participants with Relationship to Child (see attached)

## CHILD'S ATTORNEY/GUARDIAN AD LITEM

| Attorney's Name: | Guardian Ad Litem's Name: Michael Gathany |
|---|---|
| Address: | Address: 671 Main Street Hallstead, PA 18822 |
| Supreme Court ID: | Supreme Court ID: 46607 |

| Commonwealth of Pennsylvania | IN THE COURT OF COMMON PLEAS OF SUSQUEHANNA COUNTY, PENNSYLVANIA |
|---|---|

**In the Interest Of:**

**JUVENILE DIVISION**

VC    **a Minor**

Date of Birth ▮▮▮ 2024

DOCKET NO: CP-   -DP- 11 - 2024
FID:          -FN-      -

## CONFIRMATION OF VERBAL ORDER FOR EMERGENCY PROTECTIVE CUSTODY

AND NOW, this 12th day of August, 2024, the court confirms its verbal order given on the 12th day of August, 2024, in which the court considered and determined:

1. **REASONS FOR PROTECTIVE CUSTODY**

☒ The Court finds the following reasons for taking the child into protective custody:

1. ▮▮▮▮ child is a newborn baby born on ▮▮/2024.

2. The Agency received a report on 8/4/2024 reporting that the parents did not have health insurance and mother did not receive any prenatal care during her pregnancy with child.

3. Child was reportedly born at approximately 34 weeks gestation at Wayne Memorial Hospital in Honesdale, PA.

4. It was reported that child did not have any imminent issues at the time of the report, however the doctor treating the child wanted child to remain in the hospital for an additional week for observation due to the gestational age.

5. Parents refused to allow child to stay for the week of observation.

6. Referral Source reported that the child was not signed out against medical advice in that there were no imminent health issues identified.

7. The agency attempted to conduct a Home Visit to assist family with any needs they may have regarding obtaining health insurance and follow up care of the infant, however the parents vehemently refused the assistance reporting they had what they needed and did not need agency assistance.

8. On 8/12/2024 the agency received a subsequent referral stating that the child was being treated at Children's Hospital of Philadelphia (CHOP).

9. Child reportedly arrived at CHOP after being seen at an emergency room in Jersey Shore, PA where the family was reportedly visiting family. Attending emergency room provider sent child to CHOP for further assessment due to extremely high bilirubin levels- jaundice.

10. Child is reportedly being treated for severe jaundice, which is reportedly preventable if child would have received additional time at Wayne Memorial Hospital after birth.

11. Child is at CHOP. Parents are reportedly refusing any subsequent testing of child and were also asking for some of the medications to be stopped.

12. Child is currently receiving life-saving measures as the child's organs are reportedly shutting down. RS is concerned that child will not live if these measures are not allowed to be provided and testing is not done to know how to best treat the child's medical conditions.

13. The report received by the agency on 8/12/2024 is registered as a Near Fatality Child Abuse Report.

2. **INCARCERATED PARENT(S)/GUARDIAN(S)**

☐ (a) The Child's Mother is currently incarcerated.

☐ (b) The Child's Father is currently incarcerated.

☐ (c) The Child's Legal Guardian/Custodian is currently incarcerated.

3. **REASONABLE EFFORTS TO PREVENT REMOVAL FROM HOME**

☒ (a) The Court finds that to allow this child to remain in the home would be contrary to the child's welfare and that

☐ (i) Reasonable efforts were made by the County Children and Youth Services Agency to prevent or eliminate the need for removal of this child from the home.

☒ (ii) Preventive services were not offered due to the necessity for emergency placement. The lack of services was reasonable under the circumstances. This level of effort was reasonable due to the emergency nature of the situation, safety considerations, and circumstances of the family.

☐ (iii) Reasonable efforts are underway to make it possible for the child to return home, the Court having previously determined pursuant to 42 Pa.C.S.A. § 6332 that reasonable efforts were not made to prevent the initial removal of this child from the home.

☐ (b) NO reasonable efforts were made by the County Children and Youth Services Agency to prevent or eliminate the need for removal of this child from the home.

## 4. SUFFICIENT EVIDENCE

☒ (a) Sufficient evidence was presented to prove the child should be kept in shelter care and that remaining in the home of Rebecca Lambard and Justic Carlson, Relationship: Mother and Father is not in the best interest of the Child.

☐ (b) Insufficient evidence was presented to prove that continuation or return of the child to his or her home is not in the child's best interests.

## 5. REASONABLE EFFORTS TO COMPLY WITH FAMILY FINDING REQUIREMENTS

☒ (a) The Agency has satisfied the requirements of Pa.R.J.C.P.1149 regarding family finding.
☐ (b) The Agency has not satisfied the requirements of Pa.R.J.C.P. 1149 regarding family finding.
☐ (c) The court previously ordered that family finding efforts be discontinued.

## 6. FURTHER FINDINGS

☐ (a) THE COURT FURTHER FINDS:
_____

☐ (b) Further Findings Attached

## ORDER – THE VERBAL ORDER IS HEREBY CONFIRMED AND:

☐ **DENIED** - The application for court order of protective custody by the County Children and Youth Services Agency is hereby denied.

☒ **GRANTED** - The application for court order of protective custody by the County Children and Youth Services Agency is hereby granted.      and/or any duly authorized law enforcement officer is authorized to investigate further the surroundings of the above-named child and to take the child into custody if the child is in imminent danger from his/her surroundings or has run away from his/her surroundings or has run away from his or her custodian. If the child is taken into custody, a shelter care hearing must be held on the next day that the court is available to hear shelter hearings.

## 7. CUSTODY AND CONDITIONS

☒ (a) **LEGAL CUSTODY** – Legal Custody of the Child shall ☐remain with    ☐return to    ☒transfer to:
   ☐ (i) Mother and Father _____
   ☐ (ii) Mother _____
   ☐ (iii) Father _____
   ☒ (iv) County Agency Susquehanna County Services for Children and Youth ("Agency")
   ☐ (v) Other _____ Relationship: _____

☒ (b) **PHYSICAL CUSTODY** – Physical Custody of the Child shall ☐remain with    ☐return to ☒transfer to:
   ☐ (i) Mother and Father
   ☐ (ii) Mother
   ☐ (iii) Father
   ☒ (v) County Agency Susquehanna County Services for Children and YouthAgency")
   ☒ (iv) Other _____Relationship: _____

☒ (c) **PLACEMENT**
   ☒ (i) PLACEMENT – The Child shall ☐be placed (for first placement or any moves), by the agency in
                                      ☒remain in

| Kinship Care | Foster Care | Congregate Care | Hospitalization |
|---|---|---|---|
| ☐ Relative Care-Maternal | ☐ Foster Home | ☐ Shelter Care | ☒ Medical Care Facility |
| ☐ Relative Care-Paternal | ☐ Pre-Adoptive Home (Non-Kinship) | ☐ Group Home | ☐ Psychiatric Facility |
| ☐ Pre-Adoptive Home | ☐ Supervised Independent Living | ☐ Residential Facility | |
| ☐ Kinship Non-Relative | | ☐ Residential Treatment | |

| Care | | Facility | |
|---|---|---|---|
| ☐ Specify/Other: | ☐ Specify/Other: | ☐ Specify/Other: | ☐ Specify/Other: |

☒ (ii) The Child's placement is the least restrictive placement that meets the needs of the child and there is no less restrictive alternative available, in that The child is currently at CHOP receiving medical treatment as needed by pediatric team.

☐ (iii) If the child is taken into custody, the agency shall make every effort to place the child with relatives or persons known to the child in order to minimize trauma.

☐ (iv) The agency must exhaust all other options before the child is placed into foster care or congregate care.

☐ (v) The agency shall exhaust all efforts to place the child with sibling(s) unless joint placement with sibling(s) is contrary to the safety or well-being of the child or sibling(s).

☒ (d) **PROTECTIVE SUPERVSION** – The Child shall be under the protective supervision of the Agency.

☐ (e) **CONDITIONS** – The custody and/or placement of the child is subject to the following conditions:
_____

## 8. EDUCATION/EVALUATIONS

☐ (a) **EDUCATIONAL NEEDS** – The Child's educational needs are ☐ being addressed ☐ not being addressed.

☐ (b) **HIGH SCHOOL DIPLOMA OR GED** – The Child has attained a ☐ high school diploma ☐ GED.

    ☐ (i) The Child is pursuing post-secondary education.
    ☐ (ii) The Child is not pursuing post-secondary education.

☐ (c) **STABILITY AND APPROPRIATENESS** – In order to ensure the stability and appropriateness of the Child's education, the agency shall provide the following services: _____

☐ (d) **EDUCATIONAL DECISION MAKER** - An educational decision maker:

    ☐ (i) Shall be appointed pursuant to Rule 1147. Specify, if available: _____
    ☐ (ii) Continues to be necessary at this time. Specify, if available: _____
    ☐ (iii) Is not necessary at this time, in that: _____
    ☐ (iv) Is not applicable at this time, in that: _____

☐ (e) **EDUCATIONAL EVALUATIONS** – Specify any educational evaluations, tests, counseling, or treatments that are necessary: _____

☐ (f) **EDUCATIONAL SETTING** – While the Child is in placement, he/she shall attend:

    ☐ (i) his/her school of origin.
    ☐ (ii) a public school in proximate location to the placement facility.
    ☐ (iii) a school facilitated by the placement facility, as this court finds it is not in the best interest of the Child to attend school elsewhere.

## 9. HEALTH/EVALUATIONS

☒ (a) **HEALTH CARE AND DISABILITY** – If parental consent cannot be obtained, the following evaluations and treatment are authorized: Any and all medical procedures needed for the well-being and care of the child. This includes any procedures that are necessary.

☒ (b) **HEALTH EVALUATIONS** – Specify any health evaluations, tests, counseling, or treatments that are necessary: Any and all medical procedures needed for the well-being and care of the child.

## 10. FAMILY FINDING

☐ (a) **ENGAGE AND CONTINUE** – The court orders the Agency to engage and continue in family finding until further order of court, including, but not limited to: specialized computer searches; interviewing the child and all known family members; interviewing prior caregivers and placement providers; interviewing any previous caseworkers and probation officers; interviewing past and present service providers and therapists; checking social media sites; completing a genogram, family tree, or mapping; and all other sources that would lead to the identification of family members, kin, and fictive kin. The Agency shall present its family finding efforts at the next court hearing scheduled for this child.

☒ (b) **ENGAGE AND CONTINUE** – The court orders the Agency to engage and continue in family finding until further order of court, specifically, pursuant to the governing rules and laws of Pennsylvania. The Agency shall present its family finding efforts at the next court hearing scheduled for this child.

☐ (c) **DISCONTINUED** – Family finding shall be discontinued because it is determined that:

    ☐ (i) it no longer serves the best interests of the child.

    ☐ (ii) it is a threat to the child's safety.

    ☐ (iii) the child is in a pre-adoptive placement and the court proceedings to adopt the child have been commenced.

☐ (d) **RESUMED** – The Agency shall resume family finding because resuming family finding is best suited to the safety, protection and physical, mental and moral welfare of the child and does not pose a threat to the child's safety.

## 11. FURTHER ORDERS

☒ (a) IT IS FURTHER ORDERED THAT:

The agency has the ability to sign for any medical consent needed for the care of the child.

☐ (b) Further Orders Attached


       Such disposition having been determined to be best suited to the protection and physical, mental and moral welfare of the child.

**Next Scheduled Court Event:** _____ **Date:** _____ .


**BY THE COURT:**


Judge _____

Copies To:

_____

**Commonwealth of Pennsylvania**

**In the Interest Of:**

███████████ **a Minor**

**Date of Birth** 08/03/2024

**IN THE COURT OF COMMON PLEAS OF Susquehanna COUNTY, PENNSYLVANIA**

**JUVENILE DIVISION**

**DOCKET NO:** CP- -DP- 11 -2024
**FID:** -FN- -

# ORDER FOR EMERGENCY PROTECTIVE CUSTODY

## PERSONS APPEARING AT THIS HEARING:

☐ Child
███████████

☐ Legal Counsel for Child
_____

☐ Child's GAL
Michael Gathany

☐ CASA
_____

☐ Mother
Rebecca Lombard

☐ Mother's attorney
_____

☐ Agency Worker
_____

☐ Agency's attorney
Jennifer McCambridge

☐ Father
Justin Carlson

☐ Father's attorney
_____

☐ Legal Guardian/Custodian
_____

☐ Legal Guardian/Custodian's attorney _____

☐ Other _____

AND NOW, this 13th day of August, 2024, after review the court finds

☐ **DENIED** - The request by the County Children and Youth Services Agency is hereby denied.

☒ **GRANTED** - The request by the County Children and Youth Services Agency is hereby granted.        and/or any duly authorized law enforcement officer is authorized to investigate further the surroundings of the above-named child and to take the child into custody if the child is in imminent danger from his/her surroundings or has run away from his/her surroundings or has run away from his or her custodian. If the child is taken into custody, a shelter care hearing must be held on the next day that the court is available to hear shelter hearings.

## 1. DEPENDENCY PETITION
☐ (a) **FILED** - A Dependency Petition has been set forth alleging the above named child to be a dependent child.
☒ (b) **NOT FILED** - A Dependency Petition is to be set forth alleging the above named child to be a dependent child.
☐ (c) **DEPENDENT CHILD** – The child has been previously adjudicated dependent.

## 2. INCARCERATED PARENT(S)/GUARDIAN(S)
☐ (a) The Child's Mother is currently incarcerated.
☐ (b) The Child's Father is currently incarcerated.
☐ (c) The Child's Legal Guardian/Custodian is currently incarcerated.

## 3. EVIDENCE
☒ (a) Sufficient evidence was presented to prove that continuation or return of the Child to the home of Rebecca Lombard and Justin Carlson, Relationship: Mother and Father is not in the best interest of the Child.
☐ (b) Insufficient evidence was presented to prove that continuation or return of the child to his or her home is not in the child's best interests.

## 4. REASONABLE EFFORTS TO COMPLY WITH FAMILY FINDING REQUIREMENTS
☒ (a) The Agency has satisfied the requirements of Pa.R.J.C.P.1149 regarding family finding.
☐ (b) The Agency has not satisfied the requirements of Pa.R.J.C.P. 1149 regarding family finding.
☐ (c) The court previously ordered that family finding efforts be discontinued.

## 5. REASONABLE EFFORTS TO PREVENT REMOVAL FROM HOME
☒ (a) The Court finds that to allow this child to remain in the home would be contrary to the child's welfare and that

☐ (i) Reasonable efforts were made by the County Children and Youth Services Agency to prevent or eliminate the need for removal of this child from the home.

☒ (ii) Preventive services were not offered due to the necessity for emergency placement. The lack of services was reasonable under the circumstances. This level of effort was reasonable due to the emergency nature of the

situation, safety considerations, and circumstances of the family.

☐ (iii) Reasonable efforts are underway to make it possible for the child to return home, the Court having previously determined pursuant to 42 Pa.C.S.A. § 6332 that reasonable efforts were not made to prevent the initial removal of this child from the home.

☐ (b) NO reasonable efforts were made by the County Children and Youth Services Agency to prevent or eliminate the need for removal of this child from the home.

## 6. FURTHER FINDINGS

☐ (a) THE COURT FURTHER FINDS:

☐ (b) Further Findings Attached

**ORDER - Based upon the above findings, IT IS ORDERED THAT:**

## 7. CUSTODY AND CONDITIONS

☒ (a) **LEGAL CUSTODY** – Legal Custody of the Child shall ☐remain with ☐return to ☒transfer to:
- ☐ (i)   Mother and Father _____
- ☐ (ii)  Mother _____
- ☐ (iii) Father _____
- ☒ (iv)  County Agency Susquehanna County Children and Youth Services ("Agency")
- ☐ (v)   Other _____ Relationship: _____

☒ (b) **PHYSICAL CUSTODY** – Physical Custody of the Child shall ☐remain with ☐return to ☒transfer to:
- ☐ (i)   Mother and Father
- ☐ (ii)  Mother
- ☐ (iii) Father
- ☒ (v)   County Agency Susquehanna County Children and Youth Services ("Agency")
- ☐ (iv)  Other _____Relationship: _____

☒ (c) **PLACEMENT**
- ☐ (i) PLACEMENT – The Child shall ☐be placed (for first placement or any moves), by the agency in ☒remain in

| Kinship Care | Foster Care | Congregate Care | Hospitalization |
|---|---|---|---|
| ☐ Relative Care-Maternal | ☐ Foster Home | ☐ Shelter Care | ☒ Medical Care Facility |
| ☐ Relative Care-Paternal | ☐ Pre-Adoptive Home (Non-Kinship) | ☐ Group Home | ☐ Psychiatric Facility |
| ☐ Pre-Adoptive Home | ☐ Supervised Independent Living | ☐ Residential Facility | |
| ☐ Kinship Non-Relative Care | | ☐ Residential Treatment Facility | |
| ☐ Specify/Other: | ☐ Specify/Other: | ☐ Specify/Other: | ☐ Specify/Other: |

☒ (ii) The Child's placement is the least restrictive placement that meets the needs of the child and there is no less restrictive alternative available, in that The child is currently at CHOP receiving medical treatment as needed by pediatric team.

☐ (iii) If the child is taken into custody, the agency shall make every effort to place the child with relatives or persons known to the child in order to minimize trauma.

☐ (iv) The agency must exhaust all other options before the child is placed into foster care or congregate care.

☐ (v) The agency shall exhaust all efforts to place the child with sibling(s) unless joint placement with sibling(s) is contrary to the safety or well-being of the child or sibling(s).

☒ (d) **PROTECTIVE SUPERVSION** – The Child shall be under the protective supervision of the Agency.

☐ (e) **CONDITIONS** – The custody and/or placement of the child is subject to the following conditions:

☐ (f) **VISITATION** – The additional condition(s) of visitation is set forth as _____

AOPC Form Updated 5/3/2020

## 8.  EDUCATION/EVALUATIONS

☐ (a) **EDUCATIONAL NEEDS** – The Child's educational needs are ☐ being addressed ☐ not being addressed.

☐ (b) **HIGH SCHOOL DIPLOMA OR GED** – The Child has attained a ☐ high school diploma ☐ GED.
    ☐ (i) The Child is pursuing post-secondary education.
    ☐ (ii) The Child is not pursuing post-secondary education.

☐ (c) **STABILITY AND APPROPRIATENESS** – In order to ensure the stability and appropriateness of the Child's education, the agency shall provide the following services: _____

☐ (d) **EDUCATIONAL DECISION MAKER** - An educational decision maker:
    ☐ (i) Shall be appointed pursuant to Rule 1147.  Specify, if available: _____
    ☐ (ii) Continues to be necessary at this time.  Specify, if available: _____
    ☐ (iii) Is not necessary at this time, in that: _____
    ☐ (iv) Is not applicable at this time, in that: _____

☐ (e) **EDUCATIONAL EVALUATIONS** – Specify any educational evaluations, tests, counseling, or treatments that are necessary: _____

☐ (f) **EDUCATIONAL SETTING** – While the Child is in placement, he/she shall attend:
    ☐ (i) his/her school of origin.
    ☐ (ii) a public school in proximate location to the placement facility.
    ☐ (iii) a school facilitated by the placement facility, as this court finds it is not in the best interest of the Child to attend school elsewhere.

## 9.  HEALTH/EVALUATIONS

☒ (a) **HEALTH CARE AND DISABILITY** – If parental consent cannot be obtained, the following evaluations and treatment are authorized: <u>Any and all medical procedures needed for the well-being and care of the child. This includes any procedures that are necessary.</u>

☒ (b) **HEALTH EVALUATIONS** – Specify any health evaluations, tests, counseling, or treatments that are necessary: <u>and all medical procedures needed for the well-being and care of the child.</u>

## 10. FAMILY FINDING

☐ (a) **ENGAGE AND CONTINUE** – The court orders the Agency to engage and continue in family finding until further order of court, including, but not limited to: specialized computer searches; interviewing the child and all known family members; interviewing prior caregivers and placement providers; interviewing any previous caseworkers and probation officers; interviewing past and present service providers and therapists; checking social media sites; completing a genogram, family tree, or mapping; and all other sources that would lead to the identification of family members, kin, and fictive kin.  The Agency shall present its family finding efforts at the next court hearing scheduled for this child.

☒ (b) **ENGAGE AND CONTINUE** – The court orders the Agency to engage and continue in family finding until further order of court, specifically, <u>pursuant to the governing rules and laws of Pennsylvania.</u> The Agency shall present its family finding efforts at the next court hearing scheduled for this child.

☐ (c) **DISCONTINUED** – Family finding shall be discontinued because it is determined that:
    ☐ (i) it no longer serves the best interests of the child.
    ☐ (ii) it is a threat to the child's safety.
    ☐ (iii) the child is in a pre-adoptive placement and the court proceedings to adopt the child have been commenced.

☐ (d) **RESUMED** – The Agency shall resume family finding because resuming family finding is best suited to the safety, protection and physical, mental and moral welfare of the child and does not pose a threat to the child's safety.

## 11. FURTHER ORDERS

☒ (a) IT IS FURTHER ORDERED THAT:
<u>The agency has the ability to sign for any medical consent needed for the care of the child.</u>

☐ (b) Further Orders Attached

    Such disposition having been determined to be best suited to the protection and physical, mental and moral welfare of the child.

**Next Scheduled Court Event:** _____ **Date:** _____.

**BY THE COURT:**

Judge _____

Copies To:

_____

# LIST OF DOCUMENTS

In Re: V.C.

Susquehanna County Case # 2024-11 DP
Superior Court Docket #114 MDA 2025

| No. | Description | Pages |
|-----|-------------|-------|
| 1 | Shelter Care Application | 11 |
| 2 | Confirmation of Verbal Order for Emergent Custody | 4 |
| 3 | Order for Emergency Protective Custody | 4 |
| 4 | Order Scheduling Hearing | 1 |
| 5 | Motion for Video Testimony | 1 |
| 6 | Order Granting Motion | 1 |
| 7 | Motion for Video Testimony | 1 |
| 8 | Motion for Video Testimony | 1 |
| 9 | Order Granting Motion | 1 |
| 10 | Order Granting Motion | 1 |
| 11 | Order Granting Oral Motion to Withdraw Shelter Care App. | 1 |
| 12 | Dependency Petition Filed | 8 |
| 13 | Order Scheduling Hearing | 1 |
| 14 | Order Appointing GAL | 1 |
| 15 | Notice of Appeal | 26 |
| 16 | Summons Issued | 2 |
| 17 | Supplemental Opinion | 5 |
| 18 | Docketing Statement from Superior Court | 7 |
| 19 | Commonwealth Court | 1 |
| 20 | Motion for Video Testimony | 1 |
| 21 | Order Granting Motion | 1 |
| 22 | Response to Motion for Video Testimony | 7 |
| 23 | Amended Motion for Video Testimony | 1 |
| 24 | Response to Amended Motion for Video Testimony | 6 |
| 25 | Motion for Special Appearance By Advanced Comm. Tech | 4 |
| 26 | Order Granting Motion | 1 |
| 27 | Motion to Dismiss for Lack of Subject Matter Jurisdiction | 25 |
| 28 | Order Denying Motion to Dismiss Regarding Child Care | 1 |
| 29 | Order Denying Motion to Dismiss for Improper Venue | 1 |
| 30 | Order Denying Motion to Dismiss for Lack of Subject Matter Jur | 1 |
| 31 | Dependency Petition Dismissed | 1 |
| 32 | List of Documents | 18 |

| 33 | Notice to Parties of Filing Appeal | 2 |
| 34 | Certificate & Transmittal | 1 |
| 36 | Notice of Appeal | 10 |
| 37 | Notice of Transcript | 1 |
| 38 | Transcript of Hearing 10/15/24 | 156 |
| 39 | Notice of Transcript | 1 |
| 40 | Transcript of Hearing 8/14/24 | 87 |
| 41 | List of Documents | 20 |
| 42 | Notice to Parties of Filing Appeal | 2 |
| 43 | Certificate & Transmittal | 1 |
| 44 | List of Documents | 22 |
| 45 | Notice to Parties of Filing Appeal | 2 |
| 46 | Certificate & Transmittal | 1 |

I, Margaret J. Krupinski, Prothonotary/Clerk of Courts of the Court of Common Pleas of Susquehanna County, Pennsylvania, do hereby CERTIFY that the above is a complete listing of all documents filed of record in the above-cited action.

Prothonotary/Clerk of Courts

**Exhibit "A"**

# JUVENILE COURT OF SUSQUEHANNA COUNTY
# JUVENILE DIVISION

## DETAILED DOCKET



**Docket Number: CP-58-DP-0000011-2024**
**Dependency - Abuse/Neglect**
**Page 1 of 20**

### In the Interest of: ████████████, a Minor

## CASE INFORMATION

Initiating Document Type: Shelter Care Application

Judge Assigned: President Judge Jason J. Legg

Case Status: Active/Adj. Dependent

Case Processing Status: Awaiting Appellate Court Decision

Date Filed: 08/13/2024

Hearing Officer Assigned:

Status Date: 01/30/2025

Event Track: Standard Dependency

Current Placement Goal:

## CHILD INFORMATION

Child's Name: ████████████

Child's Address (Other):
Address Unknown

Race: White

Gender: Female

Ethnicity:

Date of Birth: 08/03/2024

Phone:

FID:   58-FN-000009-2024

## CALENDAR EVENTS

| Case Calendar Event Type | Event Date | Event Time | Room | Assigned Authority | Schedule Status |
|---|---|---|---|---|---|
| Adjudicatory Hearing | 12/10/2024 | 1:00 pm | Courtroom 1 | Legg, Jason J. | Scheduled |
| Shelter Care Hearing | 08/14/2024 | 3:30 pm | Courtroom 1 | Legg, Jason J. | Scheduled |

## DISPOSITION(S)

| Disposition Case Event | Disposition | Disposition Date | Disposing Authority |
|---|---|---|---|

## CHILD PLACEMENT HISTORY

| Placement Type | Registry/Docket Entry | Filed Date |
|---|---|---|

## CASE PARTICIPANTS

| Participant Type | Other FID | Name | Phone |
|---|---|---|---|
| Children and Youth Services | | Susquehanna County Services for Children and Youth | 570-278-3022 |
| Child | 58-FN-000009-2024 | ████████████ | |
| Biological Father | | Carlson, Justin | |
| Biological Mother | | Lombard, Rebecca | |

Certified and attested from the records of Susquehanna County, PA this ___ day of February 2025
Frank J. Swunn, Prothonotary & Clerk of Courts

# JUVENILE COURT OF SUSQUEHANNA COUNTY
# JUVENILE DIVISION

## DETAILED DOCKET



**Docket Number: CP-58-DP-0000011-2024**

**Dependency - Abuse/Neglect**

**Page 2 of 20**

### In the Interest of: ███████████ a Minor

## ATTORNEY INFORMATION

| | |
|---|---|
| Name: Thomas, Rachael Ann Ballard | Name: McCambridge, Jennifer Lyn |
| Supreme Court No.: 321007 | Supreme Court No.: 093662 |
| Phone Number(s):   (570) 853-4500, (Office) | Phone Number(s): |
| Address: | Address: |
| Coughlin & Gerhart Llp | 305 Linden St 3rd Fl |
| 21-23 Public Ave | Scranton, PA 18503 |
| Montrose, PA 18801 | Representing:  Susquehanna County Services for Children |
| Representing: ███████ - Guardian Ad Litem | and Youth - Solicitor |
| Counsel Status: Active | Counsel Status: Active |

## ASSOCIATED CASES

| Case Caption | Docket Number | Association Type | FID |
|---|---|---|---|
| | | | |

## CROSS COURT ACTIONS

| Case Caption | Docket Number | Transferring Court |
|---|---|---|
| | | |

## ENTRIES

| Document/Sequence | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |
| 1 | 08/13/2024 | | |
| Shelter Care Application Filed | | | |
| McCambridge, Jennifer Lyn | | | Susquehanna County Services for Children and Youth |
| 08/13/2024 | eService | | Served |
| 2 | 08/13/2024 | | |
| Confirmation of Verbal Order for Emergency Protective Custody | | | |
| Gathany, Michael James | | | Legg, Jason J. |
| 08/13/2024 | eService | | Served |
| McCambridge, Jennifer Lyn | | | Legg, Jason J. |
| 08/13/2024 | eService | | Served |
| Susquehanna County Services for Children and Youth | | | Legg, Jason J. |
| 08/13/2024 | eNotice | | Notified |

# JUVENILE COURT OF SUSQUEHANNA COUNTY
# JUVENILE DIVISION

## DETAILED DOCKET



**Docket Number: CP-58-DP-0000011-2024**

**Dependency - Abuse/Neglect**

**Page 3 of 20**

In the Interest of: ███████████ a Minor

## ENTRIES

| Document/Sequence | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |

**16**     08/13/2024
Order for Emergency Protective Custody

| | | | |
|---|---|---|---|
| Gathany, Michael James | | | Legg, Jason J. |
| 08/13/2024 | eService | | Served |
| McCambridge, Jennifer Lyn | | | Legg, Jason J. |
| 08/13/2024 | eService | | Served |
| Susquehanna County Services for Children and Youth | | | Legg, Jason J. |
| 08/13/2024 | eNotice | | Notified |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**30**     08/13/2024     08/13/2024
Order Scheduling Hearing on Shelter Care Application on 8/14/2024 at 3:30 p.m.

| | | | |
|---|---|---|---|
| Gathany, Michael James | | | Legg, Jason J. |
| 08/13/2024 | eService | | Served |
| McCambridge, Jennifer Lyn | | | Legg, Jason J. |
| 08/13/2024 | eService | | Served |
| Susquehanna County Services for Children and Youth | | | Legg, Jason J. |
| 08/13/2024 | eNotice | | Notified |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**31**     08/13/2024
Shelter Care Hearing Scheduled 08/14/2024 3:30PM

Susquehanna County Court Administration

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**32**     08/13/2024     08/13/2024
Motion for Video Testimony

| | | | |
|---|---|---|---|
| Gathany, Michael James | | | Susquehanna County Services for Children and Youth |
| 08/13/2024 | eService | | Served |
| McCambridge, Jennifer Lyn | | | Susquehanna County Services for Children and Youth |
| 08/13/2024 | eService | | Served |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# JUVENILE COURT OF SUSQUEHANNA COUNTY
# JUVENILE DIVISION

## DETAILED DOCKET



**Docket Number: CP-58-DP-0000011-2024**

**Dependency - Abuse/Neglect**

**Page 4 of 20**

**In the Interest of:** ███████████ **a Minor**

## ENTRIES

| Document/Sequence | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |

| | | | |
|---|---|---|---|
| 33 | 08/13/2024 | 08/13/2024 | |
| Order Granting Motion to Request Telephone Testimony for Shelter Care Hearing 8/14/24 | | | |
| Gathany, Michael James | | | Legg, Jason J. |
| 08/13/2024 | eService | | Served |
| McCambridge, Jennifer Lyn | | | Legg, Jason J. |
| 08/13/2024 | eService | | Served |
| Susquehanna County Services for Children and Youth | | | Legg, Jason J. |
| 08/13/2024 | eNotice | | Notified |
| Carlson, Justin | | | Legg, Jason J. |
| 08/14/2024 | First Class | | |
| Lombard, Rebecca | | | Legg, Jason J. |
| 08/14/2024 | First Class | | |

| | | | |
|---|---|---|---|
| 1 | 08/14/2024 | 08/14/2024 | |
| Motion for Video Testimony | | | |
| Gathany, Michael James | | | Susquehanna County Services for Children and Youth |
| 08/14/2024 | eService | | Served |
| McCambridge, Jennifer Lyn | | | Susquehanna County Services for Children and Youth |
| 08/14/2024 | eService | | Served |

| | | | |
|---|---|---|---|
| 2 | 08/14/2024 | 08/14/2024 | |
| Motion for Video Testimony | | | |
| Gathany, Michael James | | | Susquehanna County Services for Children and Youth |
| 08/14/2024 | eService | | Served |
| McCambridge, Jennifer Lyn | | | Susquehanna County Services for Children and Youth |
| 08/14/2024 | eService | | Served |

# JUVENILE COURT OF SUSQUEHANNA COUNTY
# JUVENILE DIVISION

## DETAILED DOCKET



**Docket Number: CP-58-DP-0000011-2024**

**Dependency - Abuse/Neglect**

**Page 5 of 20**

### In the Interest of: ███████████ a Minor

## ENTRIES

| Document/Sequence | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |

3          08/14/2024          08/14/2024

Order Granting Motion to Request Telephone Testimony on 8/14/24 at 3:30 P.M.

| | | | |
|---|---|---|---|
| Gathany, Michael James | | | Legg, Jason J. |
| 08/14/2024 | eService | | Served |
| McCambridge, Jennifer Lyn | | | Legg, Jason J. |
| 08/14/2024 | eService | | Served |
| Susquehanna County Services for Children and Youth | | | Legg, Jason J. |
| 08/14/2024 | eNotice | | Notified |

---

4          08/14/2024          08/14/2024

Order Granting Motion to Request Telephone Testimony on 8/14/24 at 3:30 P.M.

| | | | |
|---|---|---|---|
| Gathany, Michael James | | | Legg, Jason J. |
| 08/14/2024 | eService | | Served |
| McCambridge, Jennifer Lyn | | | Legg, Jason J. |
| 08/14/2024 | eService | | Served |
| Susquehanna County Services for Children and Youth | | | Legg, Jason J. |
| 08/14/2024 | eNotice | | Notified |

---

1          08/15/2024          08/14/2024

Order Granting Oral Motion to Withdraw Shelter Care Application

| | | | |
|---|---|---|---|
| Gathany, Michael James | | | Legg, Jason J. |
| 11/06/2024 | eService | | Served |
| McCambridge, Jennifer Lyn | | | Legg, Jason J. |
| 11/06/2024 | eService | | Served |
| Susquehanna County Services for Children and Youth | | | Legg, Jason J. |
| 11/06/2024 | eNotice | | Notified |

---

1          11/06/2024          11/06/2024

Dependency Petition Filed (Case Re-opened)

| | | | |
|---|---|---|---|
| Gathany, Michael James | | | Susquehanna County Services for Children and Youth |
| 11/06/2024 | eNotice | | Notified |
| McCambridge, Jennifer Lyn | | | Susquehanna County Services for Children and Youth |
| 11/06/2024 | eService | | Served |

---

JUSTIN CARLSON, ET AL    : IN THE COURT OF COMMON PLEAS

   VS.    : SUSQUEHANNA COUNTY, PENNA.

MICHELLE GRAZIANO, ET AL : NO. 2024-612-CP

---

                  : IN THE COURT OF COMMON PLEAS

IN RE:    : SUSQUEHANNA COUNTY, PENNA.

   V.C.    : NO. 2024-11-DP

---

FOR THE PARTIES:

FOR SUSQUEHANNA COUNTY SERVICES

  FOR CHILDREN AND YOUTH:    JENNIFER MCCAMBRIDGE,

                        ESQUIRE

FOR JUSTIN CARLSON:    JUSTIN CARLSON,

                        PRO SE

FOR REBECCA LOMBARD:    REBECCA LOMBARD,

                        PRO SE

FOR THE CHILD:    MICHAEL GATHANY,

                        ESQUIRE

    THE HEARING in the above matter, heard before President Judge, Jason J. Legg, at the Susquehanna County Courthouse, Montrose, Pennsylvania, on the 14th day of August, 2024, at 3:30 p.m.

2

KAREN L. MOSER, TRANSCRIPTIONIST

DIAZ TRANSCRIPTION SERVICES

HARRISBURG, PA   17110

3

WITNESSES

DR. ALEXANDRA MEDORO

Direct Examination by Attorney McCambridge:.... Page 11

Cross Examination by Mr. Carlson:............. Page 25

Cross Examination by Attorney Gathany.......... Page 39

Re-Direct Examination by Attorney McCambridge:.. Page 40

Re-Cross Examination by Mr. Carlson:.......... Page 42

LINDSEY KUNKEL

Direct Examination by Attorney McCambridge:.... Page 46

Cross Examination by Mr. Carlson:............. Page 58

Re-Direct Examination by Attorney McCambridge.. Page 69

Re-Cross Examination by Mr. Carlson........... Page 71

MICHELLE GRAZIANO

Direct Examination by Attorney McCambridge:.... Page 75

19

cause, which I do not think that Violette had, is a baby whose blood is actually being broken down in reaction to mom's blood.  There's no evidence that that has happened for Violette.  Other potential causes of this are metabolic in nature, and those affect the way that the liver breaks down bilirubin.  We have genetic testing pending at this time that will help us determine if that is the underlying cause.  The other potential cause of this, which I consider it more of a diagnosis of exclusion once I've ruled out these other things, would be infection or just acute illness that presented in this way.  So right now I would say that I do not have the definitive explanation for why Violette, why her bilirubin was so high.

Q:  In addition to the medications and the interventions you've testified to, is Violette receiving nutrition in some way?

A:  Yes, ma'am.  She is receiving parenteral nutrition through TPN through a central line, in addition to fats.

Q:  Was there a discussion with the parents when they were present at the hospital about using mother's breast milk?

A:  Correct.  Mom and dad - - and I did discuss that on rounds early Monday morning, and I explained to

20

them that currently Violette is not able to eat herself by mouth because she has a breathing tube in place. But that right now I would be worried about feeding her in other ways, given her need for blood pressure medicine support. When babies are having low blood pressures, the body preferentially sends blood particular places, and that place might not necessarily be the intestines. And so while babies are on blood pressure support and as critically ill as she is, though I myself am a strong advocate of breast milk for all babies at all times, it was not safe at this time. However, we did discuss doing sort of oral mouth care with mom's pumped breast milk.

Q: And you indicated that Monday when you took over the case, were you able to meet with mom and dad of Violette and discuss with them your concerns, the prognosis, your treatment plan?

A: When I spoke with mom and dad on Monday, our conversations focused more on the treatment plan and further diagnostics to determine the cause of why Violette was so sick. I did not, myself, specifically discuss prognosis with this family.

Q: And in terms of that treatment plan, were mom and dad receptive to the information you were providing them, or were there some issues or concerns?

21

A: Mom and dad, at the time, were agreeable to our treatment plan. They did express some uncertainty. Mom, particularly, said that she acknowledged that we felt like we were doing the best thing for the baby, but that the concern for her being given so many medications was relayed to me at that time.

Q: Was there a statement made or an indication made that the parents were going to seek to stop the continued interventions?

A: Not to me.

Q: At any point were you directed to not complete certain tests or to not proceed with the treatment plan as you deemed appropriate?

A: The only two things that we recommended to the family that they declined was, one, as a part of routine prenatal care mothers are usually screened for infections that can be transmitted to babies. Mom, per the records that we received from the outlying hospital, had been screened for some of these infections, but not all of them. And so as a part of her medical care, we did offer to test the baby for HIV to ensure that that was not a potential contributing cause to Violette's clinical illness. The only other test that the family declined was genetic testing in order to determine a potential underlying - -

25

would offer Dr. Medoro as an expert in the field of neonatology.

THE COURT: Any objection to her expertise, Mr. Carlson?

MR. CARLSON: No, Your Honor.

THE COURT: What's that?

MR. CARLSON: No, Your Honor.

THE COURT: Ms. Lombardo (sic), any objection?

MS. LOMBARD: No.

ATTORNEY GATHANY: No.

THE COURT: All right. The Court will accept the doctor as an expert in the field offered. And is this testimony to a reasonable degree of medical certainty?

ATTORNEY MCCAMBRIDGE: Your Honor - -

DR. MEDORO: Yes.

THE COURT: Okay. All right. Mr. Carlson, go ahead, sir.

CROSS EXAMINATION

BY MR. CARLSON:

Q: So I believe you answered this, but did we ever tell you to take Violette off any medications?

A: No, sir, you did not.

Q: Okay. You said breathing issues are related

26

to jaundice?

 A: No.

 Q: Or could be.

 A: I didn't - -

 Q: Could be related.

 A: I would clarify that the breathing issues may be related to brain damage sustained from jaundice.

  MS. LOMBARD: And not just from being - -

  THE COURT: One at a time. Are you going to do it together?

  MS. LOMBARD: I'd rather - - can we talk together?

  THE COURT: Generally you wouldn't do that. You'd each have your own turn. But if you're - - I'll allow it. Go ahead. You may continue. Go ahead. Go ahead.

  ATTORNEY BOSWELL: Excuse me, Your Honor?

  THE COURT: Yes?

  ATTORNEY BOSWELL: This is Elizabeth Boswell. I'm in-house attorney from CHOP. I'm just having a little trouble hearing them when they speak together.

  THE COURT: Yep.

  ATTORNEY BOSWELL: So if they - -

  THE COURT: Yeah. Make sure - -

  ATTORNEY BOSWELL: just - -

29

A: Due to the presence of her seizures.

MS. LOMBARD:

Q: I do recall speaking with you about seizures in general, and you also told me that sometimes seizures can be electrical spasms; and that you guys sometimes think that could be a seizure, but it's just an electrical spasm that happens sometimes in babies.

A: Ma'am, I don't think that conversation was with me.

Q: I believe it was.

MR. CARLSON: Okay.

MS. LOMBARD: But - -

MR. CARLSON:

Q: Are you aware of things that may look like seizures in a premature baby, but that isn't a seizure? Is that something you've seen before?

A: Yes. That is certainly a thing that we've seen before. In your daughter's case, though, we have seen her seizures on diagnostic imaging, the video EEG. So that would not be the case for your daughter.

Q: So other than our refusal for an HIV test and genetic testing, did we prevent you from proceeding with any of your standard protocols in your treatment process?

A: No, you did not.

30

Q: Did we, when you came to us, accept what you offered and give approval to every request other than those two denials to search for HIV and a genetic test?

A: Correct.  That was our experience together.

Q: Do you have any information of anything we did specifically that caused this case of severe jaundice?

A: That, I cannot comment on.  I can't.  I don't know enough to have an opinion about that.  I only met your baby here at CHOP.

Q: Okay.  So to be clear, you have no evidence or information relating to anything the parents could have done to cause this illness?

A: All I can say about that - - I can speak in general terms - - is that this is a very rare presentation, and that babies who generally have received routine medical care do not present with this diagnosis.

Q: Have you seen babies' jaundice levels climb quickly?

A: Yes.

Q: How quickly?

A: Over a few days.

Q: And to higher levels than normal?

A: To clarify, babies' jaundice or bilirubin levels begin to rise after birth, and generally will

35

So you don't know what I'm talking about?

A:  Yeah.  I'm really sorry.  I don't.

MS. LOMBARD:  Okay.

Mr. CARLSON:

Q:  Does Violette currently have any organs that are shutting down?

A:  What would you mean by shutting down?

Q:  I wish I could say.  I'm just going off of a report that allegedly came from you guys that she is on lifesaving measures as the child's organs are reportedly shutting down.

A:  So I would say she is on life supporting measures, but I don't know that I could describe any of her organs as shutting down.

MS. LOMBARD:  That's interesting.

THE COURT:  So, Doctor, this is the Judge. One of the reasons for protective custody was the suggestion that the parents were interfering to some degree, or blocking, medical care that was necessary for Violette.  Can you provide any information as to that allegation?

DR. MEDORO:  Aside from the refusal of those two tests at our experience at CHOP, those were the only two things that this family refused.  Comments were made, but they were not made to me about

36

discomfort with treatment and wanting to stop [INAUDIBLE], but at no point did this family, for me, impair the medical care of this child.

THE COURT:  Thank you very much.  Any other questions, folks?

MR. CARLSON:

Q:  I forget how much you said you learned from the birthing hospital.  Did you - - I might have even already asked this.  I'm sorry.  But did you have any information that when the baby left the hospital that there was any illnesses, any symptoms, any signs that the parents should have been concerned of?

A:  I think we did touch on this earlier, but I'm happy to reiterate.  I did receive a discharge summary from the hospital, and that information was not there for me.

THE COURT:  Doctor, just give us a minute.  They're going through some notes.  Okay?

DR. MEDORO:  Oh, no rush.  Everybody should take their time.

MR. CARLSON:

Q:  Were you the one who filed the report with CYS?

A:  Myself and my social worker did file a report at the request of - - and I may have to defer a little

37

bit on the wording to my colleague who will use the correct words for this.  But we did file a report.  At the request of the initial referring county, we did file a report in kind with updated information.

Q:  Were you the ones who labeled it a near fatality child abuse report?

A:  I described it as a near fatality event.

Q:  What exactly does that mean?

A:  So near fatality means that, without medical intervention, this baby would have died.

Q:  Did she get the medical intervention to stop her from dying?

A:  Correct.  Yes, she did.

Q:  Do you believe it's possible that parents who had no known issues when they left a hospital could be surprised by a fast onset of jaundice?

A:  I don't know if I can answer that question.

MS. LOMBARD:  You know the way to word it.  No?  Okay.

MR. CARLSON:

Q:  I believe you may have covered this one, too, but I'll just ask again.  Can a severe case of jaundice come on within two days?

A:  Usually it takes a longer period of time than that.

40

brain.  I do not believe so.  I believe we have talked about everything.

Q:  At any time prior today have the mother and father wanted to have the child discharged from the hospital?

A:  That has not been my experience at CHOP.

Q:  Did - - if the child were discharged from the hospital with no further medical treatment, what would be the child's prognosis?

A:  She would die.

Q:  Did the parents indicate that if she was discharged from your hospital they would seek further medical treatment in another medical facility?

A:  We did not discuss discharge, so because of that we did not discuss that possibility.

Q:  So in your professional medical opinion, Violette does need more medical intervention?

A:  Correct.

ATTORNEY GATHANY:  No more questions.

ATTORNEY MCCAMBRIDGE:  Just briefly.

RE-DIRECT EXAMINATION

BY ATTORNEY MCCAMBRIDGE:

Q:  Doctor, you indicated that you were able to review the discharge summary or discharge instructions from the birth hospital, is that correct?

53

went out once, parents were not there. The second time, she said staff was threatened with violence. And she also claimed that, you know, going back to the initial concerns of why the report was made, that that's not necessarily in that area something that they always investigate in a immediate fashion. And so - - because my concern was, okay, you have an open case and it's nine days later, and this - - Violette is in a dire situation, did you ever lay eyes on this child. And she was saying that no one was able to have the opportunity to do so. So Ms. Roszel actually, she told me that we needed to file another report based on the condition of the child, of Violette. Because she was in a new setting and new, you know, state, her critical state and being considered a near fatality, which the doctors confirmed, that that needed to be a second ChildLine report. So Dr. Medoro and I made that report approximately around 3:45 in the afternoon via phone on the 12th, on Monday. And in the meantime - - that was right before we had made the call for the report. At 3:30, she, Ms. Roszel, the supervisor at Susquehanna CYS, she had called me back and said that, because of the near fatality and the nature of the case, that Judge Jason Legg had made a verbal Order for protective custody and that they would be getting us the Court

54

Order as soon as possible, but that to move all decision making to Susquehanna CYS in the interim.  And that was part of the report that we gave, as well, to ChildLine.  And there were many things that happened after that point, but that's answering kind of your initial question.

Q:  Based on that, did the access the parents had to the child change at some point?

A:  Yes.  So, from my knowledge - - and this happens - - but I - - social workers do not work on weekends.  We have - - well, we always have an emergency social worker in-house, but they work out of the emergency department.  So routine NICU social workers meet families through a Monday through Friday basis.  And so for whatever reason - - and this is common - - sometimes things wait until Monday for some of these things to be discovered, or these conversations to be had.  But Saturday and Sunday, to my knowledge, parents were visiting, family was appropriate, there were no concerns.  So I didn't have any reason to, you know, feel that there would be a need to limit, you know, their access to Violette.  But then in learning all of this information that I just disclosed, and talking with the director, Michelle Graziano, from Children and Youth, Susquehanna Children

55

and Youth, she was saying that DHS, which is Department of Human Services for Philadelphia County, was going to do a courtesy visit based on how far away Philadelphia is from your location to not only lay eyes on the baby, but also to disclose this verbal Emergency Order to parents. And again, now this is over the 5 and 6:00 hour. I'm usually done with my day around 5:00, however, I stayed through the whole evening and worked with my other colleague for extended hours team because DHS was unable to do that courtesy visit and disclose that information to parents. So I was present with my colleague and security to attempt to disclose the Emergency Order and, subsequently, the parents would have to leave the premises because of the nature of the severity of the Order.

Q: When that disclosure was made to parents, can you describe if there was any negative interaction between the parents and either yourself, your staff, or security?

A: Yes. So I was not - - I was in a different area of the hospital at the time that we had planned to - -

MR. CARLSON: Your Honor, objection. She has no personal knowledge of what she's about to say.

ATTORNEY MCCAMBRIDGE: Again, Your Honor,

56

she's - -

THE COURT:  What is the relevance of this, in any event?  We're past the point of where this report was made and the Order was issued.  The question is whether or not these individuals have, I guess in any way, placed this child at risk by denying medical care to her.  That's the real issue we're here for today.

ATTORNEY MCCAMBRIDGE:  Well, I - - part of - -

ATTORNEY BOSWELL:  Your Honor, this testimony - -

THE COURT:  Quite - - and quite frankly, the Court never ordered, never ordered, that the parents couldn't be around their child or in the presence of their child.

ATTORNEY MCCAMBRIDGE:  I understand that, Your Honor.  And that was not the Agency - -

THE COURT:  So we're not going into this. The question is whether or not these folks have done anything that put this child at risk; not their interaction with the hospital, or their reaction to the Order, or any of those things.  The question is whether or not - - because I was provided information that they were denying tests and it was - -  the baby was going to die as a result of their refusal for medical care.

57

That's all I want to hear today.  So we're not - - well, your objection is sustained.  You may continue.

ATTORNEY MCCAMBRIDGE:

Q:  Ms. Kunkel, in terms of your review of the records, were you made aware of any time the parents were refusing treatments or indicating they were going to withdraw treatments from the minor child?

A:  Not anything about withdrawing.  I never heard anything about that.  But I did hear through - -

MR. CARLSON:  Objection.  Hearsay again.

THE COURT:  Well, hearsay is admissible to some degree in this proceeding.  It's an informal proceeding.  So, overruled.  You may continue, ma'am.

A:  I did hear through my conversations that I just alluded to earlier that there was refusals for certain newborn screenings, certain screenings for mom, certain tests, and again, you know, the pediatrician appointment and things of that nature.  So there were certain refusals for things.  But again, Shore Memorial is who sent this child to our facility, so this is all coming from Wayne Memorial Hospital.

Q:  Okay.  So just so I'm clear, you're indicating that you became aware that the parents refused certain tests at the birth hospital, correct?

A:  Correct.  Correct.

58

Q: Were you made aware of any statements about refusing any testing or treatment at your hospital?

A: No. There was questions about if parents were willing to consent to antibiotics, although that's something within the realm of lifesaving treatment that we don't have to ask consent for. So there were some questions between my team and conversations with parents about parents' concerns with certain medications, also the genetic testing that Dr. Medoro mentioned. But other than that, I was not aware of any other refusal.

Q: Were you made aware of any of the parents' concerns regarding continuing the medication or calling - - pumping poisons into the minor child?

A: I heard from our nurses overhearing that mom had concerns that chemicals were being provided to her baby, also that - - questions about poisoning the child. But I - - again, that would not be conversations that I was directly a participant in.

ATTORNEY MCCAMBRIDGE: I have nothing further at this time.

THE COURT: All right. Mr. Carlson or Ms. Lombard, do you have any questions for Ms. Kunkel?

MR. CARLSON: Yes, Your Honor.

THE COURT: Go ahead.

64

ATTORNEY BOSWELL:  That he's arguing with the witness who is here to provide facts.

THE COURT:  Okay.  So you're saying it's - -

ATTORNEY BOSWELL:  Not - - you know, not to cite to portions of the code.

THE COURT:  Well, I think they're allowed to cross examine someone based - - especially if she made a report, they're certainly allowed to cross examine the basis of her knowledge for making the report and as it goes to any type of motive, bias, or prejudice.  So the objection is overruled.  You may continue.

Q:  Thank you, Your Honor.  So for the definition of serious physical neglect, we have point one.  It says:  a repeated, prolonged, or egregious failure to supervise a child in a manner that is appropriate considering the child's development, age, and abilities.  The question is, are you aware of any repeated, prolonged, or egregious failure to supervise the child?

A:  There's no way of me being able to confirm that.  Like I said - -

Q:  Okay.  Thank you.

A:  the concern was coming from a discharge at Wayne Memorial on August 5th, and then Violette showing up to Shore Memorial on the 10th and coming to CHOP.

65

That duration of time period in between is concern enough for CYS to - - meaning Susquehanna County - - to tell me, as the representative of my medical team here at CHOP, to make a report.

Q:  so - -

THE COURT:  So let me have just a minute.  I want to make sure I understand something.  So Ms. Kunkel, you did not make this report out of your own volition?  This was at the prompting of Susquehanna County Children and Youth, is that what you're saying?

MS. KUNKEL:  That's correct.

THE COURT:  Okay.  Fair enough.

MS. KUNKEL:  This - - yeah.

THE COURT:  That's all right.  I - -

MS. KUNKEL:  This was a continuum of an open case - -

THE COURT:  Okay.

MS. KUNKEL:  that was already open.

Q:  So I'm asking about the - - so we'll go back to the first case.  Do you have any evidence from the first case that - - was it opened under the guise of neglect or was it opened under the guise of abuse?  which one?

THE COURT:  It would be - -

A:  I'm not privy to understanding the guise of

67

MR. CARLSON:  Okay.

Q:  You testified earlier that it was told to you, or reported to you, that the parents apparently threatened violence to, I guess, another social worker or somebody?  Who were you referring to?

A:  So I was told by Susquehanna Children and Youth that when they made an attempt to come to the home, that they were threatened with violence and not allowed to enter the home.

Q:  What - -

A:  That's what they told - -

Q:  What type of violence?

A:  I don't know.  That's the extent of what I was told.

Q:  And who told you this?

A:  This would have been the supervisor, Diana Roszel, for the intake.

Q:  You testified that you filed the report from CHOP around 3 to 4:00 p.m., is that correct?

A:  Yep.  3:45.

Q:  And what time were you notified of Judge Legg's Order?

A:  Around 3:30.

Q:  Around 3:30?

A:  Um-hum.

68

Q:  I don't know if I can do this, but, Your Honor, was the phone call to you - -

THE COURT:  I don't recall the time. whatever she was told.  I was called by the agency. They don't - - they told me that there was going to be this report for the near fatality.  And that's all I can say.  That's all I knew.  I was told that the child was being denied medical care and there was a threat of death.  That's - - I mean, that's simplified in terms of what they were saying.  Obviously, the testimony here today suggests the two of you were not trying to discharge the child and you were not taking any steps that would have threatened the child.  I understand your position.  I don't keep track of the exact time that these calls come in, so.

MR. CARLSON:  I guess I was curious if it was later evening.

THE COURT:  It was afternoon.  It - - I was here at work, so it would have been probably before 4:30 I got the call.

MR. CARLSON:  Okay.  Okay.  That was - -

THE COURT:  That's all I can tell you.

MR. CARLSON:  Thank you.

THE COURT:  Any other questions, sir?

Q:  Do you recall why the parents didn't want

71

direct that language.

Q:   And in terms of the information that was provided in that ChildLine referral, that the child was being treated for severe jaundice, that she was receiving lifesaving measures and organs were shutting down, is that information that was provided to you by the agency or Ms. Roszel, or is that information that your team and/or you provided to ChildLine?

A:   In this courtroom today is the first time I'm hearing anything about organs shutting down.  But I don't know if that might have been misconstrued based on the intake person.  It was a telephone call.  This was not a typed portal report.  But the near fatality being that we had to use lifesaving measures, putting her on a ventilator and giving her seizure medications, and she would have died without those interventions.

ATTORNEY MCCAMBRIDGE:  Thank you.  I have nothing further.

MR. CARLSON:  Your Honor, I would like to follow up.

RE-CROSS EXAMINATION

BY MR. CARLSON:

Q:  So you just testified that Ms. Roszel was the one who convinced you to do a second report?

A:  I did not say convince.  I said that it is - -

86

course of their investigation they find facts that suggest that during this period of time from release from Wayne Memorial before the child was taken to the hospital that there was some type of neglect, they can always refile a petition.  But based upon the information that they have right now, they don't have a basis, is what they're saying, for that determination.  So they're required by law to continue this investigation.  The only thing I can do is encourage you to participate and cooperate with the agency and that investigation.  That's to avoid these misunderstandings that we had here today.  Anything else, sir?

MR. CARLSON:  No.

THE COURT:  Anything else, ma'am?  Was that a no, ma'am?  I'm sorry.  I didn't hear you?

MS. LOMBARD:  No.

THE COURT:  Okay.  And let me explain to the two of you in terms of the oral Order.  As Ms. Graziano noted, when she and I spoke it was my understanding that the child was - - basically had organs shutting down, was near death, and it was - - basically that you were all denying medical care that would have been - - kept Violette alive.  That's what I was led to believe.  That's where the emergency arose.  That's why it was an

87

oral Oder.  But also why we have these hearings so quick are to make sure that your rights are protected and we can get in here and have this hearing, which is what we did today.  So I know how frustrating that can be as a parent.  I understand that you were frustrated by that.  Obviously, you took extraordinary steps to try to address that.  We got this hearing as soon as we could for you to respond to that.  We didn't wait the full three days.  So I hope that explains it.  Doesn't in any way make your frustrations any less, but the system is designed to protect your rights, which is what it did today.  Okay?  So I wish you all the best.  And in particular, I wish all the best in terms as it relates to Violette's care and her recovery.  We stand adjourned.  Thank you very much.

MR. CARLSON:  Thank you, Your Honor.

THE MATTER IS CONCLUDED AT THIS TIME

CARLSON, ET AL.              : IN THE COURT OF COMMON PLEAS

   VS.                      : SUSQUEHANNA COUNTY, PENNA.

GRAZIANO, ET AL.             : NO. 2024-612-CP

_____

FOR THE PARTIES:

FOR SUSQUEHANNA COUNTY SERVICES

   FOR CHILDREN AND YOUTH:        JENNIFER MCCAMBRIDGE,

                                  ESQUIRE

FOR JUSTIN CARLSON:               JUSTIN CARLSON,

                                  PRO SE

FOR REBECCA LOMBARD:              REBECCA LOMBARD,

                                  PRO SE

FOR CHOP:                         FRANK BRIER,

                                  ESQUIRE

     THE HEARING in the above matter, heard before
President Judge, Jason J. Legg, at the Susquehanna
County Courthouse, Montrose, Pennsylvania, on the 15th
day of October, 2024, at 3:13: p.m.

               PAMELA HICKS, TRANSCRIPTIONIST

                DIAZ TRANSCRIPTION SERVICES

                   HARRISBURG, PA  17110

2

WITNESSES


JUSTIN CARLSON

Direct Testimony by Justin Carlson:..............Page 18


MICHELLE GRAZIANO

Cross Examination by Justin Carlson:............Page 64


Direct Examination by Jennifer McCambridge:....Page 112

Re-Cross Examination by Justin Carlson:........Page 120


EXHIBIT

COMMONWEALTH'S

| EXHIBITS | DESCRIPTION | SUBMIT | ADMIT |
|----------|-------------|--------|-------|
| 1 | Reports | 4 | 5 |

8

you, yes, but I -- it was never confirmed everybody that was on the call.

THE COURT:  Well, it would have been, in terms of my conversation, as I said, it would have been -- some of it was relayed to me indicating that CYS was looking for a shelter care order.  And then I can't confirm whether I spoke to Ms. Graziano on that occasion or not.  I don't have a specific recollection. I may have, I may not have.  I do so many of these.  I don't have a specific recollection.  So --

JUSTIN CARLSON:  Well, could we have --

THE COURT:  But --

JUSTIN CARLSON:  I mean, they probably --

THE COURT:  -- I don't know.

JUSTIN CARLSON:  -- remember.  Were you on the call?

THE COURT:  Did we talk that day?

[No audible response.]

THE COURT:  So, we did talk.  So, it would have just, that would just been the two of us on the line.

JUSTIN CARLSON:  Just not McCambridge, you weren't on the call?

ATTORNEY MCCAMBRIDGE:  I was not.

THE COURT:  No, she would not have been.

25

child abuse.  There is no section in there that tells mandated reporters to report a parent's type of prenatal care.  There is no section in there that tells mandated reporters to report, hey, this parent doesn't have health insurance.

In fact, there is a section in Pa. 23 that exempts anything from child abuse based on a parent's income.  We're not even claiming we're having financial issues.  We're not.  But their income is an exemption.

So, again, I can't understand how a report and all these violations happened to us when the definition of child abuse was never even met.

6313(b) also says content -- sorry.  This isn't verbatim.  The contents of their reports are to be of child abuse once again.  We assert that mandated reporters, pursuant to 6313, are required to report actual child abuse, not personal disagreements over parental care or insurance.

The reports against us, we believe were false, constituting false reports of child abuse and it also constitutes medical malpractice because that hospital exposed our medical situation of prenatal care.  It exposed our health insurance or medical health insurance situation to CPS.  They had no right to know that.  The state had no right to know our

26

situation, but the hospital gave it to them just because.

And as far as the final report from CHOP, we just got handed that. I don't even know what was reported for that report. All we know is someone lied about organ failure and then they lied and said medical -- the parents were stopping life-saving medical treatment. And as you just said, it was Graziano on the phone.

So, all I can go off of with no sworn affidavit filed into the record, there isn't one. I haven't been handed one or served one. All I can go off is you must have sworn her in on the phone call to get that probable cause.

So, that means Graziano is the one, Michelle Graziano, who is sitting right there, is the one who gave you false testimony in order to steal my child.

THE COURT: I can tell you I did not swear her in.

JUSTIN CARLSON: So, she was not --

THE COURT: Nor have --

JUSTIN CARLSON: -- under or --

THE COURT: Nor have I ever sworn a caseworker in when they're seeking shelter care. I do talk to them, but I've never sworn them in. Maybe

27

that's my error, but it would not be her error if I failed to do so.  So, you may continue.

JUSTIN CARLSON:  Okay.  So, given that information, first of all, we can all confirm because they didn't argue it.  There was no exigent circumstances at all.  No one's argued that.  It wasn't in the initial things that I got handed a day later.

Two, we can confirm that apparently this phone call happened while you were still in the office.  So, somewhere, 4:00 or 5:00 p.m. is the best answer I've been given so far.

We were first approached at the hospital by the hospital social worker around 7:26.  They told us to come with them and we were like no, thank you.  We don't need your services, very politely.  And I can prove all this, if I have to.  And then we went to see our baby.  They -- well, we said we're going to see our baby, but they tried to stop us.  And I said no, thank you.  I'm going to go see my baby.  Went to our room and it wasn't until about an hour later, hour and a half later they came back with men with guns, police and told us we had to leave.  We said why.  We asked for a court order.  No one presented one.  Cops, they didn't see a court order.  No one had a court order.

28

But my main point here is if it could take four hours from the time this phone call happened to the time you ripped us away from our baby, what was the imminent danger?  What imminent danger were you protecting?

There was no imminent danger because the only issue they could even be alleging has to do with drugs that the doctors already gave the baby.  We --

THE COURT:  Recognize again, sir, that the agency normally self-told the hospital that you couldn't be the -- you couldn't be with your baby.

JUSTIN CARLSON:  That's not true.  Michelle Graziano was on the phone call and she wanted us removed from the hospital.

THE COURT:  Well, I guess --

JUSTIN CARLSON:  On the phone call, during this whole ordeal, there's 15 witnesses.  Her dad was there, I was there and I have this whole thing recorded.

THE COURT:  No.  I -- certainly, the court did not order that.  But I will note just in answer to your question because I'm having my first chance to look through the reports that I do see it was unfounded.  The incident was not caused intentionally, knowing or recklessly.  So, the agency has already made

121

Q.  Are you familiar with provision 6368, which is investigation of reports?

A.  I don't have the CPSL in front of me.  So, I, I'm familiar with that the 6300s are in the CPSL, but I'm not sure exactly which one you're citing.

Q.  Well, you probably have -- when I read it out loud, you've probably heard it because you go through this training quite often, right?  Like -- or you're up -- sorry.  By quite often, I mean you're updated when things change and -- are you familiar with -- I'm going to read you a provision and I want you to let me know if you're familiar with it.  Response to direct reports, upon receipt of report of suspected child abuse by a perpetrator for an -- from an individual, the county agency shall ensure the safety of the child and any other child in the child's home and immediately contact the department in accordance with provisions Section 6334.  Are you familiar with that?

A.  That's a child abuse investigation, yes.

Q.  The key part is when -- okay.  When your team began their investigation, were they following up on child abuse as defined?

A.  For which report?  The child abuse report, yes.

122

Q.  Well, let's go through each.  The first one, what --

A.  First report is a general referral.  So, that would have a bit of a different process.

Q.  Well, this --

A.  The second one is a child abuse --

Q.  This is the --

A.  -- report.  And so --

Q.  What --

A.  -- yes, we would have followed that.

Q.  What provision is the other process is what I'm trying to get at.  So, do you know what other -- what provision says you can follow a process that isn't child abuse, it's something else?  What provision allows you to start seeing the child?

A.  Look at the General Protective Services part of the CPSL.

Q.  But off top of your head, you don't know the provision?

A.  I don't know the number, no.

Q.  Okay.  So, you --

A.  Think the Judge gave that to us a little bit ago.

# CITY OF PHILADELPHIA CODE VIOLATION NOTICE

**6073281-4**

DATE: 7/12-24  TIME: 8:13 PM

NAME OF VIOLATOR: Rebecca Lombard 5513

ADDRESS OF VIOLATOR: 171 Elkview Dr

CITY: Forest City  STATE: PA  ZIP: 18421

VIOLATION STREET CODE

LOCATION OF VIOLATION — HOUSE #: 3401  DIRECTION:  STREET NAME: Civic Cntr  DESIGNATION:

OWNER CODE

OWNER

OWNER ADDRESS

CITY  STATE  ZIP

**YOU ARE HEREBY NOTIFIED THAT YOU VIOLATED THE FOLLOWING SECTION OF THE PHILADELPHIA CODE.**

If payment is not received within 10 calendar days, a $25.00 additional penalty is due.

| | | | |
|---|---|---|---|
| 01 ☐ | PM 302.4 | High Weeds | $75 |
| 04 ☐ | 10-704.1 | Sidewalk not Litter Free | $50 |
| 06 ☐ | 10-714.1 | Premises not Litter Free | $50 |
| 07 ☐ | 10-717.1A | Trash Set out Early | $50 |

FINE AMOUNT FOR VIOLATION LISTED BELOW IS CIRCLED

$25  $50  (**$75**)  $100  $150  $250

19 ☐ Other  3503-B-1
Simple Tresspass

Comments: Abv was asked to leave CHOP by security. Abv. refused.

If your check is returned unpaid for insufficient or uncollected funds, (1) you authorize eCollect, LLC to make a one-time electronic funds transfer from your account to collect a fee of $20; and (2) eCollect, LLC may represent your check electronically to your depository institution for payment.

Issuing Officer: Griffin  Badge No.: 6663  Dept: 18  Viol Dist: 15

Issued:  Other:

**IMPORTANT ... See instructions on back.**

Three-Leaf 216.672.5844  361048

---

# CITY OF PHILADELPHIA CODE VIOLATION NOTICE

**6073282-5**

DATE: 7/12-24  TIME: 8:13 PM

NAME OF VIOLATOR: Justine Carlson

ADDRESS OF VIOLATOR: 110 Anna Rd Box # 1197

CITY: Blakeslee  STATE: PA  ZIP: 18610

VIOLATION STREET CODE

LOCATION OF VIOLATION — HOUSE #: 3401  DIRECTION:  STREET NAME: Civic Cntr  DESIGNATION:

OWNER CODE

OWNER

OWNER ADDRESS

CITY  STATE  ZIP

**YOU ARE HEREBY NOTIFIED THAT YOU VIOLATED THE FOLLOWING SECTION OF THE PHILADELPHIA CODE.**

If payment is not received within 10 calendar days, a $25.00 additional penalty is due.

| | | | |
|---|---|---|---|
| 01 ☐ | PM 302.4 | High Weeds | $75 |
| 04 ☐ | 10-704.1 | Sidewalk not Litter Free | $50 |
| 06 ☐ | 10-714.1 | Premises not Litter Free | $50 |
| 07 ☐ | 10-717.1A | Trash Set out Early | $50 |

FINE AMOUNT FOR VIOLATION LISTED BELOW IS CIRCLED

$25  $50  (**$75**)  $100  $150  $250

19 ☐ Other  3503-6-1
Simple Tresspass

Comments: Abv was asked to leave Chop by security. Abv. Refused

If your check is returned unpaid for insufficient or uncollected funds, (1) you authorize eCollect, LLC to make a one-time electronic funds transfer from your account to collect a fee of $20; and (2) eCollect, LLC may represent your check electronically to your depository institution for payment.

Issuing Officer: Hunsberger  Badge No.: 4454  Dept: 18  Viol Dist: 18

Issued:  Other:

**IMPORTANT ... See instructions on back.**

Three-Leaf 216.672.5844  361048

October 23, 2024

Rebecca Lombard and Justin Carlson
171 Elkview Dr
Forest City, PA 18421

Dear Ms. Lombard and Mr. Carlson,

We are writing in response to verbal requests you made to staff at Children's Hospital of Philadelphia (CHOP) during your daughter ███████████ recent inpatient admission. Specifically, you requested that the results of a genetic test performed by the CHOP Genomic Diagnostic Laboratory (GDL) to treat █████ not be used for research and that CHOP remove the genetic test information from █████ medical record. The purpose of my letter is to explain the data created as a result of the genetic test that █████ received and the actions CHOP can take and has taken related to your request.

When a patient receives a genetic test, a blood sample is drawn, DNA is obtained from that blood sample, and the test is run using that DNA. The genetic test produces raw genetic test data that requires further analysis and interpretation to produce the test result. The test result itself is placed into the patient's CHOP medical record. The raw genetic test data used to produce the interpreted test result is stored in a secure CHOP system in the GDL separate from the CHOP medical record due to the vast size of the information involved.

In terms of the genetic test result that is stored in █████ CHOP medical record, we are enclosing the form that is used to request an amendment of the medical record which is your right under federal law to request. However, please note that based on CHOP's document retention and destruction policies, we are required to retain the test result for ten (10) years from the earlier of age 18 or the patient's death, and are therefore not able to remove the test result from █████ medical record at this time.

As it relates to the raw genetic test data that is stored in a separate secure CHOP system in the GDL, CHOP has flagged the genetic test data for █████ in its system so that it is not used or shared for research activities performed at CHOP. With regard to CHOP's ability to delete the raw genetic test data from this system, CHOP is required to maintain the data in our secure lab system to comply with laboratory accreditation standards for a period of two years. The GDL will delete the raw genetic data from █████ test from the secure CHOP system in the GDL after two years (on August 26th, 2026). It may take longer to eliminate the data in back-up systems or servers.

Lastly, as it relates to the blood and DNA samples used to perform █████ genetic testing, the GDL identified the remaining samples of █████ stored blood and DNA and on October 8th, 2024 securely destroyed them in accordance with Hospital policy and procedure.



**Children's Hospital of Philadelphia**™

3401 Civic Center Blvd. • Philadelphia, PA 19104 • 215-590-1000 • chop.edu

Please know that CHOP takes its responsibility to protect the privacy of our patients and their personal information seriously. CHOP has policies, procedures, trainings, and other controls in place to ensure that patient data is handled in accordance with regulatory standards and our ethical obligations.

If you have questions regarding this letter or CHOP's information handling policies and procedures, you may contact the Privacy Officer at privacyoffice@chop.edu or Matthew Dulik PhD, GDL Director of Operations, at 267-426-1447 or dgdgeneticcounselor@chop.edu.

Sincerely,

*Matthew Dulik*

Matthew Dulik, PhD, FACMG
GDL Director of Operations

*Beth Thornton*

Beth Thornton
Director, Privacy Operations

**Children's Hospital
of Philadelphia**™

3401 Civic Center Blvd. • Philadelphia, PA 19104 • 215-590-1000 • chop.edu



Children's Hospital
of Philadelphia®

Office of Compliance & Privacy
2716 South Street, 20 Fl. • Philadelphia, PA 19146

neopost
10/28/2024
US POSTAGE $000.54

FIRST-CLASS MAIL
AUTO • IMI

ZIP 19611
041L12204575

Rebecca Lombard and Justin Carlson
171 Elkview Dr
Forest City, PA 18421

HWK-558 18421

## GENERAL PROTECTIVE SERVICES REFERRAL FORM

### III. Safety Tag

**Are there environmental concerns for the household?**

**What type of access does the alleged perpetrator have to the child?**

**Risk Rating:**  Low Risk

**Danger Rating:**  No danger exists

**Safety Rating:**  Child is safe       no current child abuse and/or neglect reported - mother does not have health care but an application was given to mom at the hospital

| | | | |
|---|---|---|---|
| **Accepted for Assessment Date:** | 08/05/24 | **Time:** | 09:00 AM |
| **Caseworker Assigned:** | Marysa Edwards-Ball | **Screen (hold 5 days)** | 0 |
| **Response Time:** | 10 Days | | |

**Supervisor's Comments:**

**V.  Present Concerns:**

Rebecca confirmed she had no prenatal care during her pregnancy. Rebecca additionally has no medical insurance. Rebecca was provided with a Medical assistance application while at hospital.

Rebecca reported she received no prenatal care during this meeting, she reported she took prenatal vitamins during pregnancy. She additionally does not have medical insurance. Rebecca was provided MA application for herself and newborn.

***General Protective Servcies referral - Other. If county suspects Inadequate Healthcare for the child after delivery, request re-evaluation.***MBDo you suspect that the alleged perpetrator was impaired when the alleged incident occurred: No

**The following was added from supplemental call #8861**

Child was born premature at 34 weeks, and the peds doctor at the hospital wanted baby to stay till 35 weeks, but the parents were declining based on the financial burden of the baby staying in the hospital additional time as the parents do not have insurance.
This is the second ChildLine that was placed. There was one prior due to no insurance and no prenatal care. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

***Supplemental referral to General Protective Services referral 20173021 for Inadequate Health Care.*** TC  Additional Information about Mandated Reporter's Source of Knowledge: Peds doctor informed ▮▮▮▮ that baby should still at hospital till baby was 35 weeks as baby was premature and born at 43 weeks.  Parents are refusing

Do you suspect that the alleged perpetrator was impaired when the alleged incident occurred: No

 Gmail

**Justin Carlson <env.justin@gmail.com>**

---

# Completed Transcripts

---

**Amy Curley** <acurley@susqco.com>                                      Thu, Jan 9, 2025 at 9:53 AM
To: "env.justin@gmail.com" <env.justin@gmail.com>

Good morning, Mr. Carlson.

Attached please find the completed transcripts in the matters of Justin Carlson, et al, vs. Michelle Graziano, et al, 2024-612-CP, and In RE: V.C., 2024-11-DP, from the August 14th, 2024 and October 15, 2024 proceedings.

Should there be any questions, please feel free to contact our office.

Thank you.

Amy Curley
Court Reporter/Transcriptionist
Susquehanna County

This message is intended only for the use of the individual or entity to which it is addressed, or for whom it is intended and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify us immediately by telephone, so we can make arrangements to have the material returned to us. Thank You.

---

**2 attachments**

 **Carlson v Graziano 8.14.24 (003).pdf**
319K

 **Carlson v. Graziano 10.15.24 (002).pdf**
525K