UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**JUSTIN CARLSON et al.,**
**PLAINTIFFS,**

**vs.**

**MICHELLE GRAZIANO et al.**
**DEFENDANTS.**

**NO. 3:26-CV-01231**
**CAMONI, M.J.**

**PLAINTIFFS' [PROPOSED] FINDING OF FACT AND CONCLUSIONS OF LAW FOR PRELIMINARY INJUNCTION AGAINST CHOP**

**PROPOSED FINDINGS OF FACT**

And now, upon consideration of Plaintiffs' Motion for Preliminary Injunction, the accompanying brief, the exhibits, and the record presently before the Court, the Court makes the following **Findings of Fact:**

1.    On August 12, 2024, at approximately 3:30 p.m., Defendant Graziano obtained an oral protective-custody order transferring legal custody, physical custody, and medical decision-making authority over V.C. to CYS. **[Ex-0: A.1, B.1, C.1]**

2.    The custody order required an assessment that V.C. was in imminent danger before protective custody could be granted. **[Ex-0: B.2]**

3.    The Trial Court explained that the oral order issued because it was led to believe that V.C. had organs shutting down, was near death, and that Plaintiffs were denying medical care that would have kept V.C. alive. **[Ex-0: C.1]**

4.    Plaintiffs received no notice of CYS's oral protective-custody application and had no opportunity to be heard before the oral order issued. **[Ex-0: C.2, D, E.1]**

5.    The Trial Court later confirmed that it did not administer an oath or affirmation during the oral protective-custody communication. **[Ex-0: E.1]**

6.    The docket reflects no affidavit, sworn testimony, probable-cause hearing, or sworn filing supporting the August 12 oral protective-custody order. **[Ex-0: D]**

7.    Before the oral order issued, no CYS employee had personally observed V.C. at CHOP or personally witnessed Plaintiffs' conduct concerning V.C.'s care at CHOP. **[Ex-0: C.2, K.1]**

8.    The August 12 CHOP CPSL report was filed at approximately 3:45 pm, after the 3:30 p.m. oral protective-custody order had already issued. **[Ex-0: A.1, C.8]**

9.    CHOP's August 12 morning rounds reflected that V.C. had been stable over the previous 24 hours. **[Ex-0: F]**

10. CHOP's August 12 morning rounds reflected clinical stability, including stable temperatures, appropriate kidney function, minimal ventilator settings, no organisms on gram stain, negative HSB from serum, and reduced lab frequency. **[Ex-0: F]**

11. CHOP's attending physician testified that Plaintiffs did not prevent CHOP from following treatment protocols, and approved all requested interventions other than HIV testing and genetic testing. **[Ex-0: C.3]**

12. CHOP's attending physician testified that Plaintiffs did not impair V.C.'s medical care. **[Ex-0: C.3]**

13. CHOP's attending physician testified that V.C. received the medical intervention needed to stop her from dying. **[Ex-0: C.3]**

14. CHOP's attending physician testified that she could not describe any of V.C.'s organs as shutting down. **[Ex-0: C.4]**

15. CHOP's social worker testified that the August 14 hearing was the first time she heard anything about V.C.'s organs shutting down. **[Ex-0: C.4]**

16. No CPSL report in the injunction record states that V.C.'s organs were shutting down. **[Ex-0: C.4, L]**

17.    After the oral protective-custody order issued, no additional life-saving procedure was scheduled or performed; CHOP's August 15 rounds instead reflected weaning from interventions and continued signs of clinical improvement. **[Ex-0: G]**

18.    The Trial Court later stated that it never ordered Plaintiffs barred from being around V.C. or in V.C.'s presence. **[Ex-0: C.6]**

19.    CHOP nevertheless represented to Plaintiffs that an order prohibited hospital access or contact until further notice. **[Ex-0: H]**

20.    Plaintiffs were removed from CHOP for trespass, not pursuant to any court order prohibiting Plaintiffs from being present with V.C. **[Ex-0: B.2, C.6, H, I]**

21.    The Pennsylvania Superior Court later held that CYS set forth no basis for its oral application other than its own assertions from the Wayne and CHOP referrals, and that CYS's statements to the Trial Court were misconstrued from information reported by CHOP. **[Ex-0: K.1]**

22.    The Pennsylvania Superior Court held that CYS verified the referral information without subjecting the CHOP referral to meaningful scrutiny. **[Ex-0: K.1]**

23.    The Pennsylvania Superior Court held that the shelter-care application lacked even a minimum threshold level of reliability and that CYS acted in contravention of Rule 1240 by seeking emergency protective custody without confirming the contents of the CHOP referral. **[Ex-0: K.1]**

24.    The Pennsylvania Superior Court stated that CYS's discretion is bounded by federal and state constitutional protections, that CYS must articulate its basis with reasonable factual specificity and truthful verification, and that child removal requires objectively reasonable suspicion based on the information available at the time. **[Ex-0: K.2]**

25.    The Pennsylvania Superior Court held that CYS did not establish a causal nexus between Plaintiffs' conduct and V.C.'s condition. **[Ex-0: K.3]**

26.    The Pennsylvania Superior Court held that Plaintiffs brought V.C. to the hospital for life-saving care, did not attempt to discharge her against medical advice, and did not ask the medical team to cease life-saving measures. **[Ex-0: K.3]**

27.    The Pennsylvania Superior Court held that CYS lacked authority to initiate the CHOP referral investigation. **[Ex-0: K.3]**

28.    Before CYS obtained medical decision-making authority, Plaintiffs refused genetic testing. **[Ex-0: C.3]**

29.    After CYS obtained custody and medical decision-making authority, CYS authorized CHOP to perform genetic testing on V.C. **[Ex-0: G.13]**

30.    The August 15 discussion reflected that the genetic test results would take approximately two weeks. **[Ex-0: G.15]**

31.    The August 15 discussion reflected that the genetic test "runs all the chromosomes." **[Ex-0: G.16]**

32.    CHOP later confirmed that the genetic test involved a blood sample, extraction of DNA, creation of raw genetic test data, analysis and interpretation of that raw data, placement of the interpreted test result into V.C.'s CHOP medical record, and storage of raw genetic data in CHOP's Genomic Diagnostic Laboratory system. **[Ex-0: J]**

33.    The genetic testing of V.C. generated genetic information concerning V.C. **[Ex-0: G.13, G.15, G.16, J]**

34.    Because Plaintiffs are V.C.'s biological parents, V.C.'s genetic testing also generated genetic information concerning Plaintiffs by biological extension. **[Verified Compl. Dk#1 ¶ 26; Ex-0: J]**

35.    CHOP refused Plaintiffs' demand to delete the genetic data. **[Ex-0: J]**

36.    CHOP's refusal-to-delete letter states that CHOP is retaining a "vast size of information." **[Ex-0: J]**

37.    CHOP's refusal-to-delete letter states that the retained information exists in multiple locations, including the GDL, CHOP medical records, and backup systems or servers. **[Ex-0: J]**

38.    CHOP's possession of the challenged genetic data is ongoing. **[Ex-0: J]**

39.    The challenged genetic data is uniquely sensitive, permanent, and capable of revealing information beyond simple identity, including information concerning biological family members. **[Ex-0: J]**

40.    CHOP's refusal-to-delete letter confirms CHOP already has a deletion process in place. **[Ex-0: J]**

41.    As a direct result of the challenged genetic test and CHOP's continued retention, V.C. and, by biological extension, Plaintiffs Carlson and Lombard, have been deprived of control over the acquisition, use, retention, and disclosure of their genetic information. **[Verified Compl. Dk#1 ¶ 26; Ex-0: J]**

**PROPOSED CONCLUSIONS OF LAW**

Based upon the foregoing Findings of Fact, the Court makes the following Conclusions of Law:

1. To obtain preliminary injunctive relief, Plaintiffs must show: (1) a likelihood of success on the merits; (2) irreparable harm absent relief; (3) that the balance of equities favors relief; and (4) that the public interest favors relief. Winter v. NRDC, 555 U.S. 7 (2008); Reilly v. City of Harrisburg, 858 F.3d 173 (3d Cir. 2017).

2. Preliminary injunctive relief may restore, to the extent possible, "the last, peaceable, noncontested status" between the parties where the movant's "right to relief [is] indisputably clear." Hope v. Warden York Cnty. Prison, 972 F.3d 310 (3d Cir. 2020); Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 197 (3d Cir. 1990).

3. For purposes of the preliminary-injunction record, Plaintiffs are likely to establish that the August 12, 2024 oral protective-custody order effected a seizure of V.C. and a state interference with Plaintiffs' custody and family integrity. **FOF ¶¶ 1-3.**

4. Child removals require reasonable and articulable evidence giving rise to a reasonable suspicion that the child has been abused or is in imminent danger

of abuse. Croft v. Westmoreland CYS, 103 F.3d 1123, 1126 (3d Cir. 1997); Mulholland v. Gov't Cnty. of Berks, 706 F.3d 227 (3d Cir. 2013).

5. The August 12 oral protective-custody order was not supported by oath or affirmation, sworn testimony, affidavit, probable-cause hearing, or any sworn filing in the docket. U.S. Const. amend. IV; In re Petition to Compel Cooperation with Child Abuse Investigation, 875 A.2d 365, 377-81 (Pa. Super. Ct. 2005); In re Y.W.-B., 265 A.3d 602, 623-24, 633-34 (Pa. 2021). **FOF ¶¶ 4-8.**

6. The August 12 oral protective-custody order was issued without notice to Plaintiffs and without any opportunity for Plaintiffs to be heard. **FOF ¶ 4.**

7. The emergency predicate supplied to the Trial Court was materially unreliable because the stated basis for the order was that V.C. was near death, had organs shutting down, and was being denied life-saving care, while the present record shows Plaintiffs did not impair care, did not refuse life-saving care, and V.C.'s organs were not shown to be shutting down. Croft, 103 F.3d at 1126; Mulholland, 706 F.3d 227. **FOF ¶¶ 3, 9-17, 21-27.**

8. No exigency or imminent danger justified the August 12 seizure on this record because Plaintiffs brought V.C. for life-saving care, consented to necessary treatment, did not attempt to discharge V.C. against medical advice, did not

ask CHOP to stop life-saving measures, and no additional life-saving procedure was scheduled or performed after the order issued. Croft, 103 F.3d at 1126; Mulholland, 706 F.3d 227. **FOF ¶¶ 9-17, 25-27.**

9.  CYS lacked reasonable factual specificity and truthful verification for the August 12 seizure because the oral application rested on unconfirmed, misconstrued referral information that the Pennsylvania Superior Court later held lacked even a minimum threshold level of reliability. Croft, 103 F.3d at 1126; Mulholland, 706 F.3d 227. **FOF ¶¶ 21-24.**

10. Because the August 12 oral protective-custody order lacked oath or affirmation, reliable factual support, reasonable suspicion, and exigency, Plaintiffs are likely to succeed in establishing that the August 12 seizure was unconstitutional. **FOF ¶¶ 1-27.**

11. Because the August 12 seizure was the asserted source of CYS's legal, physical, and medical decision-making authority over V.C., later intrusions flowing from that asserted authority are likely tainted by the same constitutional defect. **FOF ¶¶ 1-8, 21-29.**

12. The absence of any court order barring Plaintiffs from V.C.'s presence further supports Plaintiffs' likelihood of success in establishing that their later separation from V.C. at CHOP was not judicially authorized. **FOF ¶¶ 18-20.**

13. Plaintiffs are likely to succeed in establishing that the challenged genetic data was obtained only after Plaintiffs refused genetic testing and only after CYS obtained custody and medical decision-making authority through the August 12 oral protective-custody order. **FOF ¶¶ 1, 28-32.**

14. Plaintiffs are likely to succeed in establishing that the challenged genetic data was acquired under asserted state authority that was not supported by oath or affirmation, probable cause, reliable factual basis, or exigent circumstances. **FOF ¶¶ 1-32.**

15. DNA sampling and analysis implicate substantial privacy interests because DNA can reveal complex, comprehensive, and inherently private information. United States v. Mitchell, 652 F.3d 387, 407 (3d Cir. 2011). Blood testing also constitutes a significant bodily intrusion and places a biological sample in the hands of another. Birchfield v. North Dakota, 579 U.S. 438 (2016).

16. Medical records containing intimate personal facts are protected by the constitutional right to privacy. Doe v. Delie, 257 F.3d 309 (3d Cir. 2001). Genetic testing and genetic data are protected medical and informational-privacy material.

17. Federal law recognizes, for definitional purposes, that genetic information includes genetic tests of family members and manifestations of disease or

disorder in family members. 42 U.S.C. § 2000ff; 45 C.F.R. § 160.103. Because Plaintiffs are V.C.'s biological parents, CHOP's retention of V.C.'s genetic data implicates not only V.C.'s privacy interests but also Plaintiffs' personal genetic privacy interests. **FOF ¶¶ 33-41.**

18. For purposes of preliminary relief, CHOP's acquisition and retention of the challenged genetic data is fairly attributable to state action because CHOP proceeded under CYS/the County's asserted custody and medical-decision-making authority rather than Plaintiffs' consent. Lugar v. Edmondson Oil Co., 457 U.S. 922, 935 (1982); Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970); Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288 (2001). **FOF ¶¶ 18-20, 28-32.**

19. CHOP's state-action connection is further supported by its reliance on asserted custody/investigation authority to separate Plaintiffs from V.C. where no court order prohibited Plaintiffs' presence, followed by CHOP's request that Plaintiffs leave and police enforcement through trespass. Lugar, 457 U.S. at 935; Adickes, 398 U.S. at 152; Monroe v. Pape, 365 U.S. 167, 184 (1961); Brentwood, 531 U.S. 288. **FOF ¶¶ 18-20.**

20. CHOP's refusal to delete the challenged genetic data after custody was restored supports Plaintiffs' likelihood of success in establishing continuing

retention and ongoing deprivation of control over protected genetic information. **FOF ¶¶ 35-41.**

21. Plaintiffs are likely to succeed in establishing that CHOP's acquisition and continued retention of the challenged genetic data is actionable under 42 U.S.C. § 1983, through state-action doctrines, because the data was obtained and retained through asserted state custody authority that Plaintiffs are likely to prove was unconstitutional. **FOF ¶¶ 1-41.**

22. Continued retention of unlawfully acquired genetic data constitutes ongoing irreparable harm because money damages cannot fully restore confidentiality once such information has been taken, stored, copied, analyzed, retained, or disseminated, particularly where the data is sensitive, permanent, and revealing of familial information. Acierno v. New Castle Cnty., 40 F.3d 645 (3d Cir. 1994); Paton v. La Prade, 524 F.2d 862 (3d Cir. 1975); Doe v. Delie, 257 F.3d 309 (3d Cir. 2001).

23. Continued retention itself is part of the ongoing injury, not merely a completed past harm, because CHOP continues to possess and maintain the challenged genetic information in multiple locations. **FOF ¶¶ 35-41.**

24. CHOP's continued possession, potential use, and potential disclosure of the challenged genetic data deprives Plaintiffs of control over sensitive genetic

information and constitutes irreparable informational-privacy harm. **FOF ¶¶ 35-41.**

25. Federal courts possess equitable authority to order expungement, destruction, or deletion of unlawfully obtained sensitive records when necessary to vindicate constitutional rights upon consideration of "the accuracy and adverse nature of the information, the availability and scope of dissemination of the records, the legality of the methods by which the information was compiled, the existence of statutes authorizing the compilation and maintenance, and prohibiting the destruction, of the records, and the value of the records to the Government." Paton v. La Prade, 524 F.2d 862, 869 (3d Cir. 1975).

26. On the present record, the Paton factors favor deletion because the challenged genetic data is uniquely sensitive, permanent, maintained in multiple locations, obtained through the challenged seizure, and retained without any identified governmental need. **FOF ¶¶ 28-41.**

27. State record-keeping rules cannot immunize conduct wrongful under § 1983, cannot burden the exercise of a federal right, and cannot operate in a manner inconsistent with the remedial objectives of federal civil-rights law. Howlett v. Rose, 496 U.S. 356 (1990); Felder v. Casey, 487 U.S. 131 (1988).

28. If genetic data was obtained only by means of an unconstitutional seizure, state record-keeping rules, private retention policies, internal CHOP policies, or

accreditation standards do not, without a valid independent legal duty, bar equitable relief requiring deletion, nonuse, nondisclosure, and sworn certification. Howlett, 496 U.S. 356; Felder, 487 U.S. 131; Paton, 524 F.2d at 869.

29. Because continued possession itself perpetuates the alleged privacy injury, deletion rather than mere nonuse is the proper interim equitable remedy on the present record. Paton, 524 F.2d at 869.

30. The balance of equities favors Plaintiffs because the requested injunction is narrow, targets only data obtained or created as a result of the challenged genetic test, imposes at most a limited administrative burden, and prevents ongoing genetic-privacy harm. Winter, 555 U.S. 7; Reilly, 858 F.3d 173.

31. The public interest favors preliminary relief because the requested injunction vindicates constitutional limits on child-welfare interventions and protects medical and genetic privacy. Winter, 555 U.S. 7; Reilly, 858 F.3d 173; Croft, 103 F.3d at 1126; Doe v. Delie, 257 F.3d 309.

32. The requested injunction—requiring deletion of genetic data and derivative outputs obtained or created as a result of the challenged genetic test, prohibiting further use or disclosure of that information, requiring third-party deletion directives, and requiring sworn certification of compliance—is narrowly tailored to halt the ongoing injury while the merits of the case are adjudicated. Paton, 524 F.2d at 869; Opticians, 920 F.2d at 197.

33. Rule 65(c) generally requires the posting of security before entry of a preliminary injunction, although the amount of security is committed to the Court's discretion. Fed. R. Civ. P. 65(c); Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 103 (3d Cir. 1988).

34. In this Circuit, when determining the amount of security, "at least in noncommercial cases," the Court may consider "the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant," and where "the balance of these equities weighs overwhelmingly in favor of the party seeking the injunction," the Court may reduce or, in appropriate circumstances, waive the Rule 65(c) bond requirement. Elliott v. Kiesewetter, 98 F.3d 47, 59-60 (3d Cir. 1996).

35. The Court may also consider the impact that a bond requirement would have on enforcement of important federal rights. Temple Univ. v. White, 941 F.2d 201, 219-20 (3d Cir. 1991).

36. Full waiver of security is permissible only in the exceptionally narrow circumstance where the nature of the action necessarily precludes any monetary harm to the defendant. Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 426 (3d Cir. 2010).

37. This action is noncommercial and seeks interim relief to prevent alleged ongoing violations of federal constitutional rights, which weighs in favor of reduced or

nominal security under the Rule 65(c) equities analysis. Elliott, 98 F.3d at 59-60; Temple, 941 F.2d at 219-20. FOF ¶¶ 43-46.

38.   On the present record, the requested injunction appears to impose at most a slight administrative burden and no identified measurable compensable monetary injury, while a substantial bond would burden Plaintiffs' effort to obtain interim relief directed to alleged ongoing violations of federal constitutional rights. Elliott, 98 F.3d at 59-60; Temple, 941 F.2d at 219-20; Frank's GMC, 847 F.2d at 103.

39.   The Court can waive security under Rule 65(c) because any possible monetary loss from compliance is minimal, speculative, administrative, and timing-based, while the requested injunction seeks to halt ongoing alleged violations of federal constitutional rights. Fed. R. Civ. P. 65(c); Elliott, 98 F.3d at 59-60; Temple, 941 F.2d at 219-20; Frank's GMC, 847 F.2d at 103; Zambelli, 592 F.3d at 426.

40.   Plaintiffs are likely to succeed in establishing that Plaintiffs' genetic data was acquired under asserted state authority that lacked oath or affirmation, probable cause, reliable factual support, and exigency, rendering CHOP's acquisition and continued retention of the challenged genetic data unconstitutional and actionable under 42 U.S.C. § 1983 through state-action doctrines. **FOF ¶¶ 1-41.**

41.   Plaintiffs have established ongoing irreparable injury because CHOP continues to retain, and may use or disclose, sensitive genetic data and derivative outputs obtained through the challenged seizure. **FOF ¶¶ 32-41.**

42. The balance of equities and public interest favor injunctive relief because the requested relief is narrow, prevents ongoing genetic-privacy harm, vindicates constitutional limits on child-welfare and medical-decision intrusions, and imposes no identified measurable compensable injury on CHOP. **FOF ¶¶ 1-41.**